18 A.3d 244

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Mark Newton SPOTZ, Appellant.**

Supreme Court of Pennsylvania.

Submitted Nov. 17, 2009.

Decided April 29, 2011.

18

26

32

Robert Brett Dunham, David Lee Zuckerman, Michael Wiseman, Eric John Montroy, Defender Association of Philadelphia, Philadelphia, for Mark Newton Spotz.

Jaime M. Keating, Cumberland County District Attorney's Office, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice McCAFFERY.

Mark Newton Spotz ("Appellant") has appealed from the denial of his petition for collateral relief filed pursuant to the Post Conviction Relief Act [1] ("PCRA"), following his conviction for first-degree murder and the imposition of a sentence of death. We affirm.

While engaged in a three-day crime spree in early 1995, Appellant killed four people in four counties. He was tried separately for each homicide, and he was ultimately convicted of voluntary manslaughter in the death of his brother, Dustin Spotz, in Clearfield County, and of first-degree murder in the deaths of June Ohlinger, Penny Gunnet, and Betty Amstutz, in, respectively, Schuylkill, York, and Cumberland Counties. Although the Superior Court overturned Appellant's manslaughter conviction and granted him a new trial, this Court reversed and reinstated the conviction. *Commonwealth v. Spotz*, 582 Pa. 207, 870 A.2d 822 (2005) ("*Spotz IV*").[2] On direct appeal, this Court affirmed each of Appellant's first-

1. 42 Pa.C.S. §§ 9541–46.

2. We dismissed Appellant's claims of ineffective assistance of counsel in his manslaughter conviction without prejudice to his right to pursue those claims under the PCRA. *Commonwealth v. Spotz*, 582 Pa. 207, 870 A.2d 822, 837 (2005) ("*Spotz IV*").

degree murder convictions and sentences of death. *See Commonwealth v. Spotz,* 552 Pa. 499, 716 A.2d 580 (1998) (Schuylkill County case) (*"Spotz I "*); *Commonwealth v. Spotz,* 562 Pa. 498, 756 A.2d 1139 (2000) (York County case) (*"Spotz II "*); *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280 (2000) (Cumberland County case) (*"Spotz III "*). In addition, we affirmed the order of the PCRA court denying Appellant collateral relief from his Schuylkill County first-degree murder conviction.[3] *See Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191 (2006) (*"Spotz V "*).

Here, Appellant seeks review of the order of the PCRA court denying his petition for collateral relief from his conviction for the murder of Betty Amstutz in Cumberland County. Briefly, the circumstances of the case, as set forth by this Court on direct review and/or by the PCRA court, are as follows. On February 2, 1995, having already committed three homicides in the prior two days, Appellant abducted Ms. Amstutz in or near her Harrisburg home. Holding her hostage, he directed her to cash two checks at two different banks, transactions that were filmed by security cameras. Appellant also used Ms. Amstutz's credit card to purchase items from a sporting goods store and to check into a Carlisle hotel. In the early evening, two witnesses observed a white male standing along a Carlisle road close to a parked car matching the description of Ms. Amstutz's vehicle. Later in the evening, Appellant and two other individuals, Charles Carothers, an acquaintance, and Michelle Rhinehart, the mother of Appellant's two children, smoked crack cocaine in the hotel room. Mr. Carothers subsequently left the hotel and drove Ms. Amstutz's car to the apartment of Ms. Rhinehart's sister.

The following morning, near the side of the road where witnesses had seen Ms. Amstutz's car, a worker discovered her body, which had sustained multiple gunshot wounds, and notified the authorities. Later in the morning, police stopped Ms. Amstutz's car, in which Ms. Rhinehart's sister and a

---

**3.** Appellant's appeal from the denial of collateral relief from his murder conviction in York County is pending in this Court.

friend were traveling to pick up Appellant and Ms. Rhinehart at the hotel. Police then surrounded Appellant's hotel room and apprehended him after a lengthy standoff.

A post-arrest search of the hotel room yielded the following: blood-stained jeans; a knife; credit cards issued in the name of Penny Gunnet, one of the previous murder victims; and an itemized accounting, written by Appellant, of the money he had stolen and his expenditures on crack cocaine and other items. Bullets recovered from Ms. Amstutz's body and from the location where her body was discovered matched a nine-millimeter semiautomatic pistol in Appellant's possession. Appellant's fingerprints were found on Ms. Amstutz's car, and blood on his shoe was consistent with that of Ms. Amstutz.

Appellant was tried by a jury for Ms. Amstutz's murder in May 1996. Appellant's 17–year–old sometime girlfriend, Christina Noland, testified for the Commonwealth regarding Appellant's actions and motivation in the two days prior to the abduction and murder of Ms. Amstutz. Two days before Ms. Amstutz's murder, Ms. Noland was with Appellant in his mother's home in Clearfield County when he shot and killed his brother, Dustin Spotz, during an argument. Appellant and Ms. Noland fled to Schuylkill County, where, in need of a vehicle, Appellant abducted June Ohlinger, stole her car, and murdered her. After a short trip to Delaware, Appellant and Ms. Noland returned to Pennsylvania, this time to York County, where Appellant abducted Penny Gunnet, stole her car, and murdered her. Appellant then went on to Cumberland County without Ms. Noland, where the abduction and murder of Ms. Amstutz took place. Other evidence admitted at trial showed that the bullets used to kill Ms. Amstutz, Dustin Spotz, Ms. Gunnet, and Ms. Ohlinger all matched Appellant's pistol.

During the guilt phase of trial, Appellant proceeded *pro se,* and he asserted an innocence defense, attempting to cast blame on those in his company on the day of the murder. After the jury found Appellant guilty of first-degree murder, Taylor Andrews, Esq., Chief Public Defender of Cumberland County, assumed the role of defense counsel for the penalty

phase. After hearing testimony from numerous witnesses, the jury found three aggravating and two mitigating circumstances, determined that the former outweighed the latter, and accordingly imposed the death penalty. The aggravating circumstances were that Appellant had committed the killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); had a significant history of violent felony convictions, § 9711(d)(9); and had been convicted of another murder, § 9711(d)(11). The mitigating circumstances were that Appellant had been neglected during his childhood and had a poor upbringing by his parents. 42 Pa.C.S. § 9711(e)(8). Following formal sentencing on June 17, 1996, Appellant filed a direct appeal to this Court, during which time he continued to be represented by Mr. Andrews. We affirmed the judgment of sentence on October 20, 2000, and the United States Supreme Court denied Appellant's petition for a writ of certiorari. *Spotz III*, 759 A.2d 1280, *cert. denied*, 534 U.S. 1104, 122 S.Ct. 902, 151 L.Ed.2d 871 (2002).

On December 4, 2002, Appellant filed a counseled "Petition for Habeas Corpus Relief Under Article I, Section 14 of the Pennsylvania Constitution And For Statutory Post–Conviction Relief Under The Post–Conviction Relief Act;" three supplemental petitions were filed in 2007.[4] The PCRA court conducted an evidentiary hearing over a period of six days, following which the issues were briefed and then orally argued. On June 26, 2008, the PCRA court filed a 63–page opinion and order denying all of Appellant's claims. Appellant appealed to this Court on July 25, 2008, via a filing entitled "Jurisdictional Statement," in which he sought "review of each and every part of the [PCRA court's June 26, 2008] Order." Jurisdictional Statement, filed 7/25/08, at 1. In Appellant's brief to this Court, he has raised twenty issues, many of which have multiple parts.[5]

4. Appellant represents that, in mid–2003, the instant PCRA proceedings were held in suspense pending this Court's decision in the appeal of his Clearfield County manslaughter conviction. *See* Appellant's Brief at 3.

5. The issues, reproduced verbatim but reordered for ease of disposition, are as follows:

1. Did the failure to consolidate Appellant's three capital trials violate double jeopardy and due process when the Commonwealth was afforded a third opportunity to take Appellant's life; did the determination that the facts were the same for purposes of admitting other crimes evidence but different for purposes of multiple trials violate due process; did the inconsistent resolution of Appellant's and Christina Noland's claims under 18 Pa.C.S. § 110 violate equal protection; was the resulting prosecution arbitrary and capricious under the Eighth Amendment; and was counsel ineffective in failing to litigate these claims or in the manner in which the claims were litigated in the trial court and on appeal?

2. Was Appellant incompetent to waive his right to counsel at trial, and was that waiver invalid because it was not knowing, intelligent, and voluntary?

3. Was Appellant denied a full and fair opportunity to present a defense because of trial court error, ineffective assistance of counsel, and suppression of exculpatory evidence and was prior counsel ineffective in failing to litigate this claim?

4. Did the trial prosecutor make improper comments and arguments at trial that, individually and collectively, entitle Appellant to a new trial and was prior counsel ineffective in failing to object at trial and raise the issues in post-trial motions and on appeal?

5. Was the trial court's instruction that the jury could draw an inference of intent to kill from the use of a deadly weapon against a vital portion of the deceased's body unconstitutional when the court failed to require that the jury conclude that the defendant had intended to hit a vital part of the deceased's body; and was prior counsel ineffective in failing to raise and litigate this claim?

6. Did the presentation of extensive evidence of Appellant's prior criminal acts, the trial court's failure to provide an advance cautionary instruction, and its subsequent provision of an instruction that stressed the value of the "other crimes" evidence that had been admitted violate Pennsylvania law and the Sixth, Eighth, and Fourteenth Amendments, and was counsel ineffective in raising this issue solely as a matter of state law and in the manner he presented that claim at trial and on appeal?

7. Did the trial court's instructions improperly describe the nature and use of aggravating and mitigating factors and was prior counsel ineffective in failing to raise this issue at trial and on appeal?

8. Should Appellant's convictions and death sentence be reversed because the prosecution presented extensive unreliable evidence in guilt and sentencing relating to the circumstances of his invalid convictions for manslaughter, aggravated assault, and murder in three other counties?

9. Was the aggravating circumstance that the defendant had a significant history of felony convictions involving the use or threat of violence to the person unconstitutionally applied in this case; did the prosecution falsely imply based upon facts not of record that Appellant's burglary convictions involved the use of a gun in circumstances that put him in conflict with burglary victims; was prior counsel ineffective in failing to challenge the (d)(9) aggravating circumstance as applied, to move pretrial to preclude or limit the evidence and

 Under the applicable standard of review, we must determine whether the ruling of the PCRA court is supported by the record and is free of legal error. *Commonwealth v. Marshall,* 596 Pa. 587, 947 A.2d 714, 719 (2008). The PCRA

argument in support of this circumstance, and for failing to litigate these issues on appeal?

10. Did the jury's guilt-stage verdict rejecting a finding that the murder occurred during the commission of a felony preclude the application of the (d)(6) aggravating circumstance that Appellant committed the killing during the perpetration of a felony?

11. Must Appellant's death penalty be reversed because of numerous improper prosecutorial comments during the penalty phase?

12. Did the trial court's instructions to the jury that it must reject the death penalty before it could impose a life sentence, and the erroneous arguments of both counsel that a life sentence required mitigating circumstances to outweigh aggravating circumstances, improperly shift the penalty-phase burden of persuasion and violated the sentencing-stage presumption of life; was prior counsel ineffective in failing to litigate this issue at trial and on appeal?

13. Must Appellant's death sentence be reversed because the trial court failed to instruct the jury that he would be ineligible for parole if sentenced to life; was prior counsel ineffective at trial for failing to seek a life without parole instruction and on appeal for failing to raise this issue under all available theories?

14. Was trial counsel ineffective in failing to investigate, develop, and present reasonably available mitigating evidence, failing to obtain and employ available institutional records, adequately interview available witnesses, and fully present the mitigating evidence that was available from the witnesses he did present?

15. Did the Commonwealth's failure to produce Department of Corrections mental health records material to guilt, mitigation, and the determination of the validity of Appellant's waiver of counsel violate *Brady v. Maryland,* and was counsel ineffective for failing to independently obtain these records, provide them to a mental health expert, present them as part of a mental health defense in mitigation, and to seek a competency evaluation?

16. Was counsel ineffective for failing to investigate and present mitigating evidence that Appellant's mental health disorders were treatable in prison?

17. Is Appellant entitled to relief from his conviction and sentence because of the cumulative effects of the individual errors in this case?

18. Did the Commonwealth violate due process in consuming an entire blood sample that could have exculpated Appellant; and did the PCRA court err in denying discovery?

19. Was Appellant denied full and fair review in the PCRA court; did the PCRA court improperly limit the record and prevent Appellant from presenting or proffering material facts?

20. Were monies improperly deducted from Appellant's prison account?

Appellant's Brief at 1–3.

court's credibility determinations, when supported by the record, are binding on this Court. *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532, 539 (2009). However, this Court applies a *de novo* standard of review to the PCRA court's legal conclusions. *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 810 (2007).

To prevail on a petition for PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his or her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). These circumstances include a violation of the Pennsylvania or United States Constitution or ineffectiveness of counsel, either of which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i) and (ii). In addition, a petitioner must show that the claims of error have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). An issue has been waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state post[-]conviction proceeding." 42 Pa.C.S. § 9544(b). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2).

In many of Appellant's issues, he has alleged ineffective assistance of counsel.[6] We begin our analysis of ineffectiveness claims with the presumption that counsel is effective. *Rios, supra* at 799. To prevail on his ineffectiveness claims, Appellant must plead and prove, by a preponderance of the evidence, three elements: (1) the underlying legal claim has

---

**6.** Appellant's direct appeal was decided in October 2000, at which time the prevailing law required that a petitioner raise claims of trial counsel ineffectiveness upon obtaining new counsel. *See Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977), *overruled by Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002). The record indicates that Appellant acted *pro se* during the guilt phase of his trial, and was represented by public defender Taylor Andrews during the penalty phase as well as on direct appeal. This PCRA petition thus constitutes the first opportunity for Appellant to raise claims of ineffectiveness of trial or direct appeal counsel.

arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) Appellant suffered prejudice because of counsel's action or inaction. *Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 796 (2008) (citing *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987)). With regard to the second, *i.e.*, the "reasonable basis" prong, we will conclude that counsel's chosen strategy lacked a reasonable basis only if Appellant proves that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Commonwealth v. Williams*, 587 Pa. 304, 899 A.2d 1060, 1064 (2006) (citation omitted). To establish the third, *i.e.*, the prejudice prong, Appellant must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction. *Commonwealth v. Dennis*, 597 Pa. 159, 950 A.2d 945, 954 (2008).

## GUILT PHASE ISSUES

### 1. Consolidation of Trials

In his first issue, Appellant alleges that the failure to consolidate his homicide trials violated the compulsory joinder requirements of 18 Pa.C.S. § 110, as well as the constitutional protection against double jeopardy and guarantee of due process. Appellant asserts that he "was 'harassed' by four separate prosecutions in quick succession" in four counties, for offenses that arose out of the same criminal episode and thus should have been consolidated for trial. Appellant's Brief at 36. Appellant implies, without expressly so stating, that the relief he seeks is dismissal of the Cumberland County charges. Preliminarily, it is not entirely clear if Appellant is asserting that all four of his homicide trials should have been consolidated, or that only his three capital murder trials should have been consolidated. *Compare id.* at 2, Statement of Questions Presented (referring to the failure to consolidate his three capital murder trials) with *id.* at 35, Argument Section (discussing all four homicide trials and asserting that the "failure to consolidate these cases for trial" violated Section 110, double jeopardy protections, and due process guarantees).

On direct appeal, as the PCRA court recognized, Appellant raised a similar, if not identical issue, *i.e.,* that the failure to consolidate his trials for all four homicides violated Section 110 and entitled him to dismissal of the Cumberland County charges. *Spotz III,* 759 A.2d at 1285; Opinion and Order of PCRA Court, dated 6/26/08 (hereinafter "PCRA Court Opinion"), at 25 (rejecting this claim as previously litigated). This Court determined on direct appeal that Appellant's first three killings were not part of the same criminal episode as the Cumberland County homicide, but rather were essentially independent, occurring in different counties and on different days, and generating four separate criminal investigations. We concluded that the killings were "logically connected primarily by the fact that [A]ppellant committed all four of them." *Spotz III, supra* at 1286. In sum, on direct appeal, we held that there was no merit to Appellant's claim of trial court error for failing to dismiss his Cumberland County charges based on violation of the compulsory joinder provision of Section 110. *Id.* at 1285–86.

Thus, Appellant's first PCRA claim has been previously litigated and is not cognizable under the PCRA. *See* 42 Pa.C.S. §§ 9543(a)(3) and 9544(a)(2). Whether Appellant in the instant appeal is actually referring to consolidation of only his three capital murder trials or to consolidation of all four homicide trials does not alter this holding. The rationale set forth in our holding on direct appeal applies equally to either claim of consolidation.[7] *See Spotz III, supra* at 1285–86.

7. We further note that Appellant has previously raised very similar claims in connection with his other murder convictions, and we have consistently rejected those claims as well. In his direct appeal of his York County conviction for the first-degree murder of Penny Gunnet, Appellant argued that his trial should have been consolidated with his prior two trials for the voluntary manslaughter of his brother and for the first-degree murder of June Ohlinger, respectively in Clearfield County and Schuylkill County. Based on the compulsory joinder provision of 18 Pa.C.S. § 110, Appellant asserted that the trial court erred by denying his motion to quash the charges against him. *Commonwealth v. Spotz,* 562 Pa. 498, 756 A.2d 1139, 1157–59 (2000) (*"Spotz II"*). We rejected this claim, relying on the same factual and legal rationale as in the instant case. *Compare id.* and *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280, 1285–86 (2000) (*"Spotz III"*).

 Also in Appellant's first issue, he asserts that counsel was ineffective for failing to raise constitutional claims, grounded in alleged violations of double jeopardy protections and due process, related to the failure to consolidate his trials.[8] As the United States Supreme Court has stated, "[t]he constitutional prohibition against 'double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense...." *United States v. DiFrancesco*, 449 U.S. 117, 127, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980) (citation omitted). The high Court has also indicated that there are three separate constitutional protections encompassed in the guarantee against double jeopardy: protection against a second prosecution for the same offense after acquittal; protection against a second prosecution for the same offense after convic-

Similarly, in his petition for collateral relief from his Schuylkill County conviction for the first-degree murder of June Ohlinger, Appellant asserted that his trial should have been consolidated with his trial for voluntary manslaughter in Clearfield County, and that counsel was ineffective for failing to preserve the issue. *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1207–11 (2006) ("*Spotz V*"). We concluded that the Clearfield County and Schuylkill County homicides were not part of the same criminal episode, so there was no arguable merit to Appellant's underlying claim of error. *Id.* at 1210. We further noted that our rationale in the York County and Cumberland County cases was instructive to the Schuylkill County case. *Id.*

Thus, the instant PCRA constitutes the fourth time that Appellant has raised some permutation of the issue of consolidation of his multiple homicide trials. We have consistently rejected these claims, concluding that Appellant's four killings, however they might be cataloged, grouped, or arranged, were not part of a single criminal episode.

8. The PCRA court did not address this sub-claim, but rather made only a generalized conclusion that Issue 1 had been previously litigated. *See* PCRA Court Opinion at 25. We reiterate here that a claim of ineffectiveness of counsel is distinct from the underlying claim of trial court error. *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 573 (2005) (holding that "a Sixth Amendment claim of ineffectiveness raises a distinct legal ground for purposes of state PCRA review under § 9544(a)(2) ... [and] a PCRA court should recognize ineffectiveness claims as distinct issues and review them under the three-prong ineffectiveness standard announced in [*Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987)]"). Thus, although Appellant's claim of trial court error for failing to consolidate his trials has been previously litigated, his claim of ineffective assistance of counsel in litigating this underlying claim has not.

tion; and protection against multiple punishments for the same offense. *Schiro v. Farley*, 510 U.S. 222, 229, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994) (citation omitted); *DiFrancesco, supra* at 129, 101 S.Ct. 426 (citation omitted). "These protections stem from the underlying premise that a defendant should not be twice tried or punished for the same offense." *Schiro, supra.*

Appellant killed four people in three days in four counties, generating four separate criminal homicide investigations. As we held on direct appeal, these "essentially independent" killings are "logically connected primarily by the fact that [A]ppellant committed all four of them." *Spotz III*, 759 A.2d at 1285–86. The mere fact that Appellant was subjected to four trials for the independent killing of four human beings implicates neither double jeopardy nor due process concerns. Appellant has developed no argument to the contrary, and, perhaps not surprisingly, has cited no authority that supports his assertions of constitutional violations. Counsel was not ineffective for failing to raise a meritless issue. All of Appellant's claims in his first issue are meritless.[9]

## 2. Waiver of Right to Counsel

Appellant's second issue is focused on his waiver of the right to counsel during the guilt phase of his trial. Appellant was represented by public defender Taylor Andrews for pre-trial proceedings, during the penalty phase of the trial, and on direct appeal; however, following a colloquy, the trial court granted Appellant's motion to represent himself during the guilt phase of his trial. Appellant now contends that his

---

9. Appellant has also alleged a third constitutional violation, grounded in equal protection and based on the state's prosecution of Appellant's co-conspirator, Christina Noland. Appellant asserts, without benefit of supporting argument, that he and Ms. Noland were "similarly situated," although he was tried for the killing of four individuals, and she was tried for conspiracy and was a cooperating government witness at his trial. This sub-claim has not been developed factually or legally, and it is not supported with citations to relevant decisional or statutory law. In fact, it is impossible to discern exactly what error Appellant is alleging here. The sub-claim is unreviewable, and it is waived for lack of development.

waiver of the right to counsel was not voluntary, knowing, or intelligent; that he was not competent to waive this right; and that Mr. Andrews was ineffective for failing to object to the trial court's allegedly inadequate colloquy, for declining to present a guilt-phase defense, for failing to investigate and develop an intoxication defense, for failing to investigate Appellant's competence to waive his right to counsel, and for failing to reveal an alleged conflict of interest related to counsel's prior representation of Appellant's brother and first homicide victim, Dustin Spotz. After considering all the evidence presented at the PCRA hearing, the PCRA court concluded that Appellant was competent; that his waiver of counsel was voluntary, knowing, and intelligent; and that counsel was not ineffective. *See* PCRA Court Opinion at 5–9. We agree.[10]

A criminal defendant has a constitutional right, necessarily implied under the Sixth Amendment of the U.S. Constitution, to self-representation at trial. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). However, before a defendant will be permitted to proceed *pro se*, he or she must knowingly, voluntarily, and intelligently waive the right to counsel. *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 655 (2008). To ensure that a waiver is knowing, voluntary, and intelligent, the trial court must conduct a "probing colloquy," which is a searching and formal

---

10. This Court has held that the question of a defendant's competency to stand trial is an exception to the waiver rule on direct appeal. *See, e.g., Commonwealth v. Brown*, 582 Pa. 461, 872 A.2d 1139 (2005) (plurality) (providing citations). However, application of this principle in the context of the PCRA has been more divisive. In *Brown's* plurality opinion, authored by then-Chief Justice Cappy, we held that the exception did apply in the context of the PCRA. *Id.* at 1155–56 ("[T]he failure to raise on direct appeal a claim that the appellant was incompetent at the time of trial does not constitute a waiver of that claim for purposes of the PCRA.)" In a concurring and dissenting opinion, Justice Nigro specifically noted his agreement with this principle. Thus, a majority of the Court has agreed that competency claims are not subject to the waiver provision of the PCRA. *But see, id.* at 1158 (Castille, J., concurring) (disagreeing with this principle as a judicial relaxed waiver rule inconsistent with the plain text of the PCRA); *see also Commonwealth v. Santiago*, 579 Pa. 46, 855 A.2d 682 (2004) (Castille, J., concurring) (same).

inquiry as to whether the defendant is aware both of the right to counsel and of the significance and consequences of waiving that right. *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1335–36 (1995). More specifically, the court must determine the following:

(a) that the defendant understands that he or she has the right to be represented by counsel, and the right to have free counsel appointed if the defendant is indigent;

(b) that the defendant understands the nature of the charges against the defendant and the elements of each of those charges;

(c) that the defendant is aware of the permissible range of sentences and/or fines for the offenses charged;

(d) that the defendant understands that if he or she waives the right to counsel, the defendant will still be bound by all the normal rules of procedure and that counsel would be familiar with these rules;

(e) that the defendant understands that there are possible defenses to these charges that counsel might be aware of, and if these defenses are not raised at trial, they may be lost permanently; and

(f) that the defendant understands that, in addition to defenses, the defendant has many rights that, if not timely asserted, may be lost permanently; and that if errors occur and are not timely objected to, or otherwise timely raised by the defendant, these errors may be lost permanently.

Pa.R.Crim.P. 121(A)(2); *Blakeney, supra* at 655; *Starr, supra* at 1335.

 Although our rules set forth specific requirements for a waiver colloquy, we have been careful to distinguish between a colloquy and the right that it was designed to protect, as follows:

A waiver colloquy is a procedural device; it is not a constitutional end or a constitutional "right." . . . . [A]n on-the-record colloquy is a useful procedural tool whenever the waiver of any significant right is at issue, constitutional or otherwise, *e.g.*, waiver of a trial, waiver of the right to

counsel, waiver of the right to call witnesses, waiver of the right to cross-examine witnesses, waiver of rules-based speedy trial time limits, etc. But the colloquy does not share the same status as the right itself.

*Commonwealth v. Mallory*, 596 Pa. 172, 941 A.2d 686, 697 (2008) (applying the above principle in the context of waiver of the right to a jury trial).

As *Mallory* made explicitly clear, when a petitioner claims ineffective assistance of counsel based on a failure to object to an allegedly defective waiver colloquy, the claim must be analyzed like any other ineffectiveness claim. *Id.* at 698. The petitioner cannot prevail merely by establishing that the waiver colloquy was indeed defective in some way. Rather, the petitioner must prove that, because of counsel's ineffectiveness, he waived the constitutional right at issue unknowingly or involuntarily, and that he was prejudiced. To establish prejudice, the petitioner must demonstrate a reasonable probability that but for counsel's ineffectiveness, he would not have waived the right at issue. *Id.* at 698–704. In considering such a claim of ineffectiveness, the court considers the totality of the circumstances and the entire record, not just the colloquy itself. *Id.* at 698, 704.

Here, the record shows that the trial court conducted a colloquy that confirmed, *inter alia,* the following: Appellant wanted to represent himself, at least at the first phase of his trial, including at jury selection; Appellant understood his right to be represented by counsel and to have free counsel appointed for him; Appellant was not under the influence of alcohol, narcotics, or medications that would affect his decision; Appellant was not threatened, pressured, subjected to physical or psychological abuse, or promised anything to encourage him to waive his right to counsel; Appellant understood the elements of the offenses with which he was charged; Appellant knew the Commonwealth was seeking the death penalty; Appellant knew he would be bound by all the normal rules of procedure and evidence; Appellant recognized that there were certain dangers to proceeding *pro se,* dangers with

which counsel would be familiar, including possible permanent loss of defenses and rights; Appellant understood that errors occurring during trial but not raised in timely manner could be lost permanently; Appellant understood the significance and consequences of a decision to waive counsel. *See* Notes of Testimony ("N.T.") Waiver Hearing, 5/2/96. Appellant repeatedly stated that he understood what the court was telling him, and he signed a written waiver at the end of the colloquy, which the court accepted. *Id.* at 22–23. After posing all of the questions required by Rule 121, the trial court determined that Appellant was knowingly, voluntarily, and intelligently waiving his right to counsel. In addition, the court appointed Mr. Andrews, who had been serving as Appellant's counsel and thus was familiar with his case, to serve in the role of stand-by counsel.

It is apparent from the record that, as the PCRA court concluded, the trial court conducted a thorough colloquy, encompassing all of the required questions and safeguards. Appellant's assertions to the contrary have no merit, and we will not hold counsel ineffective for failing to object to a thorough, complete, and proper colloquy. Furthermore, Appellant fails to address in any way the totality of the circumstances surrounding his waiver of counsel, as required under *Mallory.* Appellant does not establish that he was prejudiced, *i.e.*, that he would not have waived his right to counsel but for counsel's failure to object to the colloquy.[11]

Appellant next avers that his decision to waive counsel was not voluntary because it was necessitated by Mr. Andrews's refusal to prepare a guilt-phase defense, which effectively constituted abandonment of his client. Appellant's Brief at 12–15; N.T. PCRA Hearing, 5/11/07, at 84. More specifically, Appellant contends that counsel's failure to investigate and develop an intoxication defense left him no choice but to proceed *pro se.* Appellant's Brief at 14–15. The PCRA court

11. With respect to the totality of the circumstances, we note that Appellant had already represented himself at his second capital murder trial, for the killing of Penny Gunnet in York County. *See Spotz II,* 756 A.2d at 1149.

rejected these claims, crediting Mr. Andrews's PCRA hearing testimony, which clearly belied Appellant's assertion that Mr. Andrews refused to present a defense at the guilt phase of trial. PCRA Court Opinion at 6. In addition, the PCRA court held that an intoxication defense was not available to Appellant because he never admitted that he had killed Ms. Amstutz. *Id.* at 8–9.

The record supports the PCRA court's conclusions. At the PCRA hearing, Mr. Andrews testified that he had advised Appellant to plead guilty, advice that Appellant did not "appreciate[ ]." N.T. PCRA Hearing, 5/10/07, at 175. Mr. Andrews testified neither that he refused to represent Appellant at the guilt phase of his trial, nor that he declined to present a defense. During the guilt phase of trial, Mr. Andrews served as stand-by counsel, in which capacity he provided Appellant with legal advice on a range of issues. *Id.* at 175–76. Appellant's assertion that he had no choice but to represent himself because of abandonment by his counsel was supported only by his own self-serving testimony, which was rejected by the PCRA court. The PCRA court's determination has support in the record, and accordingly we will not disturb it.[12]

With regard to Appellant's more specific assertion that his waiver of the right to counsel was not voluntary

---

12. As another part of this sub-claim, Appellant asserts that the trial court should have inquired into Appellant's reason for wanting to waive his right to counsel. Such questioning is certainly not required in order to establish that a waiver is voluntary, knowing, and intelligent. In fact, a court's disagreement with a defendant's reason for proceeding *pro se* does not constitute grounds for denial of this constitutional right. *See Commonwealth v. Starr,* 541 Pa. 564, 664 A.2d 1326, 1336–37 (1995) (concluding that a trial court erred when it refused to permit a defendant to represent himself, based partially on the defendant's failure to provide what the court considered to be an adequate reason for seeking to waive his constitutional right to counsel). Consideration of a defendant's best interests, *e.g.,* by evaluating his reasons for exercising his right to self-representation, is simply irrelevant to an assessment of whether a waiver of the right to counsel has been made knowingly, voluntarily, and intelligently. A court may not substitute its own judgment for that of a defendant who knowingly, voluntarily, and intelligently waives his right to counsel.

because of counsel's failure to investigate and develop an intoxication defense, we reiterate that such a defense is available only to those capital defendants who admit their criminal liability in the murder, but contest their degree of guilt because of an inability to formulate the requisite intent. *See Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1131–32 (2008). As the PCRA court concluded, Appellant never admitted that he killed Ms. Amstutz, and thus an intoxication defense was not available to him. PCRA Court Opinion at 8.

Although Appellant avers that counsel's failure to investigate an intoxication defense caused his waiver of the right to counsel to be involuntary, Appellant certainly did not pursue any such defense during his *pro se* representation. Rather, throughout his trial, Appellant maintained an innocence defense, repeatedly and consistently attempting to divert blame for the murder of Ms. Amstutz onto others. He has continued to pursue this strategy in his collateral appeal, asserting that Charles Carothers was the killer. *See* Appellant's Brief at 28 ("[T]he jury never heard compelling evidence that Charles Carothers, by his own admission, was the one who killed Ms. Amstutz . . . . the evidence against Carothers was substantial . . . The Carothers confession would have been highly exculpatory evidence at the guilt phase. . . ."). Thus, even now Appellant still fails to admit that he killed Ms. Amstutz. There is absolutely no evidence in the record to suggest that but for counsel's alleged ineffectiveness in failing to investigate and develop an intoxication defense, Appellant would not have waived his right to counsel, and thus Appellant has not established that he was prejudiced by counsel's alleged failings.

 In his next sub-claim in Issue 2, Appellant asserts that he was not competent to waive the right to counsel and that Mr. Andrews was ineffective for failing to investigate and raise the issue of Appellant's competency. Appellant's Brief at 18–19. Appellant contends that his waiver was the product of mental disorders, specifically, "an active PTSD-related thought disorder" and personality disorders, which affected his capacity to waive his rights, and thus rendered his waiver

of the right to counsel not knowing, not voluntary, and not intelligent. *Id.* at 15–17. After considering all of the evidence presented at the PCRA hearing, including the testimony of Mr. Andrews and psychiatrists called as expert witnesses, the PCRA court found that Appellant was competent to represent himself and that his waiver of counsel was knowing, voluntary, and intelligent. PCRA Court Opinion at 8. Once again, the PCRA court's conclusion is supported by the record, as discussed *infra,* and we will not disturb it.

This Court has previously made clear that "the competency standard for waiving the right to counsel is precisely the same as the competency standard for standing trial, and is not a higher standard." *Commonwealth v. Puksar,* 597 Pa. 240, 951 A.2d 267, 288 (2008) (quoting *Starr,* 664 A.2d at 1339). We have formulated this standard as follows: "whether the defendant has the ability to consult with counsel with a reasonable degree of understanding and whether the defendant has a rational understanding of the nature of the proceedings." *Puksar, supra* at 288–89. The focus is properly on the defendant's mental capacity, *i.e.,* whether he or she has "the *ability* to understand the proceedings." *Starr, supra* at 1339 (citation omitted) (emphasis added in *Starr*). If a court finds a defendant incapable of waiving the right to counsel, then the court must also conclude that the defendant is incapable of standing trial.[13] *Id.* at 1339. Finally, it is

---

13. In *Indiana v. Edwards,* 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), the United States Supreme Court considered whether there was a legally meaningful distinction between competency to stand trial and competency to represent oneself at trial. The high Court held that "the Constitution *permits* States to insist upon representation by counsel for those competent enough to stand trial ... but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id.* at 178, 128 S.Ct. at 2388 (emphasis added). In *Edwards,* the defendant, who suffered from schizophrenia, sought to represent himself, but the trial court refused this request, concluding that he was competent to stand trial but not competent to defend himself. The high Court held that the Constitution did not require the trial court to allow the *Edwards* defendant to represent himself at trial.

This Court has not addressed *Edwards* or its implications for established state law as delineated in *Commonwealth v. Starr,* 541 Pa. 564, 664 A.2d 1326, 1334–39 (1995). In the instant case, Appellant has not

important to recognize that a defendant is presumed to be competent to stand trial, and the burden is on the appellant to prove that he was incompetent. *Commonwealth v. Brown*, 582 Pa. 461, 872 A.2d 1139, 1156 (2005).

At the PCRA hearing, Mr. Andrews testified that, at the time of trial, he had no questions about Appellant's competency because he was lucid and rational, understood questions and responded to them, and conducted himself accordingly in court. N.T. PCRA Hearing, 5/11/07, at 40–41. Mr. Andrews also testified that, at one point in the proceedings, Appellant made an objection to one of the court's instructions, an objection Mr. Andrews had not considered, but one that was indeed correct. *Id.* at 41. Furthermore, sometime in 1995, prior to trial, Mr. Andrews had retained a psychologist to conduct an assessment of Appellant, and the psychologist's findings included the following: "For forensic purposes, [Appellant] is certainly competent to comprehend and respond to complex matters related to his legal situation. He is, therefore, intellectually competent to stand trial." Forensic Psychological Assessment of Appellant by Stephen A. Ragusea, Psy.D., assessment dates 11/20/95 and 12/12/95, at 7.

Appellant offered PCRA testimony as to this issue from two forensic psychiatrists, Robert A. Fox, Jr., M.D., and Neil Howard Blumberg, M.D. Dr. Fox, who conducted forensic evaluations of Appellant in 2000 and 2007, and reviewed portions of the record, opined that Appellant "was not capable of making rational decisions regarding his litigation in the trial." N.T. PCRA Hearing, 2/22/07, at 143. Dr. Blumberg, who interviewed Appellant three times in 2006, and reviewed background materials, including the trial and sentencing transcripts of all four of Appellant's trials, had a somewhat different opinion. When Dr. Blumberg was asked on direct examination by Appellant's PCRA counsel whether he had determined that Appellant "had any difficulty understanding the questions or the surroundings ... in the courtroom at the time [of trial]," Dr. Blumberg testified as follows: "I

cited or attempted to rely on *Edwards* for his competency argument. Thus, the *Edwards* distinction is not relevant to this case.

didn't find any evidence that he was impaired in that way, and frankly the disorders that he was suffering from at that time wouldn't preclude his being able to represent himself and ask direct questions and do cross[-]examination." N.T. PCRA Hearing, 1/18/07, at 44–45.

Thus, the PCRA court's rejection of Appellant's claim of incompetence and related claim of ineffective assistance is strongly supported by the record. The psychologist retained by Appellant before trial, as well as one of the psychiatrists retained by Appellant for PCRA proceedings, concluded that Appellant was able to stand trial. Mr. Andrews's own observations of Appellant's lucidity, rationality, comprehension, and conduct during the proceedings further support Appellant's capacity to have stood trial. There is no merit to Appellant's assertion that Mr. Andrews was ineffective for failing to investigate and raise the issue of Appellant's competency. In addition, we must note that Appellant's conduct during his self-representation, as revealed through the notes of testimony, belies any notion that Appellant was legally incompetent to stand trial. *See Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 88 (2004) (rejecting the appellant's contention that the trial court had erred in failing to order a competency hearing, because the proffered evidence was insufficient to bring his competency into question, particularly in light of his extensive assistance in his own defense, including his testimony during the penalty phase). Appellant is entitled to no relief on this claim.

▇▇▇ In the final sub-claim of Issue 2, Appellant alleges that Mr. Andrews's prior representation of Dustin Spotz constituted an undisclosed conflict of interest because counsel's duty of loyalty to his deceased client precluded counsel from pursuing viable avenues of defense for Appellant. Appellant's Brief at 17–18. Appellant specifically cites information that counsel would have learned during his representation of Dustin regarding Dustin's mental illness and propensity for violence, including violence against Appellant. Appellant suggests that his counsel did not develop a diminished capacity defense nor present mitigating circumstances based on this

information because of loyalty to Dustin. Thus, according to Appellant, counsel's failure to disclose this alleged conflict rendered Appellant's waiver of counsel not knowing and not intelligent, and also violated his Sixth Amendment right to counsel at the penalty phase of trial. Appellant's Brief at 18.

As the PCRA court has pointed out, Appellant raised a similar issue when seeking PCRA relief from his Schuylkill County first-degree murder conviction. PCRA Court Opinion at 6–7; *Spotz V*, 896 A.2d at 1231–32. Mr. Andrews, as part of a tri-county coordinated defense effort on behalf of Appellant, was responsible for investigating and gathering Appellant's background information and institutional records. In *Spotz V*, Appellant asserted that his Schuylkill County trial counsel was ineffective for having relied on the work product of Mr. Andrews, because he was a "conflicted" counsel. *Id.* at 1231. We noted in *Spotz V* that Mr. Andrews's representation of Dustin had terminated in 1990, well before he was appointed to represent Appellant. *Id.* at 1232 & n. 33. We concluded that Appellant not only had failed to demonstrate that Mr. Andrews "actively represented conflicting interests," but also had "failed to show how Attorney Andrews'[s] previous representation of the now deceased Dustin adversely affected trial counsel's representation of [Appellant] in the present matter." *Id.* at 1232.

Similarly, in the instant case, the PCRA court found that Mr. Andrews's prior representation of Dustin affected neither Mr. Andrews's representation of Appellant nor Appellant's decision to represent himself. PCRA Court Opinion at 7. The PCRA court concluded there was no conflict of interest, and we agree.

We have recently reiterated that, to establish a conflict of interest, an appellant must show that "counsel actively represented conflicting interests[,] and the actual conflict adversely affected counsel's performance." *Commonwealth v. Small*, 602 Pa. 425, 980 A.2d 549, 563 (2009) (citing *Spotz V*, 896 A.2d at 1232); *see also Commonwealth v. Weiss*, 604 Pa. 573, 986 A.2d 808, 818 (2009) (rejecting the view that counsel's representation of a client continues until such time as the client's

sentence expires, and requiring a petitioner who alleges a conflict of interest rooted in his counsel's obligation to a former client to establish that the conflict adversely affected counsel's performance). Here, Appellant has established neither that his counsel represented conflicting interests, nor that the alleged conflict adversely affected counsel's performance. In fact, Appellant's allegations of a conflict of interest are vague, entirely speculative, and contradicted by the evidence of record.

At the PCRA hearing, Mr. Andrews testified as follows:

[I]t was important to show Dustin to have been the aggressor[,] and really the bad guy in Clearfield County[,] that had assaulted [Appellant] and set this chain of events in motion. And I was prepared to do so and didn't feel in any way inhibited from doing so from having previously represented Dustin.

N.T. PCRA Hearing, 5/10/07, at 135. Mr. Andrews also testified that he did not "recall having any privileged information from Dustin that presented a problem in pursuing information that was relevant in [Appellant's] case," and that he did not think there was any conflict in pursuing an investigation or handling Appellant's case in any way. *Id.* at 137. Appellant provides no evidence to the contrary, just bald assertions and gross speculation. As we concluded in *Spotz V, supra* at 1232, "the record reveals that [ ] Attorney Andrews zealously advocated on behalf of [Appellant] and [was] unhampered by any alleged conflict of interest created by Attorney Andrews'[s] prior representation of Dustin."

Thus, all of Appellant's claims of error in issue 2 lack merit, and no relief is warranted.

## 3. Exclusion of Witman Testimony

In Appellant's third issue, he contends that the trial court erred in barring the testimony of one Thomas Witman, and that Mr. Andrews was ineffective for failing to argue in favor of the admissibility of this testimony and for failing to raise the issue on direct appeal. The factual background to this

issue is as follows. Evidence admitted at trial indicated that, on the day of Ms. Amstutz's murder, a man named Charles Carothers engaged in drug use with Appellant in the hotel room secured with Ms. Amstutz's credit card and also drove her car from the hotel. N.T. Trial, 5/13/96, at 797–801, 815–820. On April 3, 1996, Thomas Witman, who was in custody for an unrelated crime, made a statement to police to the effect that he had overheard Mr. Carothers admit to the murder of Ms. Amstutz. More specifically, Mr. Witman represented that, sometime between May and July of 1995, when he was in the Cumberland County prison, he had overheard a conversation between two other inmates, Mr. Carothers and someone named Vernon, who was subsequently identified as Vernon Robinson, in which Mr. Carothers admitted shooting Ms. Amstutz.[14] Statement of Thomas Witman, dated 4/3/96. The trial court refused to admit the testimony of Mr. Witman regarding Mr. Carothers's statement, determining that it was hearsay to which no exception applied. Appellant argues that Mr. Witman's testimony was admissible both under the hearsay exception for a statement against interest and also pursuant to federal constitutional law as set forth in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

At the PCRA hearing, both Mr. Witman and Mr. Robinson testified; however, Mr. Carothers, through his attorney, invoked his Fifth Amendment right against self-incrimination and did not appear. N.T. PCRA Hearing, 5/10/07, at 62. Mr. Witman testified that his 1996 statement to police concerning the overheard confession was accurate, and that he had attempted to contact the district attorney's office regarding the matter. *Id.* at 66–67, 73–75. Mr. Witman had an extensive

14. Specifically, the statement represented that Mr. Witman overheard Mr. Carothers say the following: "I am going to let the white mother f—— take it—let him fry;" and "I shot the old bitch in the head, but you might as well let him take it." Mr. Witman then stated that he did not remember if Mr. Carothers had said "head" or not. In his statement, Mr. Witman also claimed that he had overheard Mr. Carothers say that he and Appellant had pulled Ms. Amstutz out of the car and dumped her along the side of the road. Statement of Thomas Witman, dated 4/3/96.

record, including prior convictions for *crimen falsi,* and he acknowledged that he was cooperating with the police on other crimes of which he had knowledge because he wanted to help himself. *Id.* at 87. Vernon Robinson, the inmate to whom Mr. Carothers allegedly confessed, testified that he remembered a conversation with Mr. Carothers as follows:

*Defense Counsel:* Do you remember what [Mr. Carothers] said about why he was in [prison]?

*Mr. Robinson:* About him getting high with some guy riding around with a lady in the trunk.

\* \* \*

*Defense Counsel:* Did he say whether the lady was alive?
*Mr. Robinson:* He basically said that she was alive when they put her in the trunk, you know what I'm saying, and later on he said that she was dead.

\* \* \*

*The Court:* Did he say anything more about [Appellant]?
*Mr. Robinson:* Yeah. That pretty much he was going to let him fry for what he had done. That's when I ended the conversation. . . .

\* \* \*

*Defense Counsel:* At some point did you talk to prison officials or guards about Mr. Carothers being in your cell?
*Mr. Robinson:* Yes, I did. When we went to dinner and after we came back from dinner, this is when I found out that he was telling on [Appellant]. So I went to the guard at the time. . . . . [T]he next morning ... C.O. Durnin moved him out the cell.

*Id.* at 98–100. Mr. Robinson also testified that he would have testified at Appellant's trial if Appellant's counsel had asked him. *Id.* at 100–04.

▪ Appellant's claim of trial court error in Issue 3 is both waived and not cognizable under the PCRA because it could have been raised on direct appeal. *See* 42 Pa.C.S. §§ 9543(a)(3) and 9544(b). With regard to the ineffective assistance claims in Issue 3, the PCRA court relied in part on

this Court's decision in *Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 736–38 (2004), to hold that Appellant was precluded from raising any claims of ineffective assistance of counsel from the guilt phase of his trial because he had elected to exercise his right to self-representation during that period. PCRA Court Opinion at 12–14. The PCRA court also concluded that Appellant's claim of ineffective assistance of direct appeal counsel had no arguable merit because Mr. Witman's testimony concerning Mr. Carothers's alleged confession was properly excluded as hearsay. *Id.* at 14–22. We agree with the PCRA court, and address these conclusions in more detail below.

In *Faretta v. California, supra*, the United States Supreme Court held that a defendant has a Sixth Amendment right to conduct his own defense; however, "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Id.* at 834 n. 46, 95 S.Ct. 2525. Relying on *Faretta*, this Court has held that, when an appellant knowingly, voluntarily, and intelligently has chosen to exercise his right to self-representation, we will not consider any ineffective assistance claims that arose from the period of self-representation. *Bryant, supra* at 737; *see also Commonwealth v. Fletcher*, 586 Pa. 527, 896 A.2d 508, 522 n. 13 (2006) (*Fletcher II*) (explaining that the Court was applying the categorical approach of the *Bryant* majority "in refusing to consider any claims of ineffectiveness arising from a period of self-representation"); *Commonwealth v. Fletcher*, 604 Pa. 493, 986 A.2d 759, 774, 778 (2009) (*Fletcher III*) (refusing to revisit the holding of *Fletcher II*, and reiterating that a defendant who chooses to represent himself cannot obtain relief by raising his own ineffectiveness or that of standby counsel).

However, we have also recognized that a defendant may withdraw his waiver of the right to counsel. When the defendant in *Bryant* claimed, in the midst of his trial, to be unable to continue his self-representation because of a dental problem, the trial court held a colloquy with the defendant, during which he affirmed that, going forward, he wanted his

stand-by counsel to assume the role of trial counsel. *Id.* at 737–38. The trial court then permitted the defendant to withdraw his waiver, and once again be represented by counsel. *Id.* at 738.

In the instant case, Appellant represented himself throughout the guilt phase of his trial. As discussed in Issue 2, after a thorough colloquy, the trial court determined that Appellant had knowingly, voluntarily, and intelligently waived his right to counsel, and, accordingly, the court permitted him to proceed *pro se.* Throughout the guilt phase of his trial, Appellant continued to call and question witnesses, raise objections, and otherwise serve as his own counsel; at no point during the guilt phase did Appellant seek to withdraw his waiver of the right to counsel or to cease his self-representation. Nonetheless, Appellant now attempts to avoid the application of *Bryant's* bright-line rule by arguing that, with respect to the particular matter of the admissibility of Mr. Witman's testimony, he permitted Mr. Andrews to represent him. However, our review of the record, as presented in detail below, does not support Appellant's assertion that he withdrew his waiver of the right to counsel or abandoned his exercise of the right to self-representation at this or any other point during the guilt phase of his trial.

When Appellant sought to call Mr. Witman to testify, Appellant himself—not Mr. Andrews, his standby counsel—made a proffer to the court, in the absence of the jury, as to Mr. Witman's proposed testimony. N.T. Trial, 5/14/96, at 1222–25. The court then addressed Mr. Witman, whom the sheriff had brought to the courtroom, and, after determining that Mr. Witman wished to speak with counsel before he spoke to the court, secured an attorney for Mr. Witman. *Id.* at 1225–26. Later in the same session, after his discussion with counsel, Mr. Witman was again brought to the courtroom, and the Commonwealth objected to his proposed testimony as hearsay. *Id.* at 1283. In response, Appellant himself—again, not Mr. Andrews—argued that there had been testimony at trial as to the involvement of Mr. Carothers in the case. The court then asked Appellant if he was going to call Mr. Carothers as a

witness, and Appellant himself answered "I certainly don't know what he could say or—what his statements say are nothing to help me." *Id.* at 1284. Following a discussion off the record between Appellant and Mr. Andrews, Appellant himself reiterated that he was not going to call Mr. Carothers. *Id.* at 1285. The court then indicated that it wanted additional time to consider the matter of Mr. Witman's proposed testimony. *Id.* at 1287.

At the end of the day-long session, the court stated that it was ready to entertain argument about the admissibility of Mr. Witman's testimony, and the court asked Appellant if he wanted to make that legal argument or if he would trust Mr. Andrews to do so. *Id.* at 1424–25. After conferring with Mr. Andrews, Appellant stated the following: "Mr. Andrews said that, has indicated that there is no argument to be made. Witman cannot be used unless ... Carothers would be an unavailable witness." *Id.* at 1425. The following dialogue then occurred:

*The Court:* Well, I am ready to entertain any argument.

*[Appellant]:* There is no argument to present.

*The Court:* You are telling me that if there is any argument to present, Mr. Andrews will present it instead of yourself? Is that it?

*[Appellant]:* That is fine.

*The Court:* All right.

*[Appellant]:* But Mr. Andrews indicated there is no argument. So if you find some, I guess that is fine, he can make it.

*The Court:* I am looking at the whole issue.

*Mr. Andrews:* I think [Appellant] has said that he would agree to me speaking to this.

*[Appellant]:* Yeah, that is fine.

*Mr. Andrews:* I don't think—I hate to speak for the District Attorney, but we have exchanged cases, or at least they have given me their cases, and they are the same cases I had. I don't think there is a disagreement with the law. This statement could only be admitted if Mr. Carothers

were unavailable. If he is unavailable, then there is a decision for the Court to make as to whether that renders the statement admissible.

*The Court:* Well, I think, for openers, you have to call Carothers.

[*Appellant* ]: Call him as a witness?

*The Court:* Yes. Because ... he is available and can be brought up here to testify.

*Mr. Andrews:* In the absence of that, I think what [Appellant] is saying is accurate, I don't think there is an argument, a disagreement, a divergent point of view between the two tables.

\* \* \*

*The Court:* At this point, you haven't done what I feel has to be done to get this statement in.

[*Appellant* ]: I will.

*The Court:* So at this point—

[*Appellant* ]: I will.

*The Court:*—you should know it is not going in. That could change, but that depends on the circumstances. All right. This part of the record is closed.

*Id.* at 1425–29.

Immediately following the above discussion, the court adjourned for the day. During proceedings the next morning, Appellant requested a break in order to speak with Mr. Carothers before calling him as a witness. The jury was escorted from the courtroom, and the following discussion transpired:

*The Court:* Did you have something you wanted to say, Mr. Andrews? Or who is running the show?

*Mr. Andrews:* I am going to sit down, Your Honor.

*The Court:* .... Did you [Appellant] want to say something to me now?

[*Appellant* ]: I just ask for a few minutes to talk to my next witness before—I never talked to him. He was originally a Commonwealth witness.

*The Court:* Oh, you understand that Carothers wants to speak to you, is that what you are saying?

*[Appellant ]:* Yes, sir.

*The Court:* Is Mr. Carothers in the courtroom? Would you stand up so I can see you? You want to speak to [Appellant]?

*Mr. Carothers:* (Shook head negatively.)

*The Court:* He shakes his head no.

*[Appellant ]:* I had the law clerk ask him—and she told me—if he was willing to speak to me. And she said yes. That is why I ask. I guess now he changed his mind.

*The Court:* Stand up again, Mr. Carothers. You are Charles Carothers?

*Mr. Carothers:* (Nodded affirmatively.)

*The Court:* Can you answer?

*Mr. Carothers:* Yeah.

*The Court:* Do you want to speak to [Appellant]?

*Mr. Carothers:* If he needs to talk to me or something.

*The Court:* Pardon me?

*Mr. Carothers:* If he needs to talk to me, I guess.

*The Court:* Do you want to talk to him?

*Mr. Carothers:* If he needs to talk to me.

*The Court:* Can you give me a yes or a no?

*Mr. Carothers:* No.

*The Court:* What?

*Mr. Carothers:* No.

*The Court:* No. Is that your answer?

*Mr. Carothers:* Yeah.

*The Court:* All right. Now, where else are we going here, [Appellant]?

*[Appellant ]:* I had asked to speak to him. He said if I want to speak to him, he will speak to me. He has no need to speak to me unless I have need to speak to him. And he said he will talk to me if I want him to. I want a chance to speak to him.

*The Court:* Okay. Mr. Carothers, come on up.

N.T. Trial, 5/15/96, at 1501–03.

The sheriff then escorted Appellant and Mr. Carothers from the courtroom to allow Appellant the opportunity to consult with Mr. Carothers, and the court was in recess for approximately one-half hour. *Id.* at 1504. When all the parties were back in the courtroom, the following dialogue took place:

*The Court:* .... Where are we on this business, [Appellant]?

[*Appellant*]: The only thing left is to read in the transcripts of the witnesses that invoked their Fifth Amendment right, and the stipulation of Trooper Lander's—

*The Court:* You have had your opportunity to talk to Carothers, and you are not calling him, is that it?

[*Appellant*]: No, I will let it go.

*The Court:* All right. Then bring the jury down, and let's get these pieces of evidence read.

*Id.* at 1504.

The above excerpts of the notes of testimony make clear that Appellant did not withdraw his waiver of the right to counsel or change his mind about exercising his right to self-representation, but rather continued to prepare, direct, and present his own defense, including developing his own strategy, interviewing the witness, and deciding whether or not to call the witness. Therefore, Appellant's claim of ineffective assistance of counsel during the guilt phase of his trial is precluded by the categorical rule promulgated by this Court in *Bryant.*

Also in Issue 3, Appellant contends that Mr. Andrews was ineffective for not claiming on direct appeal that the trial court had erred by denying admission of Mr. Witman's testimony as hearsay. Appellant argues that Mr. Witman's testimony was admissible under the hearsay exception for a statement against interest, which reads as follows:

**(b) Hearsay Exceptions.** The following statements, as hereinafter defined, are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

(3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Pa.R.E. 804(b)(3).

Notably, by its unmistakably clear text, this hearsay exception requires not only that the statement be against interest, but also that there be corroborating circumstances clearly indicative of its trustworthiness, and that the declarant be unavailable. In the instant case, the trial court did not reach the issue of the trustworthiness of the statement in question because the declarant in the instant case, *i.e.,* Mr. Carothers, was **not** unavailable. *See* N.T. Trial, 5/14/96, at 1427. In fact, as presented *supra* in the excerpts of notes of testimony, on the last day of trial, Mr. Carothers was physically present in the courtroom. Appellant actively contemplated calling Mr. Carothers as a witness, but, after conferring privately with Mr. Carothers, Appellant told the court that he was not going to call Mr. Carothers to the witness stand. The trial court correctly concluded that Mr. Carothers was **not** unavailable, and accordingly, did not err in refusing to apply the hearsay exception for a statement against interest to Mr. Witman's proffered testimony. Because Appellant's underlying claim of trial court error has no merit, his claim of direct appeal

counsel ineffectiveness for failing to raise the claim of alleged trial court error must fail.[15]

Appellant also contends that appellate counsel should have argued that the exclusion of Mr. Witman's proffered testimony was unconstitutional, based on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In considering Appellant's contention, the PCRA court concluded that the factual distinctions between *Chambers* and the instant case were too numerous for *Chambers* to be controlling. PCRA Court Opinion at 21–22. We agree.

In *Chambers*, during the appellant's murder trial, he had sought to introduce testimony from three persons that an acquaintance, one Gable McDonald, had confessed to them that he had committed the murder. The trial court refused to admit this testimony, determining that it was hearsay. *Id.* at 298–99, 93 S.Ct. 1038. However, the U.S. Supreme Court concluded that the testimony rejected by the trial court "bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest." *Id.* at 302, 93 S.Ct. 1038. Specifically, the following circumstances of McDonald's confession provided assurance of its reliability: McDonald had spontaneously made three verbal confessions to close acquaintances shortly after the murder, and he had sworn and signed a confession at the offices of the appellant's attorney. *Id.* at 300, 93 S.Ct.

15. The PCRA court, in the interest of judicial economy, addressed the admissibility of Mr. Witman's proffered testimony in the event that Mr. Carothers was determined to be unavailable. Citing *Commonwealth v. Robins*, 571 Pa. 248, 812 A.2d 514 (2002) and focusing on the question of reliability, the PCRA court concluded that the circumstances surrounding the making of the statement did not clearly indicate its trustworthiness. Therefore, even if Mr. Carothers were unavailable, Witman's proffered testimony as to Mr. Carothers's alleged confession was not admissible under the hearsay exception for statements against interest. PCRA Court Opinion at 15–20.

We have no disagreement with the PCRA court's analysis. We simply conclude that it is not necessary to reach the question of the trustworthiness of Mr. Carothers's alleged confession because Carothers was not unavailable, and hence, regardless of how many indicia of reliability were or were not extant, the statement was not admissible under the hearsay exception for statements against interest.

1038. The Supreme Court generally concluded as follows: "[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302, 93 S.Ct. 1038.

Appellant attempts to rely on this general conclusion from *Chambers,* but it does not provide him relief in the instant case because the circumstances of *Chambers* bear little, if any, resemblance to his own circumstances. None of the assurances of trustworthiness concerning McDonald's confession in *Chambers* is present in Carothers's alleged confession in the instant case. Mr. Carothers's alleged jailhouse confession was overheard by one other individual, who was another inmate; it was not sworn and signed in counsel's office; and it was not repeated verbally to three acquaintances.

In addition, it must be noted that the high Court's reversal of the appellant's judgment of sentence in *Chambers* was not based solely on the trial court's exclusion of certain evidence as hearsay. Rather, it was the concurrent application of **two** state rules of evidence, not only the hearsay rule but also the voucher rule,[16] that had deprived the appellant of due process and rendered his trial unfair:

> In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers [the appellant] of a fair trial.

*Id.* at 302–03, 93 S.Ct. 1038.

The above considerations make clear that the United States Supreme Court ruling in *Chambers* was highly dependent upon the facts and circumstances of that case, in which an unusual convergence of two state rules of evidence resulted in

**16.** Under Mississippi's common law "voucher rule," a party may not impeach his own witness. *See Chambers, supra* at 295, 93 S.Ct. 1038.

.

.

an injustice of constitutional proportions. *Chambers* cannot generally be relied upon to support common, straightforward challenges to hearsay rulings that have correctly applied state criminal procedure. The facts and circumstances of *Chambers* are very different from those presented in the instant case, and, accordingly, *Chambers* provides Appellant no relief.

In the final part of Issue 3, Appellant asserts that the Commonwealth withheld exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), concerning Mr. Carothers's involvement in another, unrelated murder more than two years earlier, for which he had not been prosecuted.[17] Appellant's assertion is frivolous.

Under *Brady* and subsequent decisional law, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature. *See, e.g., Commonwealth v. Strong*, 563 Pa. 455, 761 A.2d 1167, 1171 & n. 5 (2000). To establish a *Brady* violation, an appellant must prove three elements:

> [1] the evidence [at issue] was favorable to the accused, either because it is exculpatory or because it impeaches; [2] the evidence was suppressed by the prosecution, either willfully or inadvertently; and [3] prejudice ensued.

*Commonwealth v. Lambert*, 584 Pa. 461, 884 A.2d 848, 854 (2005) (citation omitted).

The evidence at issue must have been "material evidence that deprived the defendant of a fair trial." *Commonwealth v. Johnson*, 572 Pa. 283, 815 A.2d 563, 573 (2002).

---

**17.** Appellant also alleges that the Commonwealth violated *Brady* by withholding evidence of Mr. Witman's reliability and prior cooperation with the Commonwealth as an informant. We see no indication that this issue was presented to the PCRA court, and Appellant has failed to direct us to any portion of the record that would show otherwise. Therefore, this issue has been waived. Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.")

We also fail to see how the Commonwealth's opinion of Mr. Witman's reliability can be *Brady* material, not least because it is neither material nor exculpatory.

"Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)); *see also Wood v. Bartholomew,* 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (*per curiam* ) (holding that it was not reasonably likely that disclosure of the result of a key witness's polygraph examination, which was inadmissible under state law, would have resulted in a different outcome at trial). *Brady* sets forth a limited duty, not a general rule of discovery for criminal cases. *Lambert, supra* at 854 (citing *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) for the proposition that "there is no general constitutional right to discovery in a criminal case, and *Brady* did not create one"); *Commonwealth v. Counterman,* 553 Pa. 370, 719 A.2d 284, 297 (1998).

The burden rests with the appellant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." *Commonwealth v. Porter,* 556 Pa. 301, 728 A.2d 890, 898 (1999). There is no *Brady* violation when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from non-governmental sources. *Lambert, supra* at 856; *Commonwealth v. Paddy,* 569 Pa. 47, 800 A.2d 294, 305 (2002).

Here, Appellant contends that the Commonwealth withheld evidence that, more than two years before Ms. Amstutz's murder, Mr. Carothers was implicated in, but never charged with, the murder of one Samuel Thompson. Another individual, Phillip Devenshire, was convicted of Mr. Thompson's murder in 1993, although three witnesses at Mr. Devenshire's trial, including the defendant himself, testified that Mr. Carothers was the shooter. Mr. Devenshire was convicted nearly three years before Appellant's trial, and Appellant provides no evidence that Mr. Thompson's murder was in any way related

to Ms. Amstutz's murder. Nonetheless, Appellant asserts that the evidence implicating Mr. Carothers in Mr. Thompson's murder was probative to show Mr. Carothers's motive and intent, as well as his violent propensities, including his propensity to commit the murder of Ms. Amstutz. Appellant's Brief at 24–25. Remarkably, Appellant further asserts the following as to the significance of the evidence implicating Mr. Carothers in Mr. Thompson's murder: "[T]he suppressed evidence was clearly exculpatory and highly material. The prior murder accusations showed Carothers was the likely shooter." *Id.* at 26.

The PCRA court did not address the above allegations as a *Brady* issue. However, the PCRA court did find Appellant's suggestion that evidence as to Mr. Thompson's murder could have been admissible at Appellant's trial for the murder of Ms. Amstutz to be "totally without legal merit." Supplemental Opinion Pursuant to Pa.R.A.P. 1925 of the PCRA Court, dated 8/7/08, at 8.

We conclude that none of Appellant's allegations has any basis in fact or in law, and his assertion of a *Brady* violation is frivolous. First, the involvement of Mr. Carothers in the murder of Mr. Thompson is a matter of pure conjecture. Mr. Carothers was not arrested for, not charged with, not tried for, not convicted of the Thompson murder. The "evidence" that Mr. Carothers killed Mr. Thompson consists of some testimony presented at the trial of Mr. Devenshire. Three witnesses, one of whom was Mr. Devenshire himself, testified that Mr. Carothers was the shooter, but the jury must have concluded that the testimony was not credible, as it found Mr. Devenshire guilty of the first-degree murder of Mr. Thompson. Second, regardless of whether Mr. Carothers participated in Mr. Thompson's murder, it is simply unfounded, improper, and indeed outlandish to suggest, as Appellant does, that because Mr. Carothers committed one murder, he must also have committed a second, unrelated murder years later. There is literally no way that the evidence implicating Mr. Carothers in the murder of Mr. Thompson could possibly be exculpatory of Appellant for the murder of Ms. Amstutz.

Finally, Appellant fails to suggest how the Commonwealth could have withheld, willfully or otherwise, testimony presented in a public trial. Appellant's *Brady* claim in Issue 3, like the other claims presented in this issue, is entirely meritless, and Appellant is entitled to no relief.[18]

### 4. Prosecutor Misconduct during Guilt Phase Closing Argument

In Issue 4, Appellant argues that several comments made by the prosecutor during the guilt phase closing argument destroyed the jury's objectivity and impartiality and, accordingly, deprived Appellant of a fair trial. Appellant also asserts that Mr. Andrews, in his role as stand-by counsel, was ineffective for neither objecting to these comments, nor advising Appellant, who was acting *pro se* during this time, to object. Finally, Appellant asserts that counsel was ineffective for failing to challenge the comments on direct appeal. *See* Appellant's Brief at 28–31.

■■■ The PCRA court held that all of Appellant's claims of prosecutorial misconduct were waived because he did not make a contemporaneous objection to the allegedly improper comments. In addition, the PCRA court held that no ineffective assistance of counsel claim derived from the guilt phase of trial was available to Appellant, because he had chosen to represent himself during that portion of the proceedings. PCRA Court Opinion at 22–23 (citing *Bryant*, 855 A.2d at 726, 737; *Fletcher II*, 896 A.2d at 522 n. 13). We agree with these conclusions of the PCRA court.

**18.** Appellant tacks on an ineffective assistance of counsel claim to his *Brady* claim, asserting only that counsel's performance was deficient "to the extent that counsel could have obtained this evidence despite the prosecution's suppression." Appellant's Brief at 26. As we have discussed in the text, *supra*, any claims of ineffective assistance of counsel during the guilt phase of trial are precluded by *Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 736–38 (2004), because Appellant was acting *pro se*. Furthermore, because Appellant's underlying *Brady* claim is frivolous, there can be no arguable merit to any ineffectiveness claim grounded in counsel's failure to seek the alleged *Brady* material, whether at trial or on direct appeal.

For the same reasons as we discussed in Issue 3, Appellant is precluded from raising a claim of ineffective assistance of trial counsel arising from the guilt phase of his trial. *See* text *supra* (discussing *Bryant* and *Fletcher* in the context of Issue 3); *see also Fletcher III*, 986 A.2d at 774 ("The law is clear that a defendant cannot allege his own ineffectiveness or that of standby counsel.") Because Appellant did not object to the prosecutor's comments, the issue was not preserved for direct appeal, but rather was waived. There is no merit to Appellant's claim that appellate counsel was ineffective for failing to raise, on direct appeal, a waived claim of trial court error related to the prosecutor's comments. *See, e.g., Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385, 397 (2003) (recognizing as "elementary [the principle] that issues not preserved for appellate review ... will not be considered by an appellate court") (citation omitted).

Appellant attempts to avoid these bars to merits review by invoking the direct capital appeal relaxed waiver doctrine, which was in effect at the time his direct appeal was decided. Under relaxed waiver, this Court retained the discretion to review issues in capital appeals that had not been properly preserved. *See Freeman, supra* at 393–403 (explaining the background of the relaxed waiver doctrine, and prospectively abrogating the doctrine on direct capital appeals). Appellant asserts that Mr. Andrews, in his role as appellate counsel, should have invoked the relaxed waiver doctrine to raise a challenge on direct appeal to the prosecutor's comments.

A similar issue has been raised before this Court on several occasions. In *Commonwealth v. Duffey*, 585 Pa. 493, 889 A.2d 56, 64 (2005), we refused to grant relief on a claim of appellate counsel ineffectiveness for failing to raise a waived claim of trial court error under the relaxed waiver doctrine, noting that this doctrine was discretionary, and thus there was no guarantee that we would have reviewed the issue. In *Fletcher III*, 986 A.2d at 775, 779, we declined to allow an appellant to invoke the relaxed waiver doctrine to obtain review of several issues he had waived during a period of *pro se* representation. To allow an appellant to obtain review under relaxed waiver of

an issue that he waived as a *pro se* litigant would completely undermine the holdings of this Court in *Bryant* and *Fletcher II.* However, in *Commonwealth v. Williams,* 594 Pa. 366, 936 A.2d 12, 24–26 (2007), we held that direct appeal counsel **was** ineffective for failing to invoke relaxed waiver to secure review of a claim that implicated the appellant's actual innocence of a racketeering charge. *Id.* at 25–26. We recognized in *Williams, supra,* the difficulty faced by this Court in determining the likelihood that we would have reviewed a particular claim under relaxed waiver when we are faced with collateral claims that direct appeal counsel was ineffective in failing to invoke relaxed waiver. *Id.* at 25.

We have, however, no difficulty concluding in the instant case that we would not have accepted any of Appellant's waived claims of prosecutorial misconduct for review under the relaxed waiver doctrine. None of Appellant's claims implicates actual innocence; indeed, the claims are trivial, as they do not reflect any logical or reasonable reading of the prosecutor's comments. The challenged comments from the prosecutors closing argument are as follows.

First, Appellant asserts that the prosecutor demeaned Appellants rights to present a defense and to self-representation with the following comment:

> Because [Appellant] is an extremely controlling individual. And he wanted to come in here in front of you and show how smart he is, and how he can control things, and how he manipulates women, and then fool you.

N.T. Trial, 5/15/96, at 94 (Closing Argument) (quoted in Appellant's Brief at 28 & n. 24).

Second, Appellant asserts that the prosecutor improperly argued that the jurors had a duty to society and the victim to convict him, apparently based upon the following excerpt:

> The duty on you now is just to be fair. When you are being fair to him, you also have got to be fair to the people of this state, and to Betty Amstutz.

*Id.* at 91 (cited in Appellant's Brief at 29).

Third, Appellant asserts that the prosecutor improperly opined to the jury that it needed to decide *only* the identity of

the perpetrator, and not the other elements of the crime, based apparently on the following comments:

> First degree murder has four elements. Betty Amstutz is dead. The Commonwealth has to prove that. And I don't think there is any doubt about it. Secondly, that that defendant is the one who killed her. Third, that that killing was with malice. That means that hardness of heart, cruelty, disposition. And, finally, that it was done with the specific intent to kill. I submit to you, whoever did this to a seventy year old woman had malice and specific intent. So we are down to one thing. Is that the guy that was pulling the trigger?
>
> You have got some special tools to use in this particular case. Because I have to show things that are state of mind.
>
> * * *
>
> I have got the burden of proof in this case. Got to prove each and every one of those four elements beyond a reasonable doubt.

*Id.* at 91, 93 (cited in Appellant's Brief at 29–30).

Fourth, Appellant asserts that the prosecutor improperly commented that the judge was *required* to give instructions as to second- and third-degree murder, based on the following:

> We are charging murder in the first degree. You are going to hear the Judge required to [sic] give you instructions about third degree murder and second degree murder. I will say that those are lesser crimes of first degree murder.

*Id.* at 91 (cited in Appellant's Brief at 30).

There is no question that, if appellate counsel had invoked the relaxed waiver doctrine in an attempt to obtain review of the above comments, we would have declined to grant such review. Appellant's assertions of prosecutorial misconduct are unquestionably refuted and belied by the plain text of the prosecutor's comments. Far from presenting any significant constitutional issues or implicating actual innocence, Appellant's claims are frivolous, ignoring not just the context of the

comments, but the obvious plain meaning. Appellant is not entitled to relief on any of his claims in Issue 4.[19]

19. In addition to challenging the above-quoted four comments from the prosecutor's guilt phase closing argument, Appellant also challenges one aspect of the prosecutor's cross-examination of Dr. Stephen Anthony Ragusea, a clinical psychologist who testified on Appellant's behalf in the penalty phase.

During direct examination, Dr. Ragusea opined that Appellant has made bad decisions throughout his lifetime. N.T. Penalty Phase, 5/17/96, at 1885. As an example of Appellant's poor decision-making, Dr. Ragusea cited Appellant's decision to represent himself at trial, as follows:

The most recent bad decision, not as terrible as some of them, is, of course, representing himself at trial, which is a pretty preposterous thing to do.

*Id.* at 1885–86

Subsequently, on cross-examination, the prosecutor questioned Dr. Ragusea as to his interpretation of the significance of Appellant's self-representation:

*Prosecutor:* And you talk about some of these things about [sic] you indicate, well, gee, it is pretty preposterous that he would represent himself. Now, he is of average intelligence, right?

*Dr. Ragusea:* Yes.

*Prosecutor:* First case you were at he had a lawyer, correct?

*Dr. Ragusea:* Yes.

*Prosecutor:* He didn't win?

*Dr. Ragusea:* That is correct.

*Prosecutor:* Okay. Now, suppose you put in a few other factors that I pose to you of an average intelligence, [sic] who has been through the system, who now sees that if he represents himself he can have a lot more visitors in prison, he can be in front of the jury and talk and question and everything else, *but not have to testify, or be subject to cross-examination,* if you add those factors in, that could be a pretty smart decision, couldn't it?

*Dr. Ragusea:* I don't think.

*Prosecutor:* No?

*Dr. Ragusea:* I don't think you would represent yourself in this case. I don't think your assistant would represent himself in this case. I don't think the Judge would. I think you would all be wise enough and think clearly enough to know that it is better to put it in someone else's hands.

*Id.* at 1889–90 (emphasis added to indicate the phrase cited and relied upon by Appellant; *see* Appellant's Brief at 29).

This is the context in which the eleven-word phrase challenged by Appellant appears. Based on those eleven words, taken out of context, Appellant asserts that penalty phase counsel was ineffective for failing to object because the words "demeaned [Appellant's] right to present a defense, his right to self-representation, and his privilege against self-incrimination," implicating his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Appellant's Brief at 29.

### 5. Jury Instruction as to Intent

In Issue 5, Appellant challenges the following portion of the trial court's jury instruction, delivered at the close of the guilt phase: "If you believe that the defendant intentionally used a deadly weapon on a vital part of the victim's body, you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant had the specific intent to kill." N.T. Trial, 5/15/96, at 1562. Appellant asserts that this instruction diminished the Commonwealth's burden of proof and thereby violated due process because it "did not require the jury to find that [Appellant] *intended to*

We see no indication that this issue was raised before the PCRA court. It is not included in Appellant's PCRA petition or supplemental petitions or even in his statement of questions on appeal to this Court. The PCRA court does not address the issue in its comprehensive opinions. Appellant has failed to provide any citation to the record where this issue is raised. The issue is waived. *See* Pa.R.A.P. 302(a).

Further, the issue is entirely meritless. Dr. Ragusea, a **defense** witness—not a Commonwealth witness—initially raised the matter of Appellant's choice to represent himself as an example of his bad decisionmaking. On cross-examination, the Commonwealth was entitled to question Dr. Ragusea concerning his interpretation of the significance of Appellant's decision to represent himself and to offer an alternative view, *i.e.*, that Appellant, who had represented himself in a previous trial and thus had experience with the judicial system, had made an informed and strategic decision. Although the Fifth Amendment affords protection against compulsory self-incrimination, "where as in this case the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege." *United States v. Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988); *see also Commonwealth v. Trivigno*, 561 Pa. 232, 750 A.2d 243, 248–49 (2000) (citing *Robinson's* "fair response" doctrine in concluding that the prosecutor's request to the jury to "decide the case based on the evidence that came from that chair up there" was not improper). Here, a defense witness opened the line of inquiry as to the significance of Appellant's self-representation, and the prosecution properly responded.

Finally, we cannot see any way that the above comment could have "demeaned [Appellant's] right to present a defense, his right to self-representation, and his privilege against self-incrimination." Appellant's Brief at 29. The guilt phase of trial was over, Appellant's period of self-representation was over, and the jury had found him guilty of first-degree murder. The only question remaining was the penalty to be imposed. Appellant fails to suggest how the prosecutor's question could possibly have "demeaned" his right to present a defense to the death penalty or to any other right. There is no merit to this claim.

*aim* the gun at a vital part of the deceased's body." [20] Appellant's Brief at 31 (emphasis in original). Appellant further asserts that counsel was ineffective for failing to raise this issue in post-verdict briefing or on direct appeal.

Appellant again fails to acknowledge that, throughout the guilt phase of trial, he represented himself, and thus, as we have discussed in Issues 3 and 4 *supra,* no claim of ineffective assistance of trial counsel during the guilt phase is available to him. *See Bryant,* 855 A.2d at 738–39 (rejecting the appellant's claim of counsel ineffectiveness based on failure to request a cautionary instruction upon the introduction of "bad acts" evidence, because the appellant was representing himself when the complained-of evidence was introduced and he failed to object or to request a cautionary instruction). As we also discussed in Issue 4, because the issue was not preserved with a contemporaneous objection, it was waived; direct appeal counsel was not, and could not have been, ineffective for failing to raise a waived issue.[21] Appellant is entitled to no relief.

## 6. Prior Criminal Acts Evidence and Jury Instruction

In Issue 6, Appellant argues that the admission of evidence related to his other homicides in Clearfield, Schuylkill, and York counties without an "appropriate" and "immediate" cautionary instruction violated the Sixth, Eighth, and Fourteenth Amendments. Appellant's Brief at 32. On direct

**20.** This issue is waived. *See* text *infra.* However, we cannot fail to note that Appellant's underlying contention directly conflicts with the law in this Commonwealth. As we have stated, "the critical inquiry is the *use* of a deadly weapon on a vital part of the body, not the intentional aiming of the weapon at a vital part of the body." *Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 607 (2007) (emphasis in original).

**21.** Appellant also appears to be asserting some version of relaxed waiver with the following sentence in Issue 5: "Nor was this constitutional error waived by virtue of the failure to preserve it at trial. *Freeman,* 827 A.2d at 400." Appellant's Brief at 32. We stress that this one sentence is the **entirety** of Appellant's argument against waiver of this issue. This one sentence does not constitute a developed, reasoned, supported, or even intelligible argument. The matter is waived for lack of development.

appeal, this Court held that the trial court did not err with respect to the timing or content of the limiting instruction as to other crimes evidence. *Spotz III,* 759 A.2d at 1286–87. Recognizing that Appellant's claim of trial court error in Issue 6 had been previously litigated and was therefore not cognizable under the PCRA, the PCRA court correctly held that Appellant was entitled to no relief on this issue. PCRA Court Opinion at 24.

However, as another sub-claim in Issue 6, Appellant further asserts that direct appeal counsel was ineffective in the manner in which he challenged the jury instruction. More specifically, Appellant argues that direct appeal counsel was ineffective because he failed to raise a violation of Appellant's state and federal constitutional rights, but rather relied only upon state decisional law. This is a distinct claim and one that has not been previously litigated. *See Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 573 (2005) (holding that "a Sixth Amendment claim of ineffectiveness raises a distinct legal ground for purposes of state PCRA review under § 9544(a)(2) . . . [and] a PCRA court should recognize ineffectiveness claims as distinct issues and review them under the three-prong ineffectiveness standard announced in [*Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987) ]").

Although ineffective assistance of direct appeal counsel is a distinct claim, Appellant fails to develop and argue it as such. Other than baldly asserting four times that the failure to provide an appropriate and/or immediate instruction to the jury constituted a violation of his Sixth, Eighth, and Fourteenth Amendment rights, Appellant does not explain or develop this issue. *See* Appellant's Brief at 32–34. He sets forth **no** constitutional argument relevant to either the federal or state Constitution. Remarkably, although Appellant faults direct appeal counsel for, *inter alia,* "failing to cite to federal law," Appellant likewise fails to cite even a single federal case to support his bald assertion of federal constitutional violations. Nor does he offer the slightest explanation or elucidation of his claim of a state constitutional violation. A constitutional claim is not self-proving, and we will not attempt to

divine an argument on Appellant's behalf. Appellant's claim
of ineffective assistance of direct appeal counsel in Issue 6 is
waived for lack of development. *See Commonwealth v. Steele,*
599 Pa. 341, 961 A.2d 786, 797 (2008) (stating that when an
appellant fails "to set forth all three prongs of the ineffective-
ness test and [to] meaningfully discuss them, he is not entitled
to relief, and we are constrained to find such claims waived for
lack of development").

## PENALTY PHASE ISSUES

### 7. Jury Instruction on Aggravating and Mitigating Factors as Affecting "Terribleness"

Appellant's next four issues, *i.e.,* Issues 7–10, are related to
various aspects of the aggravating and mitigating circum-
stances presented, or not presented, during the penalty phase
of Appellant's trial. In Issue 7, Appellant challenges one
sentence of the trial court's jury instruction generally explain-
ing the concept of aggravating and mitigating circumstances.

> [A]ggravating circumstances are things about the killing or
> the killer which make first degree murder—which make a
> first degree murder case *more terrible* and deserving of the
> penalty; while mitigating circumstances are those things
> which make the case *less terrible* and less deserving of
> death.

N.T. Penalty Phase, 5/15/96, at 1619 (cited in Appellant's Brief
at 73) (emphasis added).

Appellant contends that this instruction's focus on " 'terri-
bleness' produced an arbitrary and capricious sentence based
upon passion and prejudice [and that] the 'less terrible' in-
struction substantively impaired the jury's consideration of
mitigating evidence." Appellant's Brief at 73. Appellant fur-
ther asserts that counsel was ineffective for agreeing to the
above portion of the instruction and for failing to raise the
matter on direct appeal. *Id.* at 74.

The PCRA court points out that the challenged instruction
was, at the time of trial in 1996, part of a Pennsylvania

suggested standard criminal jury instruction.[22] PCRA Court Opinion at 57. Appellant acknowledges that this Court has repeatedly rejected challenges to this instruction, and that he is presenting it "to preserve it for future review." Appellant's Brief at 74.

As Appellant correctly notes, this Court has, indeed, consistently rejected challenges to inclusion of the concept of "terribleness" in the instruction regarding aggravating and mitigating circumstances. *See Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 613–14 (2007) (rejecting the appellant's assertion that the instruction improperly restricted the weight afforded mitigating factors that did not affect the "terribleness" of the offense); *Commonwealth v. Marinelli*, 589 Pa. 682, 910 A.2d 672, 687 (2006) (Opinion Announcing the Judgment of the Court) (rejecting the appellant's assertion that the description of circumstances as " 'more terrible or less terrible' diverted the focus of the jury's life or death deliberation from a reasoned determination as to the defendant's personal culpability to an amorphous and unguided consideration of how 'terrible' 'the case' was"); *Commonwealth v. Johnson*, 572 Pa. 283, 815 A.2d 563, 588 (2002) (concluding that the instructions "merely expressed to the jury, in laymen's terms, the purpose for the distinction between aggravating and mitigating circumstances in a capital penalty phase"); *Commonwealth v. Hawkins*, 567 Pa. 310, 787 A.2d 292, 308 (2001) (concluding that a jury instruction defining aggravating and mitigating circumstances, respectively, as "things that make first degree murder cases either more or less terrible" was not amorphous or unguided because instructions must be read in their entirety and because the court also gave detailed instructions as to each aggravating and mitigating circumstance); *Commonwealth v. Saranchak*, 544 Pa. 158, 675 A.2d 268, 276–77 (1996) (holding a jury instruction proper that defined aggravating and mitigating circumstances, respectively, as "things that make a first degree murder case more or less

22. The PCRA court further indicates that the instruction was modified in 2005 to eliminate use of the word "terrible" for purposes of clarity and accuracy, and also out of fear of the prejudicial nature of this term. PCRA Court Opinion at 57.

terrible," and noting that the instruction was in conformity with the Pennsylvania Suggested Standard Criminal Jury Instructions). Based on this Court's ample precedent, Appellant's claims in this issue are meritless.

## 8. Prior Homicide Convictions as Aggravating Factors

In Issue 8, Appellant asserts that, because his prior three homicide convictions, in Clearfield, Schuylkill, and York counties, respectively, were "invalid," they were improperly introduced during the penalty phase as evidence of the aggravating circumstances set forth in 42 Pa.C.S. § 9711(d)(9) and (d)(11), *i.e.*, respectively, a significant history of violent felony convictions, and prior conviction of another murder.[23] Appellant's Brief at 9–12. Appellant further asserts that counsel was ineffective in failing to challenge the admissibility of the prior convictions during the penalty phase of trial or on direct appeal. *Id.* at 12. There is no legal basis for Appellant's claim.[24]

This Court has expressly held that the term "conviction" means simply "found guilty" when used in the context of the aggravating circumstances set forth in 42 Pa.C.S. § 9711(d). *Commonwealth v. Morales*, 508 Pa. 51, 494 A.2d

---

**23.** Appellant's Clearfield County voluntary manslaughter and aggravated assault convictions were introduced pursuant to subsection 9711(d)(9), a significant history of violent felony convictions. Appellant's first-degree murder convictions in Schuylkill and York Counties were introduced pursuant to subsection 9711(d)(11), conviction of another murder, which was committed prior to or at the time of the offense at issue. N.T. Penalty Phase, 5/16/96, at 1635–36, 1639, 1641–42; 5/17/96, at 154–55, 158 (Closing Argument).

**24.** As Appellant acknowledges, he raised a similar claim, invoking only his prior Clearfield County voluntary manslaughter conviction, in his collateral appeal of his Schuylkill County murder conviction. *Spotz V*, 896 A.2d at 1224–25. We held that Appellant's voluntary manslaughter conviction was properly considered by the jury in finding the aggravating circumstance set forth in 42 Pa.C.S. § 9711(d)(12), conviction of voluntary manslaughter, committed either prior to or at the time of the offense at issue.

Appellant submits that he has presented the claim here "to preserve it for possible federal habeas review and so as not to waive it in the event that one or more of these convictions are later overturned." Appellant's Brief at 9–10.

367, 376 (1985) (citing *Commonwealth v. Beasley*, 505 Pa. 279, 479 A.2d 460, 464 (1984)). A collateral murder conviction is not divested of its character as an aggravating circumstance merely because it remains at the appeal stage. *Id.* at 376. Only if the conviction is overturned on appeal could an error ensue. *Id.; Beasley, supra* at 464.

Appellant was convicted of the first-degree murder of June Ohlinger, in Schuylkill County, and Penny Gunnet, in York County, and this Court affirmed Appellant's judgment of sentence of death in each case. *See Spotz I,* 716 A.2d at 593; *Spotz II,* 756 A.2d at 1165. This Court also denied Appellant's appeal of the denial of PCRA relief in the Schuylkill County case. *See Spotz V,* 896 A.2d at 1250. Although the Superior Court initially reversed Appellant's conviction for voluntary manslaughter in the death of Dustin Spotz in Clearfield County, this Court reinstated that conviction. *See Spotz IV,* 870 A.2d at 837. Thus, none of Appellant's convictions has been overturned, and all were properly proffered and admitted as aggravating circumstances. Because there is no arguable merit to Appellant's underlying claim of error with regard to use of the convictions, counsel cannot be held ineffective for failing to object to their admission into evidence. Appellant's eighth issue is entirely lacking in merit.

## 9. Burglary Convictions as an Aggravating Factor

In Issue 9, Appellant claims that his three prior burglary convictions were improperly admitted as evidence to support the aggravating circumstance of "a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa.C.S. § 9711(d)(9). Appellant reasons that, because his burglaries were "nonviolent," they could not be used to establish this aggravating circumstance. Additionally, Appellant asserts that counsel was ineffective for stipulating to the burglary convictions, rather than moving *in limine* to bar their introduction as an aggravating circumstance. Appellant's Brief at 75–79; N.T. Penalty Phase, 5/16/96, at 1629–33. As the PCRA court recognized in denying this claim, Appellant raised the same issue in his collateral appeal of his

Schuylkill County first-degree murder conviction, and this Court rejected his arguments based on our precedent defining burglary as a crime of violence. *Spotz V*, 896 A.2d at 1240–41.

In one of those precedential cases, *Commonwealth v. Rolan*, 520 Pa. 1, 549 A.2d 553, 559 (1988), we stated that "burglary has always been and continues to be viewed as a crime involving the use or threat of violence to the person." Accordingly, we held that the defendant's prior burglary convictions had been properly admitted as evidence of a significant history of violent felony convictions pursuant to subsection 9711(d)(9). *Id.* at 558–59. In *Commonwealth v. Bracey*, 541 Pa. 322, 662 A.2d 1062, 1075 n. 15 (1995), we cited *Rolan, supra*, for the proposition that "[t]rial counsel was [ ] not ineffective in failing to object to the accurate instruction of the trial court that the crime of burglary is a crime of violence as a matter of law." More recently, in *Commonwealth v. Small*, 602 Pa. 425, 980 A.2d 549, 576–77 (2009), we reiterated that burglary is a crime of violence, in which the element of non-privileged entry invites dangerous resistance. We rejected outright the *Small* appellant's contention that, because his **specific** burglaries did not involve violence, they could not be used to satisfy the subsection 9711(d)(9) aggravating factor.

 Based on *Small, Bracey,* and *Rolan*, as well as *Spotz V*, we hold that the trial court did not err in presuming that burglary is *per se* a crime of violence for purposes of subsection 9711(d)(9). Because there is no arguable merit to Appellant's underlying claim of trial court error, his derivative claim of trial counsel ineffective assistance is entirely lacking in merit.[25, 26]

25. Appellant insists that because his burglaries involved "unoccupied vacation cabins," they were "self-evidently non-violent." Appellant's Brief at 78 n. 109, 79. To support this view, Appellant attempts to rely on 42 Pa.C.S. § 9714, in which the General Assembly determined that burglary is a crime of violence for purposes of Pennsylvania's two-strikes sentencing law only if a person is present at the time of the offense. Appellant's reliance on Section 9714 affords him no relief. The General Assembly has indeed deemed burglary as a crime of violence for purposes of two and three strikes mandatory punishment **only** when the burglary is "of a structure adapted for overnight accommodation in which at the time of the offense any person is present."

■ Also in Issue 9, Appellant contends that his penalty phase counsel was ineffective for failing to object to the following allegedly misleading statement by the prosecutor, which suggested the use or threat of violence during Appellant's commission of the burglaries:

> The second [aggravating circumstance] is significant history of felony convictions.... But we went through all of these. Two robbery convictions, Franklin County; one here, a conspiracy to commit robbery here; three burglaries, that is breaking into someone's house to commit another crime, or dwelling place to commit another crime. That is a significant history.

> The Judge will tell you that those crimes are felonies. And it is not just a record of felonies, it is significant history of felony convictions involving, what, the use or threat of force. *That means you take one of these [a gun] when you are doing it, where you are doing something violent.* And they talk about burglary being *the type of case that brings you into conflict with other human beings.*

N.T. Penalty Phase, 5/17/96, at 154 (Closing Argument) (portions cited in Appellant's Brief at 77–78; emphasis added by Appellant).

Appellant argues that because his burglaries involved vacation cabins and no actual violence or threat to a person, the prosecutor's comment was false insofar as it suggested vio-

---

*Commonwealth v. Small,* 602 Pa. 425, 980 A.2d 549, 580 (2009) (Castille, C.J., concurring) (quoting 42 Pa.C.S. § 9714(g)). However, as Chief Justice Castille has explained, the General Assembly is free to define burglary or any other offense differently for different purposes. The fact that the General Assembly has limited the applicability of burglary for setting punishment under the two-strikes/three-strikes scenario does not alter established law regarding the use of burglary convictions to support the subsection 9711(d)(9) aggravator. *Id.*

26. Also in Issue 9, in one sentence containing no explication, Appellant claims that the aggravating circumstance of subsection 9711(d)(9) is unconstitutionally vague and overbroad as applied in this case, because the trial court failed to instruct the jury as to the definition of three elements, *i.e.,* "significant history," "use or threat of violence," and "the person." Appellant's Brief at 75. Appellant raised exactly the same issue in *Spotz V,* 896 A.2d at 1240. We rejected his claim in *Spotz V,* and we do so again here on the same grounds.

lence and conflict between Appellant and the victims of the burglaries. Appellant contends that, when the prosecutor said "one of these" in the above excerpt, he was referring to a gun and was suggesting that Appellant's burglaries had been violent, armed confrontations. Appellant's Brief at 77–78. Appellant cites the following excerpts from the PCRA hearing where his counsel was examining Mr. Andrews, Appellant's penalty phase counsel:

> *PCRA Counsel:* Setting aside the question of—the specific question of whether or not the burglaries were violent or nonviolent, do you recall the Commonwealth's closing argument when they talk about the—that burglaries were the type of case that brings you into contact with other human beings, and the prosecutor at that point had picked up a gun that had been one of the exhibits?
>
> *Mr. Andrews:* I don't recall that.

N.T. PCRA Hearing, 5/10/07, at 217–18.

The Commonwealth's interpretation of the prosecutor's penalty phase statement is quite different. The Commonwealth contends that the prosecutor was not portraying Appellant's burglaries as involving armed conflict, but rather was describing Appellant's theft of a shotgun from one of the cabins that he burglarized. Commonwealth's Brief at 68–69. The Commonwealth admits that the prosecutor's reference to the gun in the above statement was an improper reference to evidence not of record, but argues that the isolated and vague reference to a gun could not have so prejudiced the jury that it would have been unable to weigh fairly the evidence presented. *Id.* at 69; *see Commonwealth v. Jones,* 546 Pa. 161, 683 A.2d 1181, 1203 (1996) ("[A]lthough it is improper to comment on evidence not of record, we cannot conclude that the isolated reference here made by the prosecutor ... was so pervasive or deliberate so that the unavoidable effect thereof was to prejudice the jury to the point that they could not fairly weigh the evidence presented.")

The PCRA court did not make any factual findings with regard to the matter, but rather concluded that the prosecu-

tor's remark was not so prejudicial as to make the jury incapable of rendering a true verdict. PCRA Court Opinion at 53–54. We conclude that the PCRA court's determination is supported by the record, and we will accordingly not disturb it.

Contrary to Appellant's assertions, it strains reason to suggest that the prosecutor's brief, vague, passing reference to a gun during his discussion of Appellant's prior felony convictions could have so prejudiced the jury that there is a reasonable probability that the outcome of the proceedings would have been different had counsel objected. The prosecutor's reference to a gun must be considered in the broader context of Appellant's lengthy history of felony convictions. Specifically, the following felony convictions were presented to the jury to support the aggravating circumstances of a significant history of violent felony convictions, pursuant to subsection 9711(d)(9): voluntary manslaughter and aggravated assault convictions, on September 27, 1995; two felony robbery convictions on, respectively, June 12, 1990, and July 3, 1990; conspiracy to commit felony robbery conviction, on June 12, 1990; and three felony burglary convictions, on April 3, 1990. N.T. Penalty Phase, 5/16/96, at 1623–24, 1629–32, 1635–37; N.T. Penalty Phase, 5/17/96, at 158 (Defense Closing Argument). In addition, Appellant's two prior first-degree murder convictions were presented to the jury as evidence of the aggravating factor set forth in subsection 9711(d)(11), conviction of another murder. N.T. Penalty Phase, 5/16/96, at 1639–42.

Given all of Appellant's prior violent felony convictions and his two prior first-degree murder convictions, we cannot conclude that the prosecutor's brief reference to a gun in the context of the burglaries was prejudicial. To prevail on this claim, Appellant would have to establish that the prosecutor's one brief mention of a gun in the context of the burglaries tipped the balance away from mitigation and in favor of aggravation in the jury's mind, resulting in the verdict of death. This is simply not a tenable position. Given Appellant's lengthy record of violent felonies and murders with

firearms, we cannot ascribe overriding and determinative significance to one brief reference to a gun in one sentence by the prosecutor. Thus, Appellant has failed to establish that he was prejudiced, and he is not entitled to relief on his ineffective assistance of penalty phase counsel claim.

## 10. Aggravating Circumstance of Killing While in the Perpetration of a Felony

In Issue 10, Appellant argues that the jury's guilt-stage verdict of first-degree murder but not second-degree murder precluded the applicability of the aggravating factor of "a killing while in the perpetration of a felony." 42 Pa.C.S. § 9711(d)(6).[27] In other words, Appellant asserts that the jury's failure to find him guilty of second-degree murder precludes a penalty phase finding that the killing was committed during the perpetration of a felony. Appellant's Brief at 80–81. Appellant further asserts that counsel was ineffective for failing to raise this issue at trial, in post-trial motions, and on direct appeal. *Id.* at 82.

As the Commonwealth points out, Appellant's argument ignores the trial court's explicit instructions to the jury that it could find **one** of four possible verdicts: not guilty, guilty of first-degree murder, guilty of second-degree murder, or guilty of third-degree murder. N.T. Trial, 5/15/96, at 1559, 1566, 1568. In denying Appellant's claim, the PCRA court held that the jury's verdict of first-degree murder did not constitute or equate to a finding of not guilty of second-degree murder. PCRA Court Supplemental Opinion, dated 8/7/08, at 2. The PCRA court also cited *Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90, 100–01 (1995), in which this Court rejected a constitutional challenge to the death penalty statute grounded in the identity of the definitions of the 9711(d)(6) aggravating circumstance and of felony murder, a non-capital offense.

---

**27.** First-degree murder is "an intentional killing." Second-degree murder is a killing "committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S. §§ 2502(a) and (b), respectively.

██ We agree with the PCRA court and the Common-
wealth. The jury found that Appellant was guilty of first-
degree murder, an intentional killing. By no logic can the
jury's verdict be considered a finding that Appellant did **not**
commit the murder while perpetrating a felony, and thus was
**not** guilty of second-degree murder. Appellant's assertions to
the contrary are groundless; inconsistent with the law, *see
Walker, supra*; and unsupported by the record or the facts.
Accordingly, there is no merit to Appellant's assertion that
counsel was ineffective for failing to raise this issue.

## 11. Prosecutorial Comments during the Penalty Phase

Appellant challenges numerous comments made by the
prosecutor during the penalty phase and contends that trial
counsel was ineffective because he failed to object to each of
these comments. The PCRA court denied relief. Although
the PCRA court did not address individually each of the
numerous challenges, it concluded that "[n]othing stated by
the prosecutor was so prejudicial that the jury was incapable
of rendering a true verdict." PCRA Court Opinion at 52, 54
(citing *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220,
242 (2006)). After careful review of the notes of testimony,
including the prosecutor's entire opening statement and clos-
ing argument, we conclude that the PCRA court's conclusion
is supported by the record, and we will not disturb it.

██ As we have recently reiterated, a claim of ineffec-
tive assistance grounded in counsel's failure to object to a
prosecutor's comments "may succeed when the petitioner
demonstrates that the prosecutor's [comments] violated a con-
stitutionally or statutorily protected right, such as the Fifth
Amendment privilege against compulsory self-incrimination or
the Sixth Amendment right to a fair trial, or a constitutional
interest such as due process." *Commonwealth v. Cox*, 603 Pa.
223, 983 A.2d 666, 685 (2009) (quoting *Commonwealth v.
Tedford*, 598 Pa. 639, 960 A.2d 1, 29 (2008)). "To constitute a
due process violation, the prosecutorial misconduct must be of
sufficient significance to result in the denial of the defendant's
right to a fair trial." *Cox, supra* at 685 (quoting *Greer v.*

*Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)). "The touchstone is the fairness of the trial, not the culpability of the prosecutor." *Id.*

A prosecutor may make fair comment on the admitted evidence and may provide fair rebuttal to defense arguments. *Id.* at 687. Even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks. *Id.* Any challenge to a prosecutor's comment must be evaluated in the context in which the comment was made. *Id.* During closing argument in the penalty phase, a prosecutor must be afforded reasonable latitude, and permitted to employ oratorical flair when arguing in favor of the death penalty. *Commonwealth v. Stokes,* 576 Pa. 299, 839 A.2d 226, 231–32 (2003). It is not improper for the prosecutor to urge the jury to view the defense's mitigation evidence with disfavor and thus to impose the death penalty. *Id.* at 233.

Not every unwise, intemperate, or improper remark made by a prosecutor mandates the grant of a new trial:

> Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.

*Cox, supra* at 687 (citation omitted); *see also Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 242 (2006).

In the instant case, none of the prosecutor's comments so prejudiced the jury. Appellant has taken most of the challenged comments out of context, has misinterpreted their meaning, and/or has failed to consider directly relevant decisional law from this Court, as discussed below.

First, Appellant challenges several comments made by the prosecutor during his opening statement or closing argument as to his role and the role of the jury, alleging that the comments diminished the jury's sense of responsibility for the decision to impose the death penalty:

*I am required by law to be in front of you.* I did ask each one of you when you were questioned about being a juror on the case if you could *promise me that in an appropriate case, you could vote for a death penalty.* I have to now ask each and every one of you to *live up to that oath, to be a juror.*

And, remember, you are still the fact finders in this case. That is important. The sentence is set by the law. It is a very simple process.....

I will just read it to you now again. You find the facts of aggravating and mitigating and weigh them, and then the law sets the sentence. The statutes of our Commonwealth, the laws of the people of this state. [sic] The verdict must be a sentence of death, must be, if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance; or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.

\*　　\*　　\*

I am not going to say to you now that this is going to be any easy thing. But I look to each and every one of you, remember that *all of us in this society are governed by law.* I have read to you what the law stated. And *I ask you simply to remember your oath to follow that law.*

N.T. Penalty Phase, 5/16/96, at 121–22, 124 (Prosecutor's Opening Statement) (emphasis added to portions cited by Appellant in his Brief at 84).

We are here because of certain things. *I have a duty as the elected prosecutor for the people of Cumberland County to present cases where the law says that the penalty should be death.*

You, by I guess sheer chance of lot, got chosen to take on a *special duty to follow the law,* and now to decide the appropriate sentence for the willful, deliberate, and premeditated killing of Betty Amstutz.

\*　　\*　　\*

The law, again, says the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.

\* \* \*

Because if one of you says that the mitigation in this case outweighs the aggravating circumstances, it is life. But, again, that person would still have to say under the law, 1 have weighed these and that mitigation outweighs the aggravating circumstances.

N.T. Penalty Phase, 5/17/96, at 144–45 (Prosecutor's Closing Argument) (emphasis added to portions cited by Appellant in his Brief at 84).

Most egregiously, Appellant contends that the prosecutor argued to the jury that it "had a 'societal' responsibility to return a death verdict." Appellant's Brief at 84 (citing N.T. Penalty Phase, 5/16/96, at 124). This allegation constitutes a gross mischaracterization of the prosecutor's statements, *supra*. The only " 'societal' responsibility" implied by the prosecutor was to follow the law. Furthermore, we have previously concluded that there was no error where a prosecutor asked a jury to "live up to" the promise it made under oath to follow the law and to impose the death penalty in an appropriate case. *Carson*, 913 A.2d at 268–69; *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 450 (1999). The fact that the prosecutor discussed the duty of the jurors to follow the law immediately after discussing his own duty constitutes "nothing more than a simple comparison." *Carson*, *supra* at 269. The prosecutor made clear that the jury was the fact-finder and that its weighing of aggravating and mitigating factors would determine the sentence to be imposed under the law.[28] Appellant's allegation that the prosecutor diminished the jury's

---

**28.** Toward the end of its instructions to the jury, the trial court also made this point in no uncertain terms:

Remember that your verdict is not merely a recommendation. It actually fixes the punishment at death or life imprisonment.

N.T. Penalty Phase, 5/17/96, at 1915 (Jury Instructions).

sense of responsibility in the penalty phase is meritless, as it does not reflect any fair or reasonable interpretation of the prosecutor's own words.

In his second challenge to prosecutorial comments, Appellant focuses on the cross-examination of defense expert witness Dr. Stephen Ragusea, a clinical psychologist, and the prosecutor's closing argument regarding Dr. Ragusea's mitigation testimony. Appellant contends that the prosecutor improperly denigrated, distorted, and trivialized the mental health mitigating evidence offered by Dr. Ragusea. The relevant excerpts, in their proper context, are as follows:

> *Prosecutor:* Just take the devil's advocate view, this modeling approach then is what we are telling [Appellant] is, now, [Appellant], this isn't your fault, you have had all these problems, so you are really not responsible for killing Betty, right?
>
> *Dr. Stephen Ragusea:* No.

N.T. Penalty Phase, 5/17/96, at 1887–88.

> *Prosecutor:* I mean [Mark] Hinckley was diagnosed as a schizophrenic who was making a move to impress Jody Foster.
>
> *Dr. Stephen Ragusea:* Absolutely in that sense, Mark Hinckley was a much more mentally ill man than is [Appellant]. From the perspective of knowing right and wrong and understanding reality.
>
> *Prosecutor:* I am assuming these are from, what, the diagnostic manual?
>
> *Dr. Stephen Ragusea:* Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition.
>
> *Prosecutor:* The fourth edition is apparently they [sic] are up to 995 point 5 disorders now?
>
> *Dr. Stephen Ragusea:* That has always been there. That is just a categorical system.
>
> *Prosecutor:* How many are there now?
>
> *Dr. Stephen Ragusea:* I don't know.
>
> *Prosecutor:* There is [sic] an awful lot of them, aren't there?

*Dr. Stephen Ragusea:* A bunch.

*Prosecutor:* There is one, is there not, for—if you drink a lot of coffee, isn't there, something about being addict[ed] to caffeine?

*Dr. Stephen Ragusea:* It may be there. I don't know. I don't recall it. I have never used it. So I can't verify that for sure.

*Prosecutor: It is true, is it not, sir, that you can go into that book [the DSM] and take almost any person in this room, and if you sat down there and went through with them and talked with them long enough, you would find one of those numbers that fits somebody, doesn't it?*

*Dr. Stephen Ragusea:* No. Not even remotely like that. Many of the people we see in our everyday practice don't meet the criteria for any diagnostic category. That is a real overstatement.

*Prosecutor:* When people are in trouble though, there always seems to be one that fits, isn't that true?

*Dr. Stephen Ragusea: It is certainly common.* But, again, the important point is that all these things have been consistent throughout [Appellant's] lifetime. None of them is unique or unusual. It parallels his entire life experience.

*Id.* at 1896–87 (emphasis added to portions cited by Appellant in his Brief at 85).

During his penalty phase closing, the prosecutor argued as follows regarding the testimony offered in mitigation:

Talk about the accounting for his capacity to appreciate criminality is because he has, what, attention deficit disorder? You say, well, you know, a lot of people have that. I think he even said seven percent of the population. Seven percent of the population don't end up doing what happened in this particular case.

*The whole thing comes down to that Dustin is the big boogie man.*

N.T. Penalty Phase, 5/17/96, at 148–49 (Prosecutor's Closing Argument) (emphasis added to portion cited by Appellant in his Brief at 86).

Finally, we get to [mitigating factor] number eight: Other. I'm sure *Mr. Andrews, doing his job as he is required, is going to have a long list of things that we heard yesterday.*

\* \* \*

*I pointed it out back before, the computer suggested that this is an invalid profile due to exaggeration tendencies.* It is a psychological thing. It is not objective as it was made out to be. . . . .

Now, I submit to you, as the Doctor [Ragusea] admitted and Molly Muir admitted, they have a thousand cases in Children and Youth, does every one of those people grow up to be a killer? No. *Did the Doctor say that every time somebody gets in trouble their profile will probably fit into that diagnostic manual? Yeah.* And that certainly is [sic] everybody with attention disorder doesn't end up in a room like this.

*Id.* at 150–51 (emphasis added to portions cited by Appellant in his Brief at 85).

So now that is the mitigation. *That is supposed to excuse this.*

*Id.* at 153 (emphasis added to portion cited by Appellant in his Brief at 86).

*To accept that mitigation that has been presented to you— and think about it—he has got that for the rest of his life, anything he does from now on is mitigated because of his childhood. No responsibility to society. No responsibility to make some positive choices about don't take one of these and do that to an old woman.* You have got to weigh that.

*Id.* at 155 (emphasis added to portion cited by Appellant in his Brief at 86).

We have held that the prosecutor may rebut mitigation evidence in his arguments and may urge the jury to view such evidence with disfavor. *Carson, supra* at 271 (concluding that the following prosecutorial argument did not improperly prevent the jury from giving full effect to the appellant's mitigation evidence: "[A]ny argument to say that [the appellant] didn't have that opportunity [to climb out of poverty and make

something out of himself] is a slap in the face to any one of those children who managed to succeed, to have managed to climb out of the gutter and make something of themselves instead of putting a bullet through some 53–year–old man's head"); *Stokes, supra* at 233; *Rollins, supra* at 449 (concluding that it was permissible for the prosecutor to disparage the mitigation evidence proffered by the appellant and to imply that it was of so little weight that it should not affect the verdict); *Commonwealth v. Duffey,* 519 Pa. 348, 548 A.2d 1178, 1189 (1988) (concluding that it was not improper for the prosecutor to comment on the appellant's childhood history of epileptic seizures when the appellant himself had introduced the evidence into the record as a mitigating circumstance). Based on these clear precedents, we conclude that Appellant's claim of improper denigration of his mental health mitigation evidence is meritless.[29]

 In the third sub-issue of Issue 11, Appellant challenges the portion of the prosecutor's closing argument that mentioned the statutory mitigation factors not proffered by Appellant.

> Weigh that mitigation you heard yesterday against the aggravating circumstances we showed and against all of the evidence that was put in in the prior five days of trial. It is not a question of numbers. It is not a little checklist of like if there are eight mitigating and only three, well, it is obvious. It is a question of quality, that question of quality.

> *You go through these mitigating circumstances, there is [sic] eight listed in the statute.* And we will get to the last one, which basically is anything else you want to consider. I am sure Mr. Andrews is going to dwell on that at length. *But what are they?*

---

**29.** Also as part of this sub-issue, Appellant again contends that the prosecutor improperly commented on Appellant's exercise of his right to self-representation and his right not to testify. Appellant raised the same claim in Issue 4, and we have addressed the claim in that issue. *See supra* n. 19.

N.T. Penalty Phase, 5/17/96, at 146–47 (Prosecutor's Closing Argument) (emphases represent portions cited and relied upon by Appellant in his Brief at 86–87).

The prosecutor then set forth, in the order in which they appear in the statute, the list of possible mitigating circumstances. *Id.* at 147–50. The prosecutor rebutted the four statutory mitigating circumstances that Appellant had proffered,[30] and also briefly mentioned three statutory circumstances that Appellant had not invoked. *Id.* On the sentencing verdict slip, only the mitigating circumstances proffered by Appellant were listed. The trial court, in its instructions to the jury, restated the proffered mitigation factors and clearly informed the jury how to consider them: .

> In deciding whether aggravated [sic] outweigh mitigating circumstances, do not simply count their number. Compare the seriousness and importance of the aggravating with the mitigating [circumstances].
>
> \* \* \*
>
> [Y]ou are to regard a particular aggravating circumstance as present only if you all agree that it is present. On the other hand, each of you is free to regard a particular mitigating circumstance as present, despite what other jurors may believe. . . . .
>
> This different treatment of aggravating and mitigating circumstances is one of the law's safeguards against unjust death sentences. It gives a defendant the full benefit of any mitigating circumstances.

N.T. Penalty Phase, 5/17/96, at 1911–12 (Jury Instructions).

We cannot conclude that the prosecutor's brief mention of uninvoked statutory mitigation circumstances prejudiced Ap-

---

**30.** The four mitigating circumstances that Appellant proffered were the following: he was under the influence of extreme mental or emotional disturbance, 42 Pa.C.S. §§ 9711(e)(2); he had an impaired capacity to appreciate the criminality of his conduct or to conform his conduct to law, 42 Pa.C.S. §§ 9711(e)(3); he was relatively young, just under 24 years of age, 42 Pa.C.S. §§ 9711(e)(4); and, pursuant to the catch-all mitigator, 42 Pa.C.S. §§ 9711(e)(8), he was "neglected during his childhood," was "physically abused," had a "poor upbringing by his parents," and "could have been helpful to others." Sentencing Verdict Slip, dated May 17, 1996, at 2.

pellant, particularly since the prosecutor also correctly informed the jury that its duty to weigh aggravating versus mitigating circumstances was not simply a matter of counting how many of each category applied to Appellant. In addition, the trial court reiterated for the jury the relevant mitigating circumstances, and then correctly and in detail informed the jury of the law with respect to its weighing of aggravating and mitigating factors. We hold there is no reasonable possibility that the prosecutor's brief mention of uninvoked mitigators created such bias and hostility toward Appellant in the jurors' minds that they were unable to weigh the evidence and render a true verdict.

 In Appellant's fourth sub-issue, he contends that the prosecutor improperly presented and argued non-statutory aggravating factors:

> It's always easy to *talk about the death penalty when you are out on the street* and you hear about all the polls and everything else. But fortunately there are few people like you or like me that ever get personally involved in it.
>
> \* \* \*
>
> You, by I guess sheer chance of lot, got chosen to take on a *special duty to follow the law,* and now to *decide the appropriate sentence for the willful, deliberate, and premeditated killing of Betty Amstutz.*
>
> \* \* \*
>
> But it is a question of choices. You make a choice here today. The defendant made a choice on that February night.
>
> I guess the one person who didn't get any choices was Betty Amstutz. *She might have liked to sit in a room for the rest of her life and at least get to see her family, write poetry, and read books.* She isn't going to get that opportunity.

N.T. Penalty Phase, 5/17/96, at 144–45 (Closing Argument) (emphases represent the portions cited and relied upon by Appellant in his Brief at 87–88).

Appellant's allegation that the above excerpts constitute improper presentation of non-statutory aggravating factors is meritless. The trial court clearly instructed the jury as to the three aggravating circumstances proffered by the Commonwealth; the prosecutor's opening statement and closing argument, as well as the sentencing verdict slip, were consistent with and reinforced those instructions. In the excerpt above, the prosecutor reminded the jury of its duty to follow the law, and certainly did not suggest "unconstitutionally expand[ing] the death penalty to include the entire class of first degree murders." Appellant's Brief at 87.[31]

Fifth, Appellant contends that the prosecutor made a number of material misstatements of law and fact concerning aggravating circumstances. We address each contention in turn. Appellant argues that the prosecutor "erroneously defined the (d)(9) aggravating circumstance," merely referring to one page of the prosecutor's penalty phase opening argument. Appellant's Brief at 88. The (d)(9) circumstance is a significant history of felony convictions involving the use or threat of

---

31. Also in this sub-claim, Appellant alleges that the prosecutor "made sure the jury knew that the York County Victim Coordinator, Jane Riese, was present to testify for the prosecution." Appellant's Brief at 88. This one-sentence sub-claim is unexplained and simply incomprehensible.

Ms. Riese was in the courtroom to identify Appellant as the convicted defendant in the York County murder of Penny Gunnet. Because Appellant stipulated that he was the defendant in that case, Ms. Riese did not take the stand, as the following notes of testimony reveal:

*Defense Counsel:* We will stipulate that the Mark Spotz identified in that [York County] record is the Mark Spotz that is the defendant in this proceeding.

*Court:* Who is here on that one, Mr. Ebert [prosecutor]? Another one of your detectives?

*Prosecutor:* Jane Riese. I spell that R-i-e-s-e. She was present at the time of the conviction, is the York County Victim Coordinator.

*Court:* All right. That has been stipulated to that [Appellant] is one in [sic] the same for the murder conviction, first degree, of Penny Gunnet. So, ma'am, you may be excused if you wish.

N.T. Penalty Phase, 5/16/96, at 1642.

Appellant fails to offer any argument or rationale as to how this exchange could possibly constitute prosecutorial misconduct. His claim is nothing short of nonsense.

violence to the person. The only relevant portion of the page to which Appellant refers is as follows:

> The Commonwealth in this case is going to show you three aggravating circumstances. First of all, [the Commonwealth is] going to prove to you that that defendant had a significant history of felony convictions before he killed Betty Amstutz.
>
> You are going to hear evidence of three prior robbery convictions, a conviction for conspiracy to commit robbery, that he had three prior burglary convictions, that he was convicted of aggravated assault and involuntary manslaughter with regard to the death of his brother on the last two. That, under the law, I submit to you, is a significant history of prior felony convictions.

N.T. Penalty Phase, 5/16/96, at 123 (Opening Argument) (cited in Appellant's Brief at 88).

While the prosecutor failed to state in the above excerpt that the subsection 9711(d)(9) aggravating circumstance required a significant history of felony convictions involving the use or threat of *violence* to the person, he correctly listed the felonies that had been proffered to satisfy that subsection. In addition, the trial court defined this aggravating circumstance precisely and correctly, *see* N.T. Penalty Phase, 5/16/96, at 1909; and the sentencing verdict slip also bore the correct definition. There is absolutely no evidence to suggest that the jury did not follow the trial court's instructions, did not understand the verdict slip, or was confused by the prosecutor's omission.

Next, Appellant asserts that the prosecutor "improperly sought to rebut the mitigation case by further misstating the gravity and relevance of Appellant's juvenile offenses." Appellant's Brief at 88. The excerpt below is apparently the basis for this assertion:

> Talk about the next possible mitigation, mitigating circumstance is the age of the defendant at the time of the crime. He was, what, two weeks short of his twenty-fourth birthday.

And what had he shown to that particular time? He had a serious record of serious felony convictions at that point. Which started, even by his own exhibit, when he was a juvenile. Risking a catastrophe, a felony of the second degree.

N.T. Penalty Phase, 5/17/96, at 149 (Closing Argument) (cited in Appellant's Brief at 88).

The information summarized by the prosecutor in the above excerpt had been admitted into evidence, and accordingly, the prosecutor could properly comment on it and draw reasonable inferences from it. *See Carson,* 913 A.2d at 271 (concluding that the prosecutor properly referred to the appellant's unrealized opportunities for rehabilitation while in juvenile detention, because evidence of his offenses as a juvenile had been admitted into evidence at the penalty phase of trial).

Next, Appellant argues that the prosecutor improperly invited the jury to speculate as to what else was in his criminal record:

The second [aggravating factor] is significant history of felony convictions. *I don't know if you get to see these upstairs because they have other things on that you shouldn't consider, because they are just records and they tell a big story.* But we went through all of these. Two robbery convictions, Franklin County; one here, a conspiracy to commit robbery here; three burglaries, that is breaking into someone's house to commit another crime, or dwelling place to commit another crime. That is a significant history.

N.T. Penalty Phase, 5/17/96, at 154 (Closing Argument) (emphasis represents the portion quoted in Appellant's Brief at 88).

The prosecutor's brief and vague statement about the contents of Appellant's criminal record is insignificant, particularly since the prosecutor immediately also states that "we went through all of these [felony convictions]." *See* excerpt *supra.*

Thus, none of the challenged statements in this sub-issue remotely reaches the level of prosecutorial misconduct.

■ Appellant's sixth and final sub-issue in Issue 11 is that the prosecutor misstated the applicable burden of persuasion with regard to the weighing of aggravating and mitigating circumstances. The specific comment challenged by Appellant is presented below in its proper context:

> The law, again, says the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.
>
> Now, [defense counsel] will tell you that, well, a jury to give death has to unanimously decide, all twelve of you will have to check that block individually. And that is the question during voir dire when you were asked, will you stand up for your opinion, will you stick to your guns.
>
> Because if one of you says that the mitigation in this case outweighs the aggravating circumstances, it is life. But, again, that person *would still have to say under the law, I have weighed these and that mitigation outweighs the aggravating circumstances.*

N.T. Penalty Phase, 5/17/96, at 145 (Prosecutor's Closing Argument) (emphasis added to portion quoted by Appellant in his Brief at 88).

■ As Appellant correctly recognizes, the statutory standard for imposition of a death sentence is "one or more aggravating circumstances which outweigh any mitigating circumstances." 42 Pa.C.S. § 9711(c)(1)(iv); *see also Commonwealth v. Bardo*, 551 Pa. 140, 709 A.2d 871, 876 (1998) (stating that § 9711(c)(1)(iv) provides that "if the jury finds that the aggravating circumstance(s) do not outweigh the mitigating circumstance(s), it must impose a life sentence") (emphasis omitted). Thus, under the statutory standard, when the aggravating circumstances and mitigating circumstances are precisely balanced, *i.e.*, in a "tie," the proper sentence is life imprisonment, not death.

However, the prosecutor stated that for the verdict to be a sentence of life imprisonment, one juror must conclude that

mitigating circumstances outweigh aggravating circumstances. *See* excerpt *supra.* Thus, under the prosecutor's formulation of the standard, when there is a tie between aggravating circumstances and mitigating circumstances, the sentence would be death—and this is contrary to the statute. Appellant's Brief at 88.

We decline to conclude that Appellant was prejudiced by the prosecutor's misstatement. Appellant fails to give any recognition to the fact that, in the first sentence of the above excerpt, where the prosecutor is telling the jury what the law requires, he states the standard exactly correctly and completely. The prosecutor then reiterates that an imposition of the death penalty must be unanimous and reminds the jurors that during *voir dire* they were asked if they would "stand up for [their] opinion." The challenged comment is made in this context, and while it is not strictly correct, we cannot conclude that it rendered the jurors unable to weigh the evidence and render a true verdict. *See Cox, supra* at 687.

It is noteworthy that the trial court correctly and repeatedly instructed the jury on the appropriate standard by which to weight aggravating and mitigating factors. *See* N.T. Penalty Phase, 5/17/96, at 1905, 1911, 1913–14. The trial court's clear instructions remove any possible confusion as to the appropriate standard. There is no evidence to suggest that the jury did not follow the trial court's detailed and clear instructions. *See Spotz V,* 896 A.2d at 1224 ("The law presumes that the jury will follow the instructions of the court.") (citation omitted).

In sum, as we have discussed above, none of Appellant's claims of ineffective assistance of penalty phase counsel for failing to object to prosecutorial statements has any merit. Accordingly, Appellant is not entitled to any relief in Issue 11.

## 12. Jury Instructions as to the "Presumption of Life"

In Issue 12, Appellant argues that the trial court's penalty phase jury instructions erroneously required the jury to "reject death," thereby "unconstitutionally shift[ing] the sentenc-

ing-stage burden of persuasion from the Commonwealth to the defense, undermin[ing] the presumption of life afforded defendants in capital sentencing proceedings, and violat[ing] the Pennsylvania sentencing statute and the Sixth, Eighth, and Fourteenth Amendments." Appellant's Brief at 69. Appellant also asserts that counsel was ineffective for failing to object to the jury instructions. *Id.*

Appellant challenges specifically the portion of the court's instruction that directed the jury how to fill out the sentencing verdict slip. However, because, when reviewing a challenge to a jury instruction, we must consider the entire charge, not just selected portions thereof, *see Commonwealth v. Eichinger*, 591 Pa. 1, 915 A.2d 1122, 1138 (2007), we set forth much of the instruction in the paragraphs below:

> Your verdict must be a sentence of death if you unanimously find—that is if you all find—at least one aggravating circumstance and no mitigating circumstances.
>
> If you do not all agree on one or the other of these findings, then the only verdict that you may return is a sentence of life imprisonment.

N.T. Penalty Phase, 5/17/96, at 1905 (Jury Instructions).

The trial court then instructed the jury regarding the differing burdens of proof applicable to the Commonwealth and the defendant with regard to, respectively, aggravating and mitigating circumstances. The instruction continued with an explanation of each of the proffered aggravating circumstances and mitigating circumstances, and then continued as follows:

> As I told you earlier, you must agree unanimously on one of two general findings before you can sentence the defendant to death. [The general findings] are a finding that there is at least one aggravating circumstance and no mitigating circumstances, or a finding that there are one or more aggravating circumstances which outweigh any mitigating circumstances.

\* \* \*

If you all agree on either one of the two general findings, then you can and must sentence the defendant to death.

When voting on the general findings, you are to regard a particular aggravating circumstance as present only if you all agree that it is present. On the other hand, each of you is free to regard a particular mitigating circumstance as present, despite what other jurors may believe.....

This different treatment of aggravating and mitigating circumstances is one of the law's safeguards against unjust death sentences. It gives a defendant the full benefit of any mitigating circumstances.

It is closely related to the burden of proof requirements. Remember, the Commonwealth must prove any aggravating circumstance beyond a reasonable doubt. While the defendant only has to prove any mitigating circumstance by a preponderance of the evidence. [sic]

If you do not agree unanimously on a death sentence, and on one of the two general findings that would support it, then you have two immediate options.

You may either continue to discuss the case and deliberate the possibility of a death sentence, or if all of you agree to do so, you may stop deliberating and sentence the defendant to life imprisonment.

If you should come to a point where you have deliberated conscientiously and thoroughly, and still cannot all agree either to sentence the defendant to death or to stop deliberating and sentence him to life imprisonment, report that to me. If it seems to me that you are hopelessly deadlocked, it will be my duty to sentence the defendant to life imprisonment.

I now ask you to pick up the verdict slip again. .... I shall now give you specific directions about how to complete this part of the verdict slip. Before you can sentence the defendant to death, you must all agree on a general finding in either B–1 on page three, or B–2, beginning on the top of page four.

\* \* \*

Remember, you can stop deliberating and sentence the defendant to life imprisonment only if you all agree to do so. .... [I]f your sentence is life imprisonment, you should check the finding either C–1 or C–2 which will explain why you are *rejecting the death penalty* and imposing a life sentence.

If the reason for *rejecting the death penalty* is that one or more of you find no aggravating circumstances, check C–1. If the reasons for *rejecting death* is that, although all of you agree on at least one aggravating circumstance, one or more of you find that mitigating circumstances are not outweighed by aggravating circumstances, then you would check C–2.

N.T. Penalty Phase, 5/17/96, at 1911–14 (Jury Instructions).

Appellant contends that, by repeatedly using the phrase "rejecting death," the trial court failed to make clear that life imprisonment was the appropriate sentence unless the Commonwealth met its high burden of persuasion that death should be imposed. Appellant's Brief at 70.

In rejecting Appellant's claim of error with respect to this instruction, the PCRA court cited *Commonwealth v. Eichinger, supra,* for the proposition that the words "presumption of life" were not mandatory in a capital penalty phase jury instruction. PCRA Court Opinion at 56. The PCRA court concluded that the trial court had adequately explained the deliberately disparate treatment of aggravating and mitigating circumstances, and had made clear that life in prison is the appropriate sentence unless the Commonwealth has carried its high burden of proof. *Id.* We agree.

In *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288, 300 (1983), this Court acknowledged that, in some sense, a "presumption of life" is inherent in the capital sentencing statute. This "presumption" arises from the limited number of statutory aggravating circumstances, any one of which the Commonwealth must prove beyond a reasonable doubt, as compared to the wide latitude granted for mitigating circumstances, which the defendant need prove only by a preponder-

ance of the evidence. *Id.* In *Eichinger, supra* at 1137, the appellant relied on *Travaglia* to allege denial of due process by the trial court because it had declined to include an explicit "presumption of life" jury instruction. We recognized that "life has intrinsic value and should not be taken by the state without good cause, proven to our highest standard, whereas life imprisonment remains our default punishment for capital cases." *Id.* at 1138. However, consistent with this Court's policy to give trial courts latitude and discretion in the phrasing of jury instructions, we held that the words "presumption of life" were not explicitly required in penalty phase instructions. We clarified what *was* required in a proper instruction as follows:

> An explanation of the deliberately disparate treatment of the aggravating and mitigating circumstances under the applicable standards of proof and a clear indication that life in prison is the sentence unless the Commonwealth meets its high burden is sufficient to convey the fact that life is presumed.

*Id.; accord, Commonwealth v. Lesko,* 609 Pa. 128, 15 A.3d 345 (2011).

Based on our review of the entire jury instruction, we conclude that the trial court here met this standard. The trial court clearly explained and provided the correct rationale for the disparate treatment of and the distinct standard of proof applicable to aggravating and mitigating circumstances. In addition, the trial court stated directly and indirectly that life imprisonment was the appropriate sentence unless the Commonwealth met its high burden of proof with regard to aggravating factors. In fact, the instruction here in its entirety was very similar to the one challenged in *Commonwealth v. Marinelli,* 589 Pa. 682, 910 A.2d 672, 682–84 (2006) (Opinion Announcing the Judgment of the Court), even to the point of using the phrase "rejecting the death penalty" or "rejecting death" three times. We concluded that there was no merit to the *Marinelli* appellant's claim that the repeated use of the word "reject" rendered the instructions erroneous.[32] We

---

32. *Marinelli* was an Opinion Announcing the Judgment of the Court, authored by Justice Newman and joined by Justices Eakin and Baldwin.

reach the same conclusion here, and accordingly hold that counsel was not ineffective for failing to object to the jury instructions.[33]

### 13. *Simmons* "Life Means Life" Instruction

■ Appellant contends that the trial court erred by failing to instruct the jury that, if Appellant were sentenced to life imprisonment, he would not be eligible for parole. In addition, he argues that penalty phase counsel was ineffective for failing to seek such an instruction, and that direct appeal counsel was ineffective in the way in which he litigated the matter on direct appeal.

In his direct appeal, Appellant grounded his claim of trial court error for failing to instruct the jury that "life means life" on *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality). *See Spotz III,* 759 A.2d at 1291. In *Simmons, supra* at 156, 114 S.Ct. 2187, a plurality of the United States Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." We subsequently explained that a *Simmons* instruction is triggered *only* when a defendant's future dangerousness has been placed at issue *and* the defense has requested an instruction that there is no parole from a sentence of life imprisonment in Pennsylvania. *Spotz III, supra* at 1291 & n. 14. In Appellant's direct appeal, we concluded that neither of these predicate requirements existed, and the "trial court did not err in failing to issue a charge [A]ppellant was not entitled

Justice Saylor joined the majority's holding and reasoning with regard to the issue of penalty phase jury instructions. *Marinelli, supra* at 690 (Saylor, J., concurring). Chief Justice Cappy, joined by Justice Baer, concurred, raising an issue of waiver. *Id.* at 689–90 (Cappy, C.J., concurring). Justice Castille concurred in the result without a separate writing.

**33.** We note that the jury instructions delivered here closely followed the Pennsylvania Suggested Standard Criminal Jury Instructions §§ 15.2502(F), (H). The language specifically challenged by Appellant, *i.e.,* "rejecting the death penalty," is suggested by the Subcommittee Note accompanying § 15.2502(H).

to and did not request." *Id.* at 1291. Thus, the PCRA court properly denied Appellant's current claim of trial court error as previously litigated and not cognizable under the PCRA.[34] *See* PCRA Court Opinion at 48 (citing 42 Pa.C.S. §§ 9543(a)(3) and 9544(a)(2)).

 In addition, the PCRA court correctly concluded that Appellant's claim of ineffective assistance of penalty phase counsel for failing to request a *Simmons* instruction must fail because Appellant's future dangerousness had not been placed at issue and thus he was not entitled to such an instruction. *Spotz III, supra* at 1291; PCRA Court Opinion at 49. Counsel will not be held ineffective for failing to request an instruction to which his client was not entitled.

With regard to appellate counsel, Appellant's claim of ineffectiveness is based on counsel's failure to argue on direct appeal that Appellant's future dangerousness was placed at issue by the introduction of evidence of his prior violent offenses, including three homicide and other felony convictions, and his juvenile record of crimes and detention.[35] Some of this evidence was presented at the penalty phase as support for aggravating circumstances, while certain evidence of other crimes, specifically the voluntary manslaughter and two first-degree murders committed during the three days prior to the murder of Ms. Amstutz, was also presented during the guilt phase of trial. Appellant further contends that the testimony

34. The United States Supreme Court has clarified that a capital defendant's ineligibility for parole may be imparted to the jury either by the trial court's instruction or by arguments of counsel. *Shafer v. South Carolina*, 532 U.S. 36, 39, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001). Here, while defense counsel did argue to the jury that its guilty verdict meant that Appellant would die in prison, counsel never explicitly informed the jury that a life sentence would render Appellant ineligible for parole. *See* N.T. Penalty Phase, 5/17/96, at 157, 182.

35. In our opinion resolving Appellant's direct appeal, we stated that "Appellant concedes both that the Commonwealth did not argue future dangerousness and that he never requested a *Simmons* charge." *Spotz III*, 759 A.2d at 1291; *see also* Appellant's Brief at 69 (acknowledging that, on direct appeal, Appellant's counsel conceded the absence of the two predicates for a *Simmons* instruction, but arguing that had he raised the issue in "appropriate terms," a new sentencing proceeding should have been granted).

of his mental health expert, Dr. Ragusea, supported a propensity for violence. The PCRA court rejected this claim, citing *Commonwealth v. May*, 551 Pa. 286, 710 A.2d 44 (1998), in which this Court held that a defendant's criminal record of violent felonies did not address future dangerousness. Relying on *May*, the PCRA court found no arguable merit to Appellant's underlying claim, and accordingly held that appellate counsel was not ineffective for failing to raise the argument on direct appeal. We will not disturb the PCRA court's ruling, as explained below.

In *May, supra* at 47, the appellant, like Appellant here, argued that, by raising the aggravating circumstance of a significant history of violent felony convictions, the prosecutor had injected the issue of the appellant's future dangerousness into the sentencing hearing, and therefore, the trial court had erred by failing to provide a *Simmons* instruction. We denied this claim, holding that a *Simmons* instruction was not required because the evidence proffered to support the appellant's history of violent felony convictions addressed only his past conduct, not his future dangerousness. *May, supra.*

We reached a similar conclusion more recently in *Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 538 (2005), a triple first-degree murder case in which the Commonwealth's evidence to support the appellant's history of prior violent felonies included the description of a violent rape. We held that the introduction of this evidence of the *Chmiel* defendant's past violent convictions did not implicate the issue of his future dangerousness. *Id.* at 538. Also in *Chmiel*, the appellant contended that his future dangerousness was implied by the prosecutor's comments concerning the circumstances of the triple murder and his characterization of the appellant's actions as "despicable" and "abysmal," revealing a "coldness of heart, the type of depravity that tells you that he deserves death." *Id.* at 537. We concluded that the challenged comments focused exclusively on the facts surrounding the murders of which the appellant had been convicted, and did not speculate about the appellant's inherent characteristics that implied future dangerousness. *Id.* at 538. Because the chal-

lenged comments, when taken in context, "were proper commentary on [the appellant's] crimes as an appropriate predicate for the death penalty," no relief was due. *Id.* at 537–38.

Appellant submits that this Court's rulings in *Chmiel* and similar cases are erroneous as to the nature and sufficiency of evidence and prosecutorial argument that can establish future dangerousness for purposes of a *Simmons* instruction. Appellant's Brief at 64 & n. 80. Appellant relies primarily on *Kelly v. South Carolina*, 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002), a case in which the high Court reversed a state court's determinations that the appellant's future dangerousness had not been placed at issue and a *Simmons* instruction was not required. The high Court held that the state court had erred, not in its formulation of the legal issue, but rather "on the facts [because] the evidence and argument cited by the state court are flatly at odds with the view that 'future dangerousness was not an issue in this case.' " *Kelly, supra* at 252–53, 122 S.Ct. 726 (citation omitted).

The *Kelly* Court provided the following guidance as to how to evaluate evidence for purposes of a *Simmons* instruction:

A jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior. . . .

\* \* \*

Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms.

*Kelly, supra* at 253–54, 122 S.Ct. 726.

The evidence admitted during the sentencing phase of the trial in *Kelly* showed the following: the appellant had attempted an armed escape from prison, had formulated a plan to hold a female guard hostage, and had exhibited sadism at an early age, with an inclination to kill anyone who rubbed him the wrong way. *Id.* at 248–49, 122 S.Ct. 726. With regard to the

prosecutor's opening and closing arguments, the high Court stated the following:

> The prosecutor accentuated the clear implication of future dangerousness raised by the evidence and placed the case within the four corners of *Simmons*. He had already expressed his hope that the jurors would "never in their lives again have to experience being some thirty feet away from such a person" as [the appellant].... [S]ince the jurors were unlikely to be spending any time in prison, they would end up 30 feet away from the likes of [the appellant] only if he got out of prison, as he might if parole were possible.....
>
> \* \* \*
>
> And there was more. The state court to be sure considered the prosecutor's comparison of [the appellant] to a notorious serial killer, variously calling him a "dangerous" "bloody" "butcher.".... Characterizations of butchery did go to retribution, but that did not make them any the less arguments that [the appellant] would be dangerous down the road. They complemented the prosecutor's submissions that [the appellant] was "more frightening than a serial killer," [ ] and that "murderers will be murderers." Thus was [the appellant's] jury, like its predecessor in *Simmons*, invited to infer "that petitioner is a vicious predator who would pose a continuing threat to the community."

*Id.* at 255–56, 122 S.Ct. 726 (internal citations omitted).

Based on the evidence admitted and the prosecutor's arguments from that evidence, the United States Supreme Court held that the *Kelly* appellant's future dangerousness had indeed been placed at issue. However, the *Kelly* Court was careful to specify the limits of its ruling: "The only questions in this case are whether the evidence presented and the argument made at [the appellant's] trial placed future dangerousness at issue." *Id.* at 254 n. 4, 122 S.Ct. 726. No issue was raised in *Kelly* with respect to "a defendant's entitlement to instruction on a parole ineligibility law when the State's

evidence shows future dangerousness but the prosecutor does not argue it." *Id.*

In *Commonwealth v. Baumhammers,* 599 Pa. 1, 960 A.2d 59, 90–92 (2008), this Court applied the United States Supreme Court's constitutional directives in *Simmons* and *Kelly* to a case in which the jury had rejected the appellant's insanity defense and had sentenced him to death for the first-degree murder of five individuals. At trial, the Commonwealth had introduced evidence of the appellant's derogatory comments and actions toward blacks and Jews, his anti-immigration and pro-segregation views, his desire to start a white supremacist party, and his hatred for all "ethnic" people. *Id.* at 71. On direct appeal, the appellant claimed that the trial court had erred by failing to give a *Simmons* instruction, and he asserted that the issue of his future dangerousness had been brought before the jury by the proffered evidence, including not only the testimony as to his racist views, but also the extensive testimony concerning his mental illness and personality disorder, which, in the opinion of the Commonwealth's mental health witness, made him a liar, a rule-breaker, and an irresponsible person. *Id.* at 90–91. We denied this claim, concluding that the evidence cited by the appellant was not evidence of future dangerousness or of a demonstrated propensity for violence, and was "not even remotely similar in character to the evidence in *Kelly.*" *Id.* at 91.

In the instant case, Appellant's attempt to rely on *Kelly* is equally unavailing. Appellant raised a similar claim in his collateral appeal of his Schuylkill County first-degree murder conviction. *Spotz V,* 896 A.2d at 1242–46.[36] We affirmed the PCRA court's denial of that claim, citing, *inter alia, May, supra,* and concluding that evidence of Appellant's significant history of violent felony convictions did not inject concerns over his future dangerousness into the proceedings. *Spotz V,*

---

**36.** *Spotz V* was a plurality decision, authored by Justice Newman and joined by Justice Baer. There were three concurring opinions and one concurring and dissenting opinion, and Justice Eakin did not participate in the case. On the *Simmons* issue, Chief Justice Cappy and Justice Baldwin joined the Court, generating a majority on this issue.

*supra* at 1242–43. In addition, we held that "*Kelly* would not apply to appellants like Spotz who were sentenced before it was decided, and trial counsel was not ineffective for failing to request a *Simmons* instruction based on the standard announced in that case." *Id.* at 1246; *see also Carson*, 913 A.2d at 273 n. 34 ("Trial counsel's conduct [ ] must be evaluated under the law prevailing at the time of trial which was the non-precedential plurality in *Simmons.*"). The same holding applies to the instant case, as Appellant's trial for the murder of Ms. Amstutz took place in 1996, well before *Kelly* was decided.

Furthermore, even if *Kelly* were to be held applicable to Appellant's appeal, he would not be entitled to relief because, pursuant to the United States Supreme Court's directives in *Kelly,* as we have interpreted them in *Baumhammers,* Appellant's future dangerousness was not placed at issue during the trial proceedings. Contrary to Appellant's assertions, future dangerousness is not placed at issue under *Simmons/Kelly* merely because the prosecutor sets forth a capital defendant's history of prior violent offenses, without graphic description of violence and without implying significance for future violent behavior. The prosecutor here did not use epithets suggestive of violence to describe Appellant, nor did he attempt to draw any conclusions about the implications of Appellant's previous offenses for his future behavior. With regard to Appellant's mental health, psychologist Dr. Ragusea testified that Appellant had "lots of antisocial features," "broke the law, broke the rules," "was perfectly content lying to get whatever he wanted," "[had] trouble being in contact with reality," "makes bad decisions," "does have mental illness[,] is an antisocial personality[, and] is not a nice guy." N.T. Penalty Phase, 5/16/96, at 1881, 1885, 1895. Dr. Ragusea's testimony did not imply that Appellant had a propensity for violence or was a risk for violent behavior. We reject Appellant's assertion, based on *Kelly,* that the evidence and Commonwealth argument presented at his trial placed his future dangerousness at issue, and accordingly we reject his

claim of appellate counsel ineffectiveness for failing to raise these matters on direct appeal.[37]

Finally, in Issue 13, Appellant alleges ineffective assistance of direct appeal counsel for failing to identify and raise additional constitutional theories, independent of future dangerousness and legally distinct from *Simmons*, as grounds for requesting a parole ineligibility instruction. Appellant's Brief at 66. Appellant appears to seek a broad and general ruling

**37.** Appellant suggests that several other pieces of evidence, in addition to his criminal history and his mental health, support his assertion that his future dangerousness was placed at issue. The first of these other pieces of evidence is a bit of the testimony of a *defense witness* who had served for a very brief time in 1985 as Appellant's foster parent. The witness offered a lay opinion related to her conclusion that Appellant was an extremely difficult child.

> Witness: He ... was never given the opportunities, in my opinion, to develop a conscience. He has no conscience.

N.T. Penalty Phase, 5/16/96, at 1735 (direct examination).

> Prosecutor: And you just found him to have no conscience?
> Witness: That is correct. He stated he didn't.

*Id.* at 1736 (cross-examination).

Second, Appellant cites testimony of his wife that some of the poems he had written had violent-sounding names, specifically, "Media Blood Lust" and "Voices Roared through Lying Lips." N.T. Penalty Phase, 5/16/96, at 1851.

The prosecutor did not even mention these excerpts of testimony in his statements to the jury. There is no obvious relevance of this testimony to future dangerousness, and it certainly does not support the issuance of a *Simmons* instruction, even under *Kelly*.

Third, as additional evidence that allegedly placed Appellant's future dangerousness at issue, Appellant cites "[e]vidence that Appellant had been aware of his parole status at the time of the murder and thought that it was possible that he eventually could be released if sentenced to life." Appellant's Brief at 65. The specific evidence cited by Appellant to support this assertion is the testimony of Scott Miller, a state trooper who interviewed Appellant shortly after his arrest. Trooper Miller testified that Appellant stated the following to a police officer also conducting the interview: "[D]o you think I will have to do life, plus the remaining years on my parole." N.T. Trial, 5/13/96, at 982. Appellant objected to the witness's statement regarding parole as prejudicial, out of the presence of the jury, and the court then instructed the jury to disregard the reference to parole. *Id.* at 982–87.

It is far from clear that this testimony implies that Appellant thought he might eventually be released if sentenced to life imprisonment. Furthermore, Appellant presents no argument as to why his speculations to a state trooper, posed well before trial had even started, as to the sentence he might receive, should support the issuance of a *Simmons*

from this Court that a parole ineligibility instruction is *always* required when the jury knows that a capital defendant committed the offense while on parole. Appellant baldly asserts, without benefit of accompanying argument or rationale, that the failure to provide such a jury instruction violates either the Eighth Amendment to the United States Constitution or due process, in the following ways: violates the Eighth Amendment because the jury was not permitted to consider all relevant mitigating evidence and was presented with a false choice of sentencing options; violates the Eighth Amendment bar against arbitrary and capricious sentencing; offends evolving standards of decency in violation of the Eighth Amendment; violates due process by imposing a death sentence on the basis of inaccurate, material information which the defendant had no opportunity to rebut; and violates the right to an impartial jury by skewing the weighing of aggravating and mitigating circumstances. Appellant's Brief at 66–67. Appellant's "argument" for each of these alleged constitutional violations consists, in its entirety, of footnote lists of United States Supreme Court opinions, devoid of even a parenthetical explanation, much less any development of the relevance or significance of the listed opinions to the relief Appellant seeks. *See id.*

As we have previously stated, the United States Supreme Court has never ruled that the Eighth Amendment requires a parole ineligibility instruction, nor have we ever made a parole ineligibility instruction mandatory in capital cases. *Commonwealth v. Baumhammers,* 599 Pa. 1, 960 A.2d 59, 92 (2008); *see also Simmons,* 512 U.S. at 156, 162 n. 4, 114 S.Ct. 2187 (making clear that the Court's opinion was grounded in the Due Process Clause of the Fourteenth Amendment and specifically clarifying that the Court "express[ed] no opinion on the question whether the result [was] also compelled by the Eighth Amendment"). Here, Appellant's one-sentence, undeveloped assertions of Eighth Amendment viola-

instruction. This sort of "advocacy" neither credits counsel nor benefits his client.

tions fail to provide any reviewable argument or rationale for revisiting those precedential decisions.

Appellant's attempt to recast the lack of a *Simmons* instruction into an assertion of "inaccurate information" having been imparted to the jury likewise must fail. Appellant's Brief at 67. No inaccurate information, material or otherwise, was imparted to the jury by the mere fact that a *Simmons* instruction was not given, and Appellant's assertions to the contrary have no legal or factual basis.

■ Finally, Appellant's assertion that the lack of a parole ineligibility instruction skewed the weighing of aggravating and mitigating evidence and impaired the jury's ability to follow the law is entirely unsupported. The Commonwealth presented three statutory aggravating factors, and Appellant offered several mitigating factors, including the "catch-all" mitigator which includes "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8). Although, during the penalty phase, evidence may be presented as to any matter that the trial court deems relevant and admissible on the question of the sentence to be imposed, 42 Pa.C.S. § 9711(a)(2), "[c]apital juries are to weigh *only* the aggravating and mitigating circumstances enumerated in the statute." *Commonwealth v. Robinson,* 583 Pa. 358, 877 A.2d 433, 447 (2005) (emphasis added); *see also* 42 Pa.C.S. § 9711(c)(1)(iv). Appellant neither provides authority for his apparent view that a parole ineligibility instruction somehow implicates a mitigation factor, nor sets forth any support for his view that the jury here was unable to follow the law regarding its duty to weigh the statutory mitigating and aggravating factors that were proffered.

Because there is no arguable merit to any of Appellant's alternate theories, direct appeal counsel will not be held ineffective for failing to advance them. In sum, for all the reasons discussed above, Appellant is not entitled to relief on any of the numerous sub-issues he raised under Issue 13.

## 14. Presentation of Mitigating Evidence

In Issue 14, Appellant alleges that trial counsel was ineffective in failing to investigate, develop, and present mitigating evidence during the penalty phase. Specifically, Appellant contends that, because of counsel's ineffectiveness, the jury did not hear complete evidence of the following: (i) the pervasive and extensive physical and sexual abuse to which Appellant had been subjected, as well as his family history of dysfunction and impairment; (ii) Appellant's history of drug and alcohol addiction and abuse; (iii) the extensive abuse and violence that Appellant had suffered at the hands of his brother Dustin; (iv) the mental health history of Appellant's family; and (v) Appellant's own mental health problems. Appellant alleges that counsel's investigation and presentation of the above mitigating circumstances were deficient under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that he was therefore deprived of his Sixth Amendment right to counsel. We first summarize the relevant general legal principles, and then address each of Appellant's sub-issues below.

Appellant raised a similar claim in his collateral appeal of his Schuylkill County first-degree murder conviction. In denying this prior claim, we reiterated the following principles regarding counsel's duty to investigate evidence of a defendant's mitigating circumstances:

It is well established that capital defense counsel has a duty to undertake reasonable investigations or to make reasonable decisions that render particular investigations unnecessary. In the context of the penalty phase, trial counsel has an obligation to conduct a thorough investigation of the defendant's background, particularly with respect to the preparation and presentation of mitigation evidence. [T]his obligation includes the duty of penalty phase counsel to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor. The reasonableness of a particular investigation depends upon evidence known to counsel, as well as evidence that would cause a reasonable

attorney to conduct a further investigation. At the same time, counsel's obligations do not require an investigation into every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.

*Spotz V,* 896 A.2d at 1225 (internal quotation marks and citations omitted).

In addition, we have made clear the following:

The reasonableness of counsel's investigation and preparation for the penalty phase, of course, often depends critically upon the information supplied by the defendant. Counsel cannot be found ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family [that] is not provided to counsel.

*Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33, 45–46 (2002) (internal citations omitted); *see also Commonwealth v. Bracey,* 568 Pa. 264, 795 A.2d 935, 944 (2001) (concluding that counsel could not be found ineffective for failing to present evidence of the appellant's history of abuse where appellant and his family failed to reveal such history during their consultations with counsel).

We have been careful to note that "different light falls upon counsel's performance depending upon whether [counsel] asked and was not told, or [alternatively, whether counsel] did not ask and therefore was not told." *Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717, 735 (2000).

Appellant's first sub-issue in Issue 14 is that counsel was ineffective for failing to investigate and present sufficiently detailed and corroborating evidence of the pervasive sexual and physical abuse that Appellant had suffered, as well as his family history of dysfunction and impairment. Appellant's Brief at 44–48, 50–51. During the penalty phase, numerous family witnesses testified as to the chaotic, abusive, violent, deprived, and dysfunctional environment in which Appellant was raised; in addition, Dr. Ragusea, a psychologist expert witness who had conducted a psychological assessment of Appellant, reinforced much of this family testimony. *See*

*infra* (describing testimony in more detail). Nonetheless, Appellant now contends that, if his physical and sexual abuse and his family history of dysfunction and mental illness had been addressed more extensively and presented in more detail, it would likely have swayed the jury toward mitigation. In support of his contention, Appellant cites, *inter alia*, the PCRA testimony of his maternal grandmother, Jean Redden, wherein she provided graphic detail of some incidents of sexual abuse inflicted upon Appellant.

The PCRA court recognized the extensive efforts that penalty phase counsel, Mr. Andrews, had taken with regard to mitigation, and determined that neither Appellant nor Ms. Redden had ever suggested to counsel the full extent of the family dysfunction or of the physical and sexual abuse to which she testified at the PCRA hearing. The PCRA court cited *Bracey, supra,* for the principle that counsel cannot be deemed ineffective for failing to present evidence of abuse that a defendant and his family failed to reveal to counsel. PCRA Opinion at 42–43. In addition, the PCRA court concluded that Ms. Redden's PCRA testimony differed from her penalty phase testimony only in "a matter of degree," and held that Appellant had failed to show how he was prejudiced by the jury's failure to learn of the entirety of the abuse to which Ms. Redden had testified at the PCRA hearing. We conclude that the record supports the PCRA court's conclusions, as discussed below.

At the PCRA hearing, Attorney Andrews testified as follows regarding the numerous investigative activities relevant to possible mitigation factors that he undertook on behalf of Appellant. The various attorneys for Appellant's three capital cases shared responsibilities for the investigation of his background for mitigation purposes. N.T. PCRA Hearing, 5/10/07, at 122. Attorney Andrews had responsibility for the investigation of Appellant's life story, and he hired, as assistants, a local investigator; a retired state trooper; and a forensic psychologist, Dr. Ragusea, who interviewed Appellant, reviewed numerous records, and prepared a forensic psychological assessment. *Id.* at 123; Forensic Psychological Assessment of Appellant by Stephen A. Ragusea, Psy.D., assessment

dates 11/20/95 and 12/12/95. Attorney Andrews met with Appellant as soon as he was able to do so, conducting and recording two long interviews, which focused on Appellant's life story; with this information, counsel tried to construct Appellant's life chronology and looked for significant mitigation witnesses. N.T. PCRA Hearing, 5/10/07, at 129; and 5/11/07, at 26. Attorney Andrews also corresponded with Appellant on an on-going basis. N.T. PCRA Hearing, 5/11/07, at 26–27. In addition, Attorney Andrews sought institutional records. He obtained records from Appellant's elementary school, which led to a discussion with one of Appellant's teachers, and from Children and Youth Services ("CYS"), which led to his procurement of mental health records. N.T. PCRA Hearing, 5/10/07, at 129–30, 138–42.

With regard to Ms. Redden, Attorney Andrews testified during the PCRA hearing that she was "actively participating" and "very helpful [and] anxious to help," in the investigation of mitigation factors. *Id.* at 159–60; N.T. PCRA Hearing, 5/11/07, at 38. Although he did not recall if she had told him that Appellant had been sexually abused, he understood her to be quite forthcoming and had no sense that she was withholding information. N.T. PCRA Hearing, 5/10/07, at 159–60; and 5/11/07, at 38–39. Attorney Andrews further testified that he had recorded a "pretty long" interview with Ms. Redden at her home and had spoken with her on other occasions; in addition, his investigator also spoke with her as necessary. N.T. PCRA Hearing, 5/11/07, at 38, 75, 77. Attorney Andrews's testimony concerning his interactions with Ms. Redden flatly contradicted Ms. Redden's testimony that counsel had not visited or conversed with her prior to her courtroom testimony. N.T. PCRA Hearing, 1/17/07, at 61.

During the penalty phase of Appellant's trial, Attorney Andrews presented fourteen witnesses and focused on Appellant's abysmal upbringing and its effects on his mental state. We summarize the most relevant portions of the penalty phase testimony in the next few paragraphs.

Appellant's maternal grandmother, Ms. Redden, testified regarding Appellant's chaotic upbringing, which was charac-

terized by numerous relocations, in-state and out-of-state; periods of institutionalization at various children's homes and foster homes; a largely absent, often jailed biological father and two abusive step-fathers; and dilapidated living conditions. N.T. Penalty Phase, 5/16/96, at 1645–80 and 1743–53. When asked why she had not maintained custody of Appellant herself, she testified that "the mother and stepfather wanted the kids with them at certain times. It brought in assistance money." *Id.* at 1752. In addition, Ms. Redden testified as to the abuse she observed against Appellant, his brother, and mother at the hands of the children's step-fathers; in particular, she testified that the children had been whipped so severely that they could not sit down or go to school for three days. *Id.* at 1744–47.

Jean Newpher, Appellant's mother, also testified as to the household environment in which Appellant grew up. She testified that Appellant's first step-father, Bill Beish, "stopped associating" with Appellant and his brother Dustin after Mr. Beish's biological son died and Dustin was blamed. *Id.* at 1802–03. She testified that she and her sons were abused by Mr. Beish, who hit the children, locked them in their bedrooms after supper and through the night, and burned Dustin's hand with a book of matches. *Id.* at 1803–04. She also testified that Appellant's second step-father, Darrell Newpher, showed her young sons a marijuana cigarette and had them smoke it. *Id.* at 1809–10. She testified that Dustin had cut Appellant with a knife several times, *id.* at 1815–16, and gave the following further detail as to Dustin's childhood abuse of Appellant:

> *Defense Counsel Andrews:* Were there other times when there was violence between [Appellant and Dustin]?
>
> *Ms. Newpher:* Oh, yeah. Basically, [Appellant's] whole life Dustin was beating up on him, hurting him. When [Appellant] was—it was in 1974, ... [Appellant] was a little over three, almost four years old, and he had rheumatic fever, and he was trying to slide down the step on—we lived in a two-story house, and he was trying to slide down the steps on his bottom. And Dustin kicked him down the steps.

[Dustin] stabbed [Appellant] in the back with a pencil. He had stabbed him in the arm with pencils. He sat at the dinner table and would pick up his fork, and out of absolutely nowhere, jump up and reach across the table and nail [Appellant] in the back of the arm with a fork, or whatever part of his body he could attack him with, [sic] would poke him with something. Anything he had in his hands really. He used Chinese stars. He used broomsticks.

*Defense Counsel Andrews:* All right.

*Ms. Newpher:* [Dustin] pulled [Appellant] out of a tree the one time. Said—he moved the ladder so [Appellant] couldn't get down. [Appellant] was short. Dustin was tall. And [Appellant] couldn't reach the ground. And Dustin says, here, I'll help you, give me your hand. And he just yanked him right down out of the tree. And [Appellant] landed on his chest with the wind knocked out of him.

And it was just—another time he put [Appellant's] head under his arm, against his ribs, and rammed his head right into the wall in the living room, and put a great big hole in the wall, with [Appellant's] head. Another time he picked him up and he pile[-]drived him on the living room floor a couple times.

*Id.* at 1817–18.

Other family members were also called as defense witnesses. Lorraine Page, Appellant's great-aunt, testified that she and her husband adopted Appellant's half-sister Annette as a toddler. Ms. Page had decided to adopt the child after she visited the household and found the conditions deplorable, with no food and little supervision. *Id.* at 1753–58. Nancy Jo Dale, Appellant's cousin and babysitter, testified that conditions in the household were "disgusting," with little food and a poor environment. *Id.* at 1770–72. Carol Dale, Appellant's great-aunt, testified that, for a short time when Appellant was a young teenager and his mother did not want him, he lived with her and her family; however, the Dale family was unable to maintain Appellant in the household because of his behavioral problems. *Id.* at 1775–82.

Molly Muir, an administrator for Clearfield County CYS, testified as to the extensive involvement of that agency with Appellant's family, as revealed through agency records. According to agency reports that Ms. Muir read into the record, Ms. Newpher, Appellant's mother, was depressed and lonely; had severe emotional problems, including a complete emotional breakdown in 1975 and threats of suicide; and at one time, had invited two young men that she had met at a bar to stay with her in the trailer she shared with her children. The caseworker's report concluded that it seemed best to take seriously Ms. Newpher's suicide threats and the possibility of her being a danger to herself or her children. *Id.* at 1687–89, 1691. Ms. Newpher indicated that she had married the father of Appellant and Dustin because he had threatened her and her family. *Id.* at 1689–90. According to other agency reports, Ms. Newpher had had a brief and stormy marriage with her sons' father, did not want or love either of her sons, and did not look at Appellant for two days after he was born. She recognized that both sons had severe behavioral problems, which she attempted to address by yelling at them. *Id.* at 1690–91. Ms. Newpher's second marriage, to Bill Beish, was also stormy. *Id.* at 1691. Based on continuing agency reports, Ms. Muir further testified to an incident in 1977 in which, because Ms. Newpher had said that she never wanted to see her sons again, a caseworker had picked up Appellant and his brother Dustin at school and had placed them in a children's home. *Id.* at 1693. Shortly thereafter, Ms. Newpher partially changed her mind, still wanting no contact with her sons, but forbidding adoption and instead wanting her mother to raise them. *Id.* at 1694–95. The children were released into the care of their grandmother, but subsequently they moved back into their mother's home. Then, in 1983, as a result of "severe family dysfunction," Appellant was admitted to the Children's Aid Society; Appellant claimed that he had been beaten and mentally abused at home, although he also stated that he missed his family and wanted to maintain some contact with them. *Id.* at 1700–01. Appellant was placed in several foster homes, but because of his severe

behavioral problems, the placements were short-term. Ms. Muir also testified as to CYS's involvement specifically with Appellant's brother Dustin Spotz. *Id.* at 1703–06, 1717–20, 1722–25. Dustin consistently made reports of abuse in the home, and he was involuntarily committed to hospital in 1982 after holding Appellant at knife-point. *Id.* at 1718, 1720.

Dr. David G. Thompson, a licensed psychologist at the Milton Hershey School, where Appellant and his brother Dustin were enrolled for a short time in 1984, testified that, during a pre-admission interview, Appellant reported a psychologically and physically abusive home life. *Id.* at 1784–88.

Psychologist Dr. Ragusea also testified during the penalty phase as to the deplorable environment in which Appellant had been raised, reinforcing the testimony of the family witnesses. Some excerpts of Dr. Ragusea's testimony are as follows:

> But let me go through some realities here. And that is that [Appellant] had an awful childhood and an awful adolescence. . . . he lived in something like twenty-three different places, he went to eleven different [ ] public schools and specialized schools before he finally dropped out in eleventh grade. He was abused. At the very least, we have evidence for physical abuse. He also contends he was sexually abused by his brother, by his stepfather, and by others. In addition to all of that, we know that he was neglected for long periods of time. We know that his mother vacillated back and forth, based upon the records, from saying I hate this child, take him away from me, I don't love him, I have never loved him, I don't ever want to see him again; to saying, all of you people in the Children's Services Agency are bad people screwing up my family, stay out of my life and I will take care of my kid. Bring him back to me. And so the kid went back and forth, back and forth, between his mother and something like a dozen different other people and institutions at various times.

N.T. Penalty Phase, 5/16/96, at 1871–72.

> [Appellant] was vulnerable from the beginning. From the very beginning, he was vulnerable to violent behavior due

to, one, a poor early environment, as we have already described, as you have heard about in this trial, neglect and abuse throughout his life.

*Id.* at 1877.

Based upon my review of the records, what we have is an incident wherein [Appellant's] hand was held on a burner of a stove. And his hand was severely burned on that stove.[38]

\* \* \*

And then what happened was Children's Services was brought in to investigate it. The children then said, no, that didn't happen. That isn't really what happened. This was some time later.

\* \* \*

That is common with children who have been abused. Then what happened was interviews were conducted later on with people who said they had spoken with the perpetrator of the abuse, and he had confirmed that he had indeed done it. So that is what I am looking at in terms of confirmatory evidence of severe abuse.

*Id.* at 1890–91 (footnote added).

The difficulty in this situation was the kids [Appellant and Dustin] were never returned home because the situation had improved in the home. The kids were returned home because the mother wanted them there.

And even though the Children's Services Agency knew that those horrible conditions continued to exist, the judge insisted on returning the kid[s] to the home. And that never should have been done. In fact, it was done against the advice of the Children's Service agencies. And that is a fact.

*Id.* at 1893.

By offering the extensive mitigation testimony summarized above, Attorney Andrews presented a picture of

---

**38.** There is some confusion in the record as to whose hand—Appellant's, Dustin's, or both—a stepfather burned, apparently as punishment.

Appellant's chaotic, dysfunctional family environment, in which his mentally ill mother and absent or abusive father figures could provide neither life's basic necessities nor love and emotional support to their children. In the testimony, a home atmosphere not simply of neglect, but also of violence and abuse was apparent. Despite the extensive evidence summarized above, Appellant argues that had his counsel presented even further details and more examples of abuse, of whatever nature, it is likely that the jury would have attributed determinative weight to mitigation circumstances and not imposed the death penalty. We agree with the PCRA court that Appellant's argument is unconvincing and ultimately unavailing. As he did in *Spotz V*, 896 A.2d at 1226–30, Appellant simply labors under the mistaken notion that if only the jury had more details and more data regarding his upbringing, it would not have returned a death sentence. In addition, we also agree with the PCRA court that Attorney Andrews cannot be held ineffective for failing to uncover details and instances of abuse that Appellant and his family failed to disclose.[39] Accordingly, Appellant's allegations of penalty phase counsel's ineffectiveness for failing to investigate and present sufficient evidence of abuse and family dysfunction and impairment have no merit.

In the second sub-issue under Issue 14, Appellant asserts that counsel was ineffective for failing to develop and present further evidence of Appellant's drug and alcohol addiction and abuse. Although Dr. Ragusea testified that Appellant suffered from polysubstance abuse, Appellant now argues that counsel was ineffective for failing to present additional evidence of his drug use and addiction, including testimony from family members and other witnesses, CYS and child placement records, and court records of his prior offenses. Appellant's Brief at 49. The PCRA court rejected Appellant's claim, noting that Linda Spotz, Appellant's wife, testified that Appellant had a problem with drugs, smoked marijuana, used

---

**39.** At the PCRA hearing, Dr. Ragusea testified that Appellant gave an indication that there was sexual abuse in his family, but "he grossly understated it." N.T. PCRA Hearing, 1/18/07, at 138.

LSD and crack, drank beer, and was very different when he was using drugs. PCRA Court Opinion at 39; N.T. Penalty Phase, 5/16/96, at 1847–48.

We agree with the PCRA court that Appellant's claim has no merit. Dr. Ragusea testified that Appellant's diagnosis of polysubstance abuse meant that he had "abused a whole lot of different substances, marijuana, cocaine, hashish, alcohol, all those different things." N.T. Penalty Phase, 5/16/96, at 1879. Dr. Ragusea and Ms. Newpher, Appellant's mother, both testified that Appellant was introduced to marijuana at the age of seven by his step-father. *Id.* at 1809–10, 1877. Dr. Ragusea further testified that Appellant grew up in a home in which drugs were commonly used, bought, and sold. *Id.* at 1877.

Attorney Andrews was questioned by Appellant's counsel regarding this issue at the PCRA hearing, which we excerpt, in part, below:

> *Defense PCRA Counsel:* Mr. Andrews, you previously testified that ... you would have wanted to present evidence from lay witnesses that would support Dr. Ragusea's diagnoses. With respect to Dr. Ragusea's diagnosis of polysubstance abuse, would you have wanted to present as much evidence as was available of [Appellant's] history of drug abuse?

> *Mr. Andrews:* There's limits as to how much you would put on. I mean, once you believe a fact is established you don't just keep putting on more evidence that's cumulative in nature. I don't know that there was any dispute that [Appellant] had a history of substance abuse.

N.T. PCRA Hearing, 5/11/07, at 18.

We will not conclude that Attorney Andrews was ineffective for failing to present additional, cumulative evidence of Appellant's drug use and addiction. *See Spotz V*, 896 A.2d at 1231 (holding that Appellant was not prejudiced in one of his other trials by the failure of counsel to present merely cumulative evidence).

In his third sub-issue, Appellant contends that counsel was ineffective for failing to investigate, develop, and present evidence of the lifelong history of violence perpetrated by Dustin Spotz against Appellant and other family members, as revealed in Dustin's psychiatric records, CYS reports, and criminal history. Appellant's Brief at 51–52 & n. 65. Appellant argues that if the full extent of Dustin's violence and its effect on Appellant's mental state had been presented, the jury would have given mitigating circumstances more weight and not imposed the death penalty. Contrary to Appellant's assertions, the jury heard considerable evidence as to Dustin's abuse of and violence toward Appellant.

At least three witnesses testified in the penalty phase regarding Dustin's abuse of Appellant and/or the effect of Dustin's violence on Appellant. Ms. Newpher, Appellant's and Dustin's mother, testified in detail, with numerous chilling examples, as to Dustin's gratuitous childhood violence against Appellant. *See* excerpts of notes of testimony, *supra*. In addition, during the guilt phase of trial, Ms. Newpher testified as to the events that took place in her home on the night of Dustin's death. N.T. Trial, 5/14/96, at 1170–1206. She testified that Dustin was in a rage, had threatened Appellant, and had stabbed him in the back with a steak knife and a butter knife. *Id.* at 1186. She further testified that Dustin had hurt both her and Appellant numerous times in the past, once stabbing Appellant in the hand so severely that stitches were required. *Id.* at 1228–29.

Molly Muir, the CYS administrator, also testified during the penalty phase as to Dustin's violent episodes, including one where he held Appellant at knife-point. N.T. Penalty Phase, 5/16/96 at 1720. In addition, Ms. Muir testified as follows regarding Appellant's relationship with Dustin and its effects on Appellant:

[Appellant] was torn between his allegiance to his brother, Dustin, and his interest in his family.

\* \* \*

[Appellant] also tended to be drawn in by Dustin's behaviors, being the follower and defender in this sibling relationship.

\* \* \*

The last runaway [from a children's home] took place on October 24, 1983, when [Appellant] left with his roommate and brother.

When Lynn Washburn and Bill Inglefritz were called to St. John's Lutheran Church to pick up the boys, it was necessary to restrain Dustin because of his aggressive behaviors. This is when [Appellant] most clearly displayed his difficulty in determining allegiance. He kept asking Bill to let Dustin go while [Dustin] was being restrained, but became upset with Dustin because he was telling [Appellant] to kick Lynn, who was pregnant, and, quote, kill the baby. [Appellant] pleaded with Dustin to stop saying such things, and eventually became so angry that he kicked Dustin in the side. During this whole incident, ... [Appellant] fluctuated between support and abhorrence of [Dustin's] behavior. It seemed that [Appellant] was losing his own identity and values because of his fear of letting [Dustin] down.

N.T. Penalty Phase, 5/16/96, at 1701–02; *see also id.* at 1706.

Dr. Ragusea suggested that Appellant had been sexually molested by his brother. N.T. Penalty Phase, 5/16/96, at 1872, 1886. In addition, Dr. Ragusea testified that during the fight that culminated in Dustin's death, Dustin stabbed Appellant in the back two times, leading Appellant to conclude that he was "in a fight to the death." *Id.* at 1878.

■ The testimony presented thus established that the relationship between Appellant and his brother Dustin was, from early childhood, volatile, violent, and abusive. Appellant's contention that counsel was ineffective for failing to offer yet additional evidence in the form of Dustin's psychiatric records, CYS reports, and criminal history, is meritless. Such evidence would have been merely cumulative of the testimony presented with regard to the matter of Dustin's abuse of and violence toward Appellant.

■ In his fourth sub-issue of Issue 14, Appellant alleges that counsel was ineffective for failing to investigate Appellant's family history of mental illness, which, Appellant argues, not only was "independently mitigating," but also directly affected Appellant's "susceptibility for mental illness." Appellant's Brief at 50. Appellant cites in particular the various diagnoses of mental illness given to his biological father; mother, Ms. Newpher; and brother Dustin as "relevant and material to the jury's consideration of mitigation." *Id.* at 51.

Appellant ignores the substantial penalty phase evidence presented as to the family history of mental illness. Molly Muir, the CYS administrator, testified that Ms. Newpher had severe emotional problems, including a complete emotional breakdown in 1975, for which she received psychiatric care; had experienced depression over a long period of time; and had threatened suicide. N.T. Penalty Phase, 5/16/96, at 1687–89, 91. Ms. Muir also testified as to Dustin's mental health problems, including his uncontrollable behavior, anger and resentment, aggression, and threats of self-harm. *Id.* at 1703–06, 1717–18; *see also supra*, excerpts of Ms. Muir's testimony. Dustin's violent behavior was well documented before the jury. The reports Ms. Muir read into the record indicated that Dustin asked the caseworkers to hit him instead of talking to him. *Id.* at 1705. On several occasions, Dustin had grabbed a sharp object and threatened to slit his wrist or hurt someone else, requiring crisis intervention and physical restraint. *Id.* at 1723–25. In addition, Dustin had been involuntarily committed to a hospital in 1982 on a crisis basis. *Id.* at 1719–20. Dr. Thompson, the director of psychological services at the Milton Hershey School, testified that Dustin was subjected to psychiatric evaluation and discharged from the school because of his aggressive, extremely difficult behavior. *Id.* at 1789–90. Dr. Ragusea testified that, at the time of Appellant's conception, his father was using "very heavy kinds of drugs," which research has suggested can affect the genetic material in sperm and result in offspring with neurological syndromes. *Id.* at 1875.

Appellant provides no argument as to how or why additional evidence as to his family history of mental illness would not have been merely cumulative. In addition, he provides no argument as to how or why additional evidence of his family history of mental illness could possibly have been determinative in the jury's balance of mitigating and aggravating factors. There is no merit to his assertion that Attorney Andrews was ineffective for failing to present such additional evidence.

 Finally, in the fifth and last, and somewhat redundant, sub-issue of Issue 14, Appellant asserts that counsel was ineffective for failing to obtain and consider all available records and evidence of his mental health problems, which incorporated the effects of abuse, neglect, abandonment, drug addiction, and family history of mental illness. More specifically, Appellant asserts that, because his expert witness, Dr. Ragusea, did not have access to *all* of the records and information regarding Appellant's background,[40] Dr. Ragusea provided merely "a drop in an ocean of background and collateral data," and accordingly, presented a "materially inaccurate" picture of Appellant's life and mental health to the jury. Appellant's Brief at 52–53. Relying on the PCRA hearing testimony of two psychiatrists, Dr. Neil Blumberg and Dr. Robert A. Fox, Jr., as well as Dr. Ragusea, Appellant argues that, had all the evidence relevant to his background and history been considered, "additional, more significant mental health diagnoses" would have been rendered. *Id.* at 54. These "more significant mental health diagnoses" would, Appellant argues, have tipped the balance in favor of mitigating circumstances during the jury's deliberations. *Id.* at 54–55.

The PCRA court denied relief. First, the PCRA court pointed out that, to the extent the records challenged in this issue were allegedly incomplete and inadequate CYS institu-

---

40. The allegedly incomplete or absent records, information, and evidence cited by Appellant includes the following: testimony of Ms. Redden as to abuse suffered by Appellant, discussed *supra* in text; criminal, institutional, and hospital records of Dustin Spotz, *see* Appellant's Brief at 45 n. 51, 47, 50–51 n. 63; CYS and other institutional records regarding Appellant and his family members, *see id.* at 47–49

tional records regarding Appellant and his immediate family, the matter had also been raised in the collateral appeal of Appellant's Schuylkill County first-degree murder conviction. *See Spotz V*, 896 A.2d at 1230–31. In *Spotz V*, this Court concluded that Appellant had not been prejudiced by the allegedly incomplete records, because any additional records would have been merely cumulative and redundant. *Id.* at 1231. Similarly, in the instant case, the PCRA court concluded that Appellant was not prejudiced by Dr. Ragusea's lack of access to all the records and other evidence relevant to Appellant's background. The PCRA court carefully compared the various mental health diagnoses that Appellant had received, both at the time of trial and for purposes of collateral review, when the additional records were brought forth. The PCRA court determined that the differences in the diagnoses were not prejudicial and would not have altered the outcome of the penalty phase, particularly in light of the substantial evidence supporting the three aggravating factors found. *See* PCRA Court Opinion at 45–46. The PCRA court's conclusions are supported by the record, and we will not disturb them, as explained below.

At the PCRA hearing, Dr. Ragusea explained in general terms the significance of the additional records and other evidence regarding Appellant's background as follows:

[We now] have much more information in general both from [Appellant] and collateral sources about his condition and the condition of the family for many years, and as a result, there's a greater level of specificity that I didn't have [at trial].

In addition, the information that is derived from all that more specific information is more profoundly disturbing and suggests more severe family dysfunction, more severe abuse, more severe inappropriate sexual activity.

N.T. PCRA Hearing, 1/18/07, at 142.

Thus, by Dr. Ragusea's own words, the additional records and information merely allowed him to be more specific about Appellant's condition and suggested a greater degree of dys-

function and abuse; however, there is no indication from Dr. Ragusea's testimony that the additional records and information led to any substantially new insights or qualitative change in his opinions.

Dr. Ragusea then explained more specifically how he had modified his diagnoses of Appellant based on the additional records and information. At the time of trial, Dr. Ragusea testified that he had diagnosed Appellant with the following mental health disorders: attention deficit hyperactivity disorder; polysubstance abuse, involving marijuana, cocaine, hashish, alcohol; post-traumatic stress disorder, from the trauma of Dustin's killing; and mixed personality disorder, with features of borderline personality, antisocial behavior, and schizotypal personality. PCRA Court Opinion at 34–35; N.T. Penalty Phase, 5/16/96, at 1877–81 and 83–84. After reviewing additional records and other evidence regarding Appellant's background at the request of PCRA counsel, Dr. Ragusea modified his diagnoses in two ways: (1) the old diagnosis of mixed personality disorder with features of borderline personality, antisocial behavior, and schizotypal personality was replaced with "a specific personality disorder, such as schizotypal personality disorder, simply because [there] now is some evidence that [Appellant] was hallucinating and delusional at various points and that that also occurred in family members." N.T. PCRA Hearing, 1/18/07, at 142; and (2) the old diagnosis of post-traumatic stress disorder was replaced with chronic posttraumatic stress disorder, of many years' duration, and induced, not just by Dustin's killing, but more generally by the violence and abuse Appellant had habitually suffered in his family life. *Id.* at 145–46.[41]

41. The two psychiatrist expert witnesses offered by the defense at the PCRA hearing also concluded that Appellant suffered from chronic and severe post-traumatic stress disorder, as well as polysubstance abuse. One, Dr. Fox, also diagnosed Appellant with obsessive compulsive disorder.

Although, like Dr. Ragusea, both psychiatrists also diagnosed Appellant with a personality disorder, they differed with regard to the type. Dr. Fox's diagnosis was borderline personality disorder, but Dr. Blumberg's diagnosis was personality disorder not otherwise specified, with features from dependent, schizotypal, borderline, and antisocial personali-

While we do not minimize the potential significance of the revised diagnoses to trained psychologists or psychiatrists involved in mental health treatment, we can locate nothing in the record to suggest that the revisions would have been determinative in the deliberations of the jury. We agree with the PCRA court that Dr. Ragusea's revised diagnoses on collateral appeal constitute no prejudice to Appellant because he has not established that the revisions would have caused the jury to weigh differently the mitigating versus aggravating circumstances. *See* PCRA Court Opinion at 45.

Dr. Ragusea also testified both at trial and at the PCRA hearing as to the statutory mitigators, 42 Pa.C.S. §§ 9711(e)(2) and (e)(3). With regard to subsection (e)(2) ("The defendant was under the influence of extreme mental or emotional disturbance"), Dr. Ragusea testified at trial that Appellant met this mitigating circumstance. N.T. Penalty Phase, 5/16/96, at 1882. At the post-conviction hearing, Dr. Ragusea testified that, based on the additional information he had received, he could testify to this mitigating circumstance "with a much greater degree of certainty now because the emotional disturbance was far greater and far bigger than that was—that was related to that single incident with his brother. [Appellant's] level of emotional disturbance was broader, deeper, more severe than I had an appreciation for based upon the evidence that I had available to me at the time [of trial]." N.T. PCRA Hearing, 1/18/07, at 149–50.

With regard to subsection (e)(3) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired"), Dr. Ragusea testified at trial as follows:

> *Dr. Ragusea:* I believe that [Appellant] could have conformed his conduct to the law if he chose to. I think, but I am not certain.

ty disorders. PCRA Court Opinion at 41 n. 26; N.T. PCRA Hearing, 2/22/07, at 76; and 1/18/07, at 10–11, 17, 26. Dr. Blumberg clarified that personality disorder not otherwise specified is simply the newer term for mixed personality disorder. N.T. PCRA Hearing, 1/18/07, at 10. Thus, it would appear that the type of personality disorder diagnosed by Dr. Blumberg for purposes of collateral appeal is very similar to the type *first* diagnosed by Dr. Ragusea, *i.e.,* at the time of trial.

And the reason for that has to do with the fact that [Appellant] told me that he did not commit these murders. And, therefore, anytime I asked him what was it like at the time of the murder, what were you thinking, he said, I was unconscious behind the driver, and I was lying in the back seat of the car. So, as far as I was concerned, I couldn't explore that area really at all. But, in general, my answer is I couldn't tell.

\* \* \*

*Defense Counsel:* Let me just get back to ... the ability to conform his conduct to the law, and you said you really don't have an opinion on that because he had always told you—he didn't give you enough information that you could make a determination?

*Dr. Ragusea:* That is correct.

*Defense Counsel:* If you assume as a hypothetical that [Appellant] committed this offense in the fashion that he is charged, are you able to say whether your findings on the first mitigating circumstance, about being subject to an extreme mental or emotional disturbance, would bear upon his ability to conform his conduct to the law?

*Dr. Ragusea:* Yes, it might have. It could have impacted him adequately so he would have trouble doing it.

N.T. Penalty Phase, 5/16/96, at 1882–84.

At the PCRA hearing, Dr. Ragusea testified regarding the subsection (e)(3) mitigator as follows:

*Dr. Ragusea:* The other issues involved include the fact that one of the things these additional records do is they show me that this then-young man was brought up in a home in which he was taught abhorrent behavioral standards. He was taught that violence, degradation, humiliation, life-threatening actions were all normal. It was part of every day family life.

Now, within that context, I don't know if he understood how wrong it was to do the things that he was doing within the framework of our sense of morality and our understanding of the law.

*Defense Counsel:* So then let me refer you to the first clause of [mitigator (e)(3) ], the capacity of the defendant to appreciate the criminality of his conduct, . . . .

Based on what we know with the augmented records and the extent of[,] as you characterized[,] abuse and degradation and humiliation[,] and the fact that it continued throughout his entire life, can you today render an opinion to a reasonable degree of psychological certainty as to that first clause there?

*Dr. Ragusea:* Given that it is impossible for us to be inside somebody's head, there are limits to what we can conclude. But to the degree that psychologists can make such a determination, yes, within a reasonable degree of psychological certainty I can say that [Appellant] did not have the capacity to appreciate the criminality of his conduct.

N.T. PCRA Hearing, 1/18/07, at 152.

Appellant has failed to establish that it was prejudicial for the jury not to hear Dr. Ragusea's modified opinions regarding the two statutory mitigating factors of subsections 9711(e)(2) and (e)(3). The modifications in Dr. Ragusea's opinions are subtle, largely a matter of degree or emphasis. As with the revised mental health diagnoses, nothing in the record suggests that the subtle modifications in Dr. Ragusea's opinions as to the statutory mitigators would have led the jury to give determinative weight to mitigating circumstances and thus spare Appellant the death penalty.

Because none of Appellant's multiple claims of ineffective assistance in issue 14 has any merit, Appellant is entitled to no relief.

## 15. Department of Corrections Mental Health Reports

■ In Issue 15, Appellant asserts a violation of *Brady v. Maryland* and ineffective assistance of counsel, both grounded in the failure of the Department of Corrections to provide two reports of a mental health evaluation of Appellant conducted by prison health care personnel in January 1996. Appellant contends that one of these documents constituted mitigation

evidence because it indicated that he would adjust well to prison life; in addition, Appellant contends that the documents provided support for a "diminished capacity/emotional disturbance defense," as well as for a finding that Appellant was not competent to waive counsel. Appellant's Brief at 57–59.

The PCRA court made the following findings of fact with regard to this matter. *See* PCRA Court Opinion at 46. When defense counsel Andrews sought Appellant's mental health records from the Department of Corrections, the Department informed him that such records would not be released without a court order. *See* N.T. PCRA Hearing, 5/10/07, at 160–64; Letter to Mr. Andrews from Ben Livingood, Corrections Superintendent Assistant, dated 11/13/95 (Petitioner's Exhibit 82). Knowing that the Office of the Public Defender in York County was seeking the same records, Attorney Andrews deferred to that office. The Department of Corrections sent Appellant's psychological/psychiatric records, noting that they were compiled prior to his incarceration for murder, to the York County public defender on February 21, 1996.[42] These records, which dated from Appellant's 1990 incarceration for robbery, simple assault, burglary, and conspiracy, were forwarded from York County to Attorney Andrews on February 23, 1996. Subsequently, PCRA counsel discovered two additional documents, which summarized Appellant's mental health evaluation by prison personnel on January 31, 1996, but which apparently had not been sent to counsel.

The PCRA court concluded that counsel was not ineffective for not re-requesting Department of Correction records immediately before trial; in addition, the PCRA court noted that there was no evidence that Appellant had told counsel that he had been evaluated by prison mental health professionals. Finally, the PCRA court recognized that Appellant had raised,

42. The PCRA court found that the Department of Corrections sent Appellant's psychological/psychiatric records to the York County Office of the Public Defender in November 1995; however, the court's findings in this regard are not consistent with the exhibits of record. The exhibits show that the records at issue were sent on February 21, 1996. *See* Petitioner's Exhibit 83. This discrepancy is not relevant to our resolution of the matter.

and this Court had rejected, a similar issue in the collateral appeal of Appellant's first-degree murder conviction in Schuylkill County. PCRA Court Opinion at 47 (citing *Spotz V*, 896 A.2d at 1237). In *Spotz V*, we denied relief on this issue, based on the speculative nature of the documents' assessment of Appellant's future adjustment to prison life and on Appellant's failure to demonstrate prejudice. *Spotz V*, 896 A.2d at 1237. The same conclusion applies here, and thus we affirm the PCRA court's ruling on this issue.

We consider first the content of the two documents at issue. The first document is a psychological evaluation of Appellant, conducted by Franklin P. Ryan, Ph.D., the chief psychologist for the Department of Corrections, on January 31, 1996, which was a year after Appellant's crime spree and shortly before his murder trials. Psychological Evaluation, conducted by Dr. Ryan, dated 1/31/96 (Petitioner's Exhibit 84) (hereinafter "Ryan Report"). The evaluation was apparently prompted by Appellant's complaints to prison personnel of decreased sleep, hallucinations, and depression. Psychiatry Department Referral Form, referred by Cynthia M. Crowell, dated 1/29/96 (Petitioner's Exhibit 34). The Ryan Report included, *inter alia*, the following findings: Appellant had a verbal IQ in the "bright normal range;" he had a "markedly deviant" Minnesota Multiphasic Personality Inventory profile; he described his family as "critical, quarrelsome, lacking in love, understand[ing] or support;" he was isolated, alienated, lonely, unhappy, generally obnoxious, and immature, and viewed himself as misunderstood and a failure; he had demonstrated aggression towards others and admitted to having impulses to do something harmful and shocking. Ryan Report at 1–2. The report also suggested the following "Diagnostic Impressions": (1) adjustment disorder with anxious mood; (2) personality disorder, severe, mixed, with features of passive-aggressive, passive dependent, narcissistic, antisocial; (3) polysubstance abuse/dependence, in remission; (4) problems with legal system. *Id.* at 2–3. Finally, under "Recommendations," the report stated the following: "[Appellant] eventually will adjust well to prison life. It provides him with a struc-

ture, limits, and guidelines. It will meet his dependency strivings, and won't tolerate his acts of aggression. He is bright and can be trained at a prison trade. During the next year, however, while his cases are being heard and decided, he must be held in closer custody for the safety of those around him." *Id.* at 3.

The second document, authored by Department of Corrections psychiatrist Frederick R. Maue, and also dated January 31, 1996, is extremely short and informal, comprising only a few hand-written notations. According to the notations, Dr. Maue saw Appellant, who claimed to have felt better after meeting with Dr. Ryan, slept well, and had fewer flashbacks and nightmares. Psychiatry Department Referral Form, completed by Frederick R. Maue, M.D., dated 1/31/96 (Petitioner's Exhibit 34) (hereinafter "Maue Notes"). The Maue Notes do not mention any diagnosis or potential for adjustment to prison life.[43]

For his argument as to the relevance of these documents to the penalty phase of trial, Appellant relies on *Skipper v. South Carolina,* 476 U.S. 1, 4, 7 & n. 2, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). In *Skipper,* the United States Supreme Court held that the state court had committed constitutional error by excluding, from a capital sentencing hearing, testimony proffered by the defendant regarding his good behavior in prison during the time between his arrest and trial. The high Court concluded that it was a "not undesirable element of criminal sentencing" for the jury to consider "a defendant's past conduct as indicative of his probable future behavior." *Id.* at 5,

---

**43.** Appellant also asserts that the Ryan Report and Maue Notes "corroborated testimony concerning sexual abuse and neglect," "described Appellant's personality features consistent with those expected in a person who suffered extreme physical and sexual abuse, neglect, and a severely dysfunctional upbringing," "demonstrat[ed] that Appellant was suffering from a serious PTSD-related mental and emotional disorder in the days immediately following [the killing of his brother Dustin]," and "establish[ed] that Appellant was actively suffering from PTSD at and around the time of trial." Appellant's Brief at 57–59.

These assertions do not accurately reflect the content of the documents at issue. Post-traumatic stress disorder (PTSD) is not included among the "Diagnostic Impressions" of the Ryan Report. In fact, neither the Ryan Report nor the Maue Notes even mentions PTSD.

106 S.Ct. 1669. Relying on its prior holding that a sentencing court "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," the high Court concluded that "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." *Id.* at 4, 106 S.Ct. 1669 (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (emphasis in original)) and 7, respectively.

In the instant case, Appellant submits that his counsel was ineffective for not proffering, as mitigation evidence under *Skipper*, the projection in the Ryan Report that Appellant "eventually will adjust well to prison life." Ryan Report at 3. Appellant has failed to establish that, had the Ryan Report and/or the Maue Notes been offered as additional mitigation evidence, there is a reasonable probability that the jury would have decided upon life imprisonment, not the death penalty. Appellant totally ignores the fact that the documents present a far from uniformly positive picture of his personal characteristics, interpersonal relations, and likely future conduct. Although Appellant had been imprisoned for nearly a year when the documents were written, they give little, if any, insight as to his conduct in and adjustment to prison during that time. While the Ryan Report does indeed speculate that Appellant "*eventually* will adjust well to prison life," it also mentions several times his aggressive tendencies toward others, and notes the need to maintain him in "closer custody for the safety of those around him" while his cases were being decided. Ryan Report at 3 (emphasis added). There is no reasonable probability that the jury would have chosen not to sentence Appellant to death based upon the speculative—and largely negative—assessments in the documents at issue. Accordingly, we will not hold counsel ineffective for failing to proffer these documents as mitigation evidence.

Furthermore, we will not hold counsel ineffective for failing to proffer these documents as guilt phase evidence in

support of a diminished capacity defense or of Appellant's incompetence to waive counsel. The documents provide absolutely no insight as to Appellant's mental state at the time of the offense, the only relevant time for a diminished capacity defense. *See Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 237 (2007) (requiring a defendant advancing a defense of diminished capacity based on mental defect to "establish [that he or she] had a mental defect at the time of [the] murder that affected his [or her] cognitive abilities of deliberation and premeditation necessary to formulate specific intent to kill."). Furthermore, nothing in the documents remotely implies that Appellant did not have the mental capacity to understand the legal proceedings, and thus was not competent to stand trial or to waive counsel. *See Starr*, 664 A.2d at 1339; *Puksar*, 951 A.2d at 288. In fact, the Ryan Report constitutes evidence to the contrary, noting that Appellant exhibited a verbal IQ of 118, which placed him in the bright normal range of mental ability. Thus, far from supporting a diminished capacity defense, the documents more logically support Appellant's competence to stand trial and waive counsel. Accordingly, there is no arguable merit to Appellant's assertions that counsel was ineffective for failing to offer these documents as evidence during the guilt phase of trial.

Finally, in Issue 15, Appellant asserts a violation of *Brady v. Maryland* grounded in the failure of the Department of Corrections to produce the documents at issue. Appellant neglects to accompany his assertion with any argument, but it is meritless on its face. To establish a *Brady* violation, an accused must prove, *inter alia*, that the evidence allegedly withheld was "material evidence that deprived the defendant of a fair trial." *Commonwealth v. Johnson*, 572 Pa. 283, 815 A.2d 563, 573 (2002). "Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 433,

115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). For the reasons discussed *supra*, neither the Ryan Report nor the Maue Notes constitutes "material evidence." Appellant's assertions to the contrary are entirely meritless and he is entitled to no relief on his fifteenth issue.

## 16. Amenability to and Availability of Mental Health Treatment as a Mitigating Factor

In Issue 16, Appellant asserts that penalty phase counsel was ineffective for failing to proffer, as a mitigating circumstance, evidence that Appellant's mental disorders, including PTSD, were amenable to treatment, and that appropriate treatment for his mental disorders was available to inmates serving a life sentence. Appellant relies on the Department of Corrections mental health documents discussed *supra* in Issue 15 to support these assertions.[44] Furthermore, he contends that his amenability to and the availability of appropriate mental health treatment should have been considered as additional evidence supporting his favorable prognosis for adjustment to prison life. Appellant's Brief at 60–61.

■ Our review of the record reveals no indication that this matter was presented to the PCRA court in a timely enough fashion to preserve it for appeal, and Appellant fails to provide a citation to the record to establish the contrary. *See* Pa.R.App.P. 2117(c)(4) (requiring "specific reference to the places in the record where the matter appears ... as will show that the question was timely and properly raised below so as to preserve the question on appeal"); *see also* Pa. R.App.P. 2119(e). The matter was first raised in Appellant's motion for reconsideration, which was filed on July 21, 2008, nearly a month after the PCRA court had issued its opinion and order denying all of Appellant's claims for relief. There is

44. Appellant asserts that the Maue Notes and the DOC Psychiatry Department Referral Form "evidenc[e] symptoms of Appellant's Posttraumatic Stress Disorder." Appellant's Brief at 60. However, there is no mention of PTSD in these writings, only Appellant's self-reported symptoms of decreased sleep, hallucination, and depression. Furthermore, PTSD is not included in the "Diagnostic Impressions" of the Ryan Report.

also no indication from the record that the PCRA court addressed the matter. We conclude that the matter has been waived. *See* Pa.R.App.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.")

**17. Cumulative Effects of Alleged Errors and Ineffective Assistance**

Appellant next contends that the cumulative effect of the alleged errors and ineffective assistance warrants a grant of relief, summarily asserting "cumulative prejudice from the combination of court error, improper actions by the prosecution, and deficient performance by counsel at both the trial and appellate stages." Appellant's Brief at 92. Comprising only six sentences in total, this claim does not develop any specific, reasoned argument for cumulative prejudice. Appellant merely cites *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532 (2009), and *Commonwealth v. Sattazahn*, 597 Pa. 648, 952 A.2d 640, 670–71 (2008), for the principle that a claim of error based on cumulative prejudice may be viable. The PCRA court denied Appellant's claim of cumulative effect based on its findings that none of Appellant's individual claims warrant relief. PCRA Court Opinion at 25, 58.

We have often held that "no number of failed [ ] claims may collectively warrant relief if they fail to do so individually." *Johnson, supra* at 532 (quoting *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 617 (2007)). However, we have clarified that this principle applies to claims that fail because of lack of merit or arguable merit. *Sattazahn, supra* at 671. When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed. *Id.; Johnson, supra* at 532 (citing *Commonwealth v. Perry*, 537 Pa. 385, 644 A.2d 705, 709 (1994), for the principle that a new trial may be awarded due to cumulative prejudice accrued through multiple instances of trial counsel's ineffective representation).

■ We have denied most of Appellant's claims based on lack of merit, and there is no basis for a claim of cumulative error with regard to these claims. With regard to the few claims that we have denied based on lack of prejudice, *see* one sub-claim in Issue 9, two sub-claims in Issue 11, and Issue 15, we are satisfied that there is no cumulative prejudice warranting relief. These claims are independent factually and legally, with no reasonable and logical connection that would have caused the jury to assess them cumulatively.

## PCRA PROCEEDING

### 18. DNA Testing of Blood Sample

In Issue 18, Appellant asserts that the PCRA court erred by denying discovery related to the Commonwealth's handling of a blood sample obtained from Appellant's right sneaker. At trial, Appellant and the Commonwealth stipulated to a report by Cellmark Diagnostics, a DNA laboratory in Maryland that performed DNA analysis on the blood obtained from the sneaker, as well as on blood obtained from Appellant and his four victims. The DNA analysis excluded Appellant and the first three victims as sources of the blood; however, Betty Amstutz could not be excluded. N.T. Trial, 5/14/96, at 1133–35. Appellant now alleges that the Commonwealth did not employ an independent lab for analysis of the blood from the sneaker, but rather relied on a police lab, which used out-of-date and less reliable testing methods. Appellant further states that, when he sought to re-test the blood from the sneaker, he learned that it had been destroyed, and he alleges that the Commonwealth exercised bad faith in failing to preserve the sample.[45] Appellant's Brief at 92.

Appellant's motion for discovery related to these allegations was denied by the PCRA court based on failure to show good

---

**45.** It appears that Donald Bloser, Jr., a forensic scientist employed by the Pennsylvania State Police Crime Laboratory, initially extracted and then did some preliminary testing of the blood stain on the sneaker. After this testing established that the blood did not belong to Appellant, Mr. Bloser recommended that the sample be forwarded to Cellmark Diagnostics for DNA analysis. N.T. Trial, 1/13/96, at 1012.

cause, particularly in light of the fact that he had stipulated to the DNA report from Cellmark Diagnostics. PCRA Court Opinion at 62. The PCRA court also concluded that no evidence had been offered during the PCRA proceedings to support the allegations that the entire sample had been consumed, or, if it had been consumed, that there had been any way to preserve a portion of the sample. In addition, the PCRA court concluded that there was no evidence of bad faith on the part of the Commonwealth, and no evidence that retesting of the sample could possibly have exculpated Appellant. PCRA Court Supplemental Opinion, dated 8/7/08, at 5–6.

Discovery requests in the context of a PCRA petition in a death penalty case are addressed in Pennsylvania Rule of Criminal Procedure 902(E)(2), which provides as follows:

(2) On the first counseled petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause.

Pa.R.Crim.P. 902(E)(2).

We review the denial of a discovery request in post-conviction proceedings for abuse of discretion. *Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 749–50 (2004).

We agree with the PCRA court that Appellant has not come close to making a showing of good cause with respect to his discovery requests related to the analysis of the blood obtained from the sneaker. Appellant fails to mention, much less discuss, Cellmark Diagnostics' DNA analysis and his stipulation to the resulting report. His assertions of out-dated methods of analysis, destruction of the sample, bad faith on the part of the Commonwealth, and exculpatory nature of the evidence are barely explained and entirely unsupported. Bald assertions, unaccompanied by any supporting evidence, do not constitute a showing of good cause, and we hold that the PCRA court did not abuse its discretion in denying Appellant's discovery motion. *See Bryant, supra* at 750 (stating that mere speculation as to possible errors or potentially

exculpatory evidence does not constitute good cause under Rule 902(E)(2)).

## 19. PCRA Court Rulings

In Issue 19, Appellant raises numerous allegations of PCRA court error, including (1) failure to transmit the entire record to this Court for review; (2) preclusion of his proffers of testimony during the PCRA hearing, thereby allegedly preventing him from developing the record; (3) preclusion of much material and relevant evidence, particularly testimony that supported his constitutional claims, and (4) denial of his motion for reconsideration.[46] We address each sub-claim in turn.

In his first sub-claim, Appellant asserts that the PCRA court "transmitted only those PCRA exhibits that were admitted into evidence, but did not transmit other exhibits [that the PCRA court] ruled inadmissible, even though those exhibits relate to issues that are the subject of this appeal." Appellant's Brief at 94. Appellant contends that it was error for the PCRA court not to forward to this Court the nineteen exhibits **not** admitted into evidence.[47] Notably, Appellant does **not**

---

**46.** In another sub-claim of Issue 19, Appellant reasserts exactly the same issue already addressed and rejected in Issue 18. Appellant's Brief at 95; *see* text, *supra*.

**47.** There were approximately 90 defense exhibits in total presented to the PCRA court, of which the Commonwealth objected to 21. N.T. PCRA Hearing, 5/11/07, at 102.

We note that one of the exhibits allegedly not transmitted, *i.e.*, Exhibit 39, is in fact included in the record transmitted to this Court and was apparently admitted by the PCRA court. *See* N.T. PCRA Hearing, 5/11/07, at 108, 115–16. The exhibit is identified by Appellant as "Schuylkill PCRA Hrg. Exh. P–10, handwritten note from Schuylkill prosecutor's file." Appellant's Brief at 94 n. 123. It was described in the notes of testimony as a handwritten note from the file of the Schuylkill County District Attorney. N.T. PCRA Hearing, 5/11/07, at 107–08. The note, in its entirety, reads as follows:

 10/6/95
 Re: Noland
 atty Cammarano [Noland's counsel] won't be here on the 18th for Plea Negos.
 won't be able to meet w/ her parents until the 20th
Appellant's Exhibit 39.

specifically challenge the PCRA court's **rulings** with regard to the admissibility of any of the exhibits at issue, and he does not even explain how any of the exhibits are relevant or material to the issues raised in this appeal. He merely complains that the inadmissible exhibits were not sent to this Court.

It is the duty of the clerk of court to transmit to this Court the record on appeal, including the transcript and exhibits necessary for the determination of the appeal. Pa. R.A.P. 1931(a)(1), (c). As an appellate court, we are "limited to considering only those facts that have been duly certified in the record on appeal." *Commonwealth v. Williams*, 552 Pa. 451, 715 A.2d 1101, 1103 (1998). Appellant cites no authority for his implied assertion that inadmissible exhibits properly constitute part of the record on appeal. Furthermore, Appellant was free to challenge on appeal the PCRA court's evidentiary rulings with regard to the admissibility of any of the exhibits. He has not done so. Indeed, he has not set forth a single argument or citation to authority or legal principle to support the admissibility of any of the exhibits at issue. Appellant's bald assertion of error in the transmission of the record to this Court is entirely without merit. To remedy the non-existent problem in transmission of the record, Appellant seeks remand—to what end, we have no idea, as no explanation is offered. This sub-claim is frivolous in the extreme.

In his second sub-claim, which comprises three sentences and a footnote, Appellant asserts that he was precluded from preserving and developing the record because the PCRA court precluded his proffers of testimony throughout the PCRA hearing. Appellant's Brief at 94–95. During the hearing, the PCRA court made clear the reasons for its rulings with regard to the proffers of testimony. Appellant could

Christina Noland, who pled guilty to several charges in connection with Appellant's first three killings but was not charged in the instant Cumberland County crimes, testified against Appellant at trial. *See* N.T. Trial, 5/10/96, at 261–406. Appellant provides absolutely no insight as to the conceivable relevance or materiality of this note, which apparently concerns the scheduling of Ms. Noland's Schuylkill County plea negotiations, to his instant appeal.

certainly have challenged these rulings on appeal with proper argument and citations to relevant authority, but for whatever reason, he chose not to do so. Instead, Appellant merely lists, in a footnote, seven citations to the record where the PCRA court allegedly precluded counsel's proffer of testimony; each citation to the record is accompanied only by a phrase, which purports to summarize the proffer precluded, but which includes no argument as to the court's alleged error. *Id.* at n. 124. This sub-claim is completely undeveloped and unreviewable, and, accordingly, it is waived.[48]

48. To illustrate the undeveloped nature of Appellant's contentions in this sub-claim, two examples are set forth below, each of which includes the excerpt of the PCRA notes of testimony cited by Appellant and his accompanying but unexplained assertion as to that excerpt. With regard to the first example, Appellant asserts only that the PCRA court "preclud[ed] proffer on the relevance of expert testimony regarding Dustin Spotz's sexual abuse." Appellant's Brief at 94 n. 124.

 *Defense Counsel:* Doctor, in the ... records related to Dustin [Spotz], there is a reference that Dustin propositioned another boy asking him to have oral sex. Is that consistent with the conduct of a child who has been sexually abused and is reenacting that abuse?
 *Commonwealth:* Objection.
 *PCRA Court:* Sustained.
 *Defense Counsel:* What would the significance of an event like this be?
 *Commonwealth:* Objection.
 *PCRA Court:* Sustained. Move on to your client.
 *Defense Counsel:* Your Honor—
 *PCRA Court:* I have made the ruling. You are hammering in the same thing from 50 different angles. Get me information that I have not heard that is relevant.
 *Defense Counsel:* Your Honor–I would just ... offer a proffer.
 *PCRA Court:* No. I don't want to hear a proffer. You are ahead of the game.

 N.T. PCRA Hearing, 1/17/07, at 181–82 (cited in Appellant's Brief at 94 n. 124).

 It is clear from the notes of testimony reproduced above that the PCRA court denied admission of the proffered testimony based on relevance and cumulative effect. Appellant has set forth absolutely no argument that the PCRA court's ruling was erroneous.

 With regard to the second example, Appellant asserts only that the PCRA court "preclud[ed] proffer of expected expert testimony regarding Appellant's state of mind at the time" of the killing of his brother. Appellant's Brief at 94–95 n. 124.

 *Defense Counsel:* Doctor [Blumberg], I would now like to turn your attention to the Clearfield County incident where Dustin attacks [Appellant], [Appellant] kills Dustin. First of all, was [Appellant]— how aware was [Appellant] of Dustin's violent propensities?

In his next sub-claim, Appellant similarly asserts that he was precluded from presenting material and relevant evidence in support of his constitutional claims by the PCRA court's evidentiary rulings during the hearing. As in the prior sub-claim, no argument and no citations to relevant authority accompany Appellant's bald assertions of PCRA court error. Appellant merely lists ten general areas in which he contends the PCRA court "precluded" evidence, and adds lengthy footnotes listing citations to the notes of testimony, with each cite accompanied by a parenthetical stating only a short summary

> *Dr. Blumberg:* Intimately aware. He had been assaulted by him on numerous occasions. He had been threatened by him on numerous occasions. He had been stabbed by him, you know, on one prior occasion in which he was actually stabbed with a knife and significantly injured by him on, again, other occasions with sharp objects, and he was well aware of Dustin's explosive violent nature.
> *Defense Counsel:* When Dustin stabs [Appellant] and there are two knife stabs and threatens—well, first of all, who did Dustin threaten?
> *Commonwealth:* Objection, Your Honor.
> *PCRA Court:* How is all this relevant? [Appellant] was convicted of what?
> *Defense Counsel:* [Voluntary] Manslaughter.
> * * *
> *PCRA Court:* How is this relevant?
> *Defense Counsel:* Because there was no mental health evidence that was presented in that case at all, and in terms of rebutting the seriousness of the manslaughter conviction as an aggravating circumstance, Dr. Blumberg is going to give his opinion that—well, Your Honor, may I approach? I don't want to say—
> *PCRA Court:* You may not approach. I am going to sustain the objection. I have heard enough. It is not relevant in this case.
> *Defense Counsel:* I'm sorry?
> *PCRA Court:* We are not getting into the—we know what [Appellant] was guilty of in that case, voluntary manslaughter. It has been determined. Now, how that case was tried and what the circumstances were and what was admitted is not relevant in this case, and I will not allow it period.

N.T. PCRA Hearing, 1/18/07, at 34–36 (cited in Appellant's Brief at 94–95 n. 124).

It is clear from the above excerpt that the PCRA court sustained the Commonwealth's objection based on relevance and the finality of a prior conviction. Again, as in the first example, Appellant has set forth absolutely no argument that the PCRA court's ruling was erroneous. As summarized in the text, *supra*, Appellant's generalized assertion that the PCRA court's rulings, such as in the above examples, denied him "the chance to develop a record, in violation of his constitutional rights to meaningful post-conviction review" does not constitute a reasoned argument amenable to review.

of the testimony "precluded." Appellant's Brief at 95–98.[49]

Examples are necessary to appreciate the manner in which Appellant has set forth this sub-claim. In the following paragraphs, two of the ten general areas of evidence listed by Appellant, and their accompanying footnotes, are reproduced verbatim:

> The PCRA Court precluded . . .
>
> evidence regarding the Clearfield incident that counsel should have developed and presented at trial and during the penalty hearing that would have supported Appellant's mental state defenses for this incident and challenged the prosecution's aggravation;

Appellant's Brief at 95–96.

> The footnote at the end of this claim is as follows:
>
> *See, e.g.*, PC 1/18/07, 57 (precluding expert testimony about the impact of the Clearfield incident on Appellant's pre-existing impairments; PC 2/22/07, 120–21 (precluding expert testimony about Appellant's mental state at the time of the Clearfield incident; the decedent's mental state; and the impact of the Clearfield incident on Appellant's pre-existing impairments).

*Id.* at 96 n. 127.

Similarly, another general area of evidence cited by Appellant is as follows:

> The PCRA Court precluded . . .
>
> evidence of Dustin Spotz's history of violence and abuse both against Appellant and others that was relevant and material to both Appellant's mental state at, and following,

---

49. One of the ten general areas concerns testimony regarding the circumstances of Ms. Noland's prosecution and guilty plea. Appellant contends that this testimony was relevant and material to his *Brady* claim. Appellant's Brief at 97. Appellant raises two *Brady* claims in this appeal, which we have rejected, *supra*, in the text. One concerns evidence as to the involvement of Mr. Carothers in a prior murder, and the other concerns mental health reports from the Department of Corrections. *See* text, *supra*, Issues 3 and 15, respectively. Appellant provides absolutely no suggestion as to how the circumstances of Ms. Noland's prosecution and guilty plea could possibly be relevant and material to either of these *Brady* claims.

the incident in Clearfield County that counsel was constitutionally obligated to investigate and develop in support of guilt-phase mental state defenses; in order to challenge the prosecution's aggravation; and in support of penalty-phase mitigation and that counsel was obligated to present to his mental health expert in order to ensure that Appellant received competent, constitutionally required mental health assistance at trial and during the penalty hearing.

Appellant's Brief at 96–97.

The footnote at the end of this claim is as follows:

*See, e.g.,* PC 1/17/07, 40 (counsel prevented from eliciting evidence of Dustin Spotz's rages); *id.* at 176, 181 (precluding Dr. Blumberg from testifying regarding Dustin Spotz's history); PC 1/18/07, 96–98 (precluding Dr. Fox from testifying regarding Dustin Spotz's history of sexual abuse and the impact that history had on corroborating Appellant's allegations that Dustin sexually abused him).

*Id.* at 97 n. 129.[50]

We emphasize that the above paragraphs from Appellant's brief are only two examples of Appellant's ten areas of "evidence" and ten footnotes, which in total list 51 citations to the notes of testimony. In each of Appellant's areas of "evidence," the format is the same as the examples above, which constitute the **entirety** of Appellant's "argument." In no case does Appellant provide the slightest explanation or rationale to support his general claim that he was precluded from presenting evidence.

These are generalized assertions; they are not arguments, much less reasoned and developed arguments supported with citations to relevant legal authority. Appellant's assertions are not reviewable, and this sub-claim is waived for utter lack of development.[51]

**50.** The second citation to the notes of testimony in this excerpt of Appellant's brief is in error. Dr. Fox testified on February 22, 2007, not on January 18, 2007.

**51.** We cannot fail to note that Appellant's parenthetical phrases after his citations to notes of testimony in this issue do not even consistently and accurately describe the circumstances of the excerpt. For exam-

ple, Appellant contends that, in the following excerpt, the PCRA court precluded "expert testimony regarding the impact of Appellant's foster-care experience on his emotional, psychological, and mental stability." Appellant's Brief at 96 n. 128. A review of the excerpt shows that Appellant has incorrectly characterized the PCRA court's action.

> *Defense Counsel:* If it was devastating—it was the most emotionally devastating day for the caseworkers, what would it have been like for those two young children [Appellant and Dustin Spotz]?
>
> *Dr. Blumberg:* Well—
>
> *Commonwealth:* Objection, assuming facts not in evidence.
>
> *PCRA Court:* What, being told that they weren't going home with their parents? Is that what the question is?
>
> *Defense Counsel:* Yes.
>
> *PCRA Court:* Are or are not?
>
> *Defense Counsel:* Are not going home.
>
> *PCRA Court:* Sustained. I did not come from the moon. Come on. There are no 12 people sitting over here. Get me the facts that I need to resolve the issues on.
>
> *Defense Counsel:* Your Honor, this could have been told to the jury.
>
> *PCRA Court:* Sustained. Next question.
>
> *Defense Counsel:* Doctor [Blumberg], what kind of effect would this type of experience have on [Appellant's] emotional development?
>
> *Dr. Blumberg:* Very damaging. Again, this is not just an implied or indirect abandonment but a definite rejection from the parent that they don't want the child. It's kind of hard to think of anything in terms of an emotional damage that could be more damaging.
>
> *Defense Counsel:* Would that effect be compounded with each additional instance of parental abandonment?
>
> *Dr. Blumberg:* Yes, it would certainly be cumulative.

N.T. PCRA Hearing, 1/17/07, at 159–60.

Dr. Blumberg then continued to answer several other questions regarding the effect on Appellant of his foster care placements and abandonment by his mother. Contrary to Appellant's assertion, the PCRA court did not preclude testimony as to the effects of his foster care experiences on his emotional and psychological health.

In a second example, Appellant asserts that, in the following excerpt of his grandmother's examination, defense "counsel was prevented from eliciting evidence of Dustin Spotz's rages." Appellant's Brief at 97 n. 129. Again, Appellant has misstated the import of the excerpt.

> *Defense Counsel:* .... [Appellant's] relationship with his brother, Dustin. Could you describe—was there a difference between the way Dustin responded to the abuse at home and the way [Appellant] responded to the abuse?
>
> *Ms. Redden:* When [Appellant] was abused, he was very passive. He did not fight back. He took it and was quiet about it. Dustin, on the other hand, when he was abused, he returned abuse. He would fight with these stepfathers.
>
> And their relationship to each other, the two boys—Dustin already had his growth spurt. [Appellant] was small. Dustin was tall and of course stronger than [Appellant], and they would start wrestling. Usually Dustin would initiate, let's wrestle.
>
> *Defense Counsel:* .... Would it go beyond wrestling?

*Ms. Redden:* Yes, yes. He would hurt [Appellant]. He said he didn't do it intentionally, but once he would get started these violent rages Dustin described that—

*Defense Counsel:* Your Honor, I'm going—

*Ms. Redden:* —he had a different world inside him.

*PCRA Court:* Next question.

*Defense Counsel:* Did you observe any of these occurrences?

*Ms. Redden:* Oh, yes, yes. The time that I intervened was when I was watching them. .... I saw where Dustin was really getting rough with [Appellant].....

And finally he was twisting [Appellant] all different directions..... and [Appellant's] saying, Dustin, you're hurting me.....

\*　　\*　　\*

*Defense Counsel:* As they got older ... did this situation improve or get worse?

*Ms. Redden:* As Dustin got older, his bipolar, manic depressive condition worsened, and of course he became more violent, although [Appellant] was growing too and he could defend himself a little bit more, but Dustin at that time as he got older he was not just wrestling for fun. He would get these violent spells.

N.T. PCRA Hearing, 1/17/07, at 39–41.

Contrary to Appellant's assertions, the PCRA court did not preclude defense counsel from eliciting testimony by Appellant's grandmother as to Dustin's violent outbursts, particularly as they were directed against Appellant.

Appellant further asserts that he was precluded from eliciting testimony that "the social services system failed [him]." Appellant's Brief at 97 n. 130. This is entirely false, as the following excerpts of testimony show:

*Defense Counsel:* I want to turn now to the many placements that [Appellant] underwent as a child. My specific question [is] can you form an opinion as to whether Child and Youth Services and other agencies, governmental agencies responsible to insure the well-being of children in this Commonwealth, functioned as well as they could have?

*Dr. Ragusea:* The answer is they functioned far worse than that. This was—in all the years I've worked with these agencies, I've never seen a worse example of society—individuals that were given the affirmative action to protect children [—] fail. I've never seen a worse example of a group of individuals who were assigned the task of saving children from pain and suffering fail as badly as this. That's the answer to that question.

*Defense Counsel:* Were there sufficient red flags for those—for the authority to do something, to remove these children from the home?

*Dr. Ragusea:* Many. Again, you know, various points of severity wasn't [sic] known, but there was enough information that these children should never have been brought back to their home.

*Defense Counsel:* And was it one specific instance or were there multiple?

*Dr. Ragusea:* No, it was multiple instances. And based upon the record that I looked at, the kids were brought back to the home more because their mother wanted them there at various points, and they

In the fourth sub-claim of Issue 19, Appellant asserts that remand is required in order to permit him to amend his PCRA petition to include certain additional issues raised in his motion for reconsideration. The procedural background of this sub-claim is as follows. On June 26, 2008, the PCRA court filed an opinion and order denying all of Appellant's claims. On or about July 4, 2008, Appellant, acting *pro se,* sent a "Letter to the Court," in which he alleged ineffective assistance of PCRA counsel, sought to remove PCRA counsel and represent himself, requested rescission of the PCRA court's order denying his petition, and set forth several issues that he wanted the PCRA court to consider. These issues were the following: (1) Appellant's competency to waive counsel at the time of trial; (2) ineffective assistance of penalty phase counsel based on failure to elicit testimony that there was treatment available in prison for Appellant's psychiatric disorders, were he to be sentenced to a life term; (3) inconsistent verdict, grounded in the jury's finding of the subsection 9711(d)(6) aggravating circumstance (murder committed in the course of a felony), but not of second-degree murder; and (4) unnamed statutory deficiencies in the subsection 9711(d)(6) aggravating circumstance.

On July 21, 2008, Appellant's PCRA counsel filed a motion for reconsideration, seeking to vacate the PCRA court's order; requesting consideration or reconsideration of the four issues

were sent out of the home because their mother didn't want them at various points.
*Defense Counsel:* And even reviewing the Child Service records, the minimal ones, even from there there's enough indication that the system failed?
*Commonwealth:* Objection, asked and answered.
*Court:* Sustained. He answered your question before.
N.T. PCRA Hearing, 1/18/07, at 168–70.
Thus, Appellant's assertion that he was precluded from eliciting testimony that the social services system failed him is completely belied by the record. The Commonwealth's objection, and the sustaining of that objection, were grounded in the cumulative nature of the continuing testimony, nothing more.
The sheer number of undeveloped challenges in this sub-claim, and the above excerpts, which are non-exhaustive examples of Appellant's misinterpretation of the record, suggest that Appellant is attempting to compensate for a lack of overall merit with an overwhelming number of assertions of error.

raised by Appellant in his *pro se* Letter to the Court; and stating that "to the extent that counsel failed to [present any issue of merit or any available evidence in support of a meritorious issue], those failures would have been ineffective." Motion for Reconsideration, filed 7/21/08, at 3. Notably, PCRA counsel did not unequivocally aver that they provided ineffective assistance with regard to any specific matter, nor did they provide any insight as to the form that their potential ineffectiveness might have taken. Nonetheless, the motion for reconsideration averred that "[t]he appropriate remedy to enforce [Appellant's] right to effective assistance would be for [the PCRA court] to address the issues presented in [Appellant's *pro se*] 'Letter to the Court.'" *Id.* On July 25, 2008, days after filing his motion for reconsideration with the PCRA court, Appellant filed the instant counseled appeal to this Court.

There is no indication from the record that the PCRA court specifically addressed Appellant's motion for reconsideration. However, the PCRA court had already considered and rejected Appellant's claim that he was not competent to waive counsel at trial. *See* PCRA Court Opinion at 5–8; *see also* text, *supra* (discussion of Issue 2). In addition, the PCRA court, in a supplemental opinion, had considered and rejected Appellant's claim of an inconsistent verdict based on the jury's finding of both first-degree murder and the subsection 9711(d)(6) aggravating factor. *See* PCRA Court's Supplemental Opinion Pursuant to Pennsylvania Rule of Appellate Procedure 1925, dated 8/7/08, at 1–4; *see also* text, *supra* (discussion of Issue 10).

 In this appeal, Appellant now seeks remand to "amend" his PCRA petition to include the issues raised in his Letter to the Court and motion for reconsideration, and to allow the PCRA court to consider or reconsider the merits of those issues. Appellant's Brief at 99. In essence, Appellant seeks to file a second—and untimely—PCRA petition, raising four more issues, at least two of which have already been addressed by the PCRA court. Appellant cites no provision in the PCRA or other statutory or decisional law—undoubtedly

because there is no such basis—upon which this Court can grant him the relief he seeks. *See Commonwealth v. Williams*, 566 Pa. 553, 782 A.2d 517, 524 (2001) (explaining that the practical effect of the legislative scheme of the PCRA as interpreted by this Court is to limit the opportunity for collateral relief in most cases to a single, counseled petition); *Commonwealth v. Lawson*, 519 Pa. 504, 549 A.2d 107, 112 (1988) (concluding that a second or any subsequent post-conviction request for relief "may be entertained only for the purpose of avoiding a demonstrated miscarriage of justice, which no civilized society can tolerate").[52] Appellant's fourth sub-claim is frivolous.

There is no merit to any of Appellant's numerous claims in Issue 19, and, accordingly, no relief is warranted.

## 20. Deductions from Appellant's Prison Account

In his final issue, Appellant contends that deductions by the Department of Corrections from his inmate account were

---

**52.** In addition, Appellant also appears to assert, albeit vaguely, that PCRA counsel were ineffective.

. [] Appellant's counsel filed a Motion for Reconsideration that, in part, requested that the [PCRA] court permit counsel to amend to include those claims [*i.e.,* claims raised in Appellant's *pro se* Letter to Court]. Counsel specifically noted that they had no intent or strategic basis for failing to raise these issues and that, to the extent counsel failed to raise issues, counsel was ineffective.

Appellant's Brief at 99.

Other than a few citations to authority for the principle that a person seeking post-conviction relief is entitled to assistance of counsel, the sentences above constitute the entirety of Appellant's "argument" for his apparent assertion that PCRA counsel was ineffective.

We first note that the Defender Association of Philadelphia, Capital Habeas Corpus Unit, has represented Appellant throughout the PCRA proceedings and this appeal. To the extent that Appellant's PCRA attorneys are asserting their own ineffectiveness, such an assertion violates the general rule that counsel cannot argue his or her own ineffectiveness. *See Commonwealth v. Ciptak*, 542 Pa. 112, 665 A.2d 1161, 1161–62 (1995) ("As a general rule, a public defender may not argue the ineffectiveness of another member of the same public defender's office since appellate counsel, in essence, is deemed to have asserted a claim of her or her own ineffectiveness.")

However, because it is impossible to determine exactly what Appellant is arguing from his brief, vague, and qualified assertions, we conclude that the matter is unreviewable and waived for lack of development.

unlawful and unconstitutional because the trial court's sentencing order did not include an order directing him to pay the costs of prosecution. Appellant now agrees with the Commonwealth that this issue has been resolved and requires no further judicial consideration. *See Spotz v. Commonwealth,* 972 A.2d 125 (Pa.Cmwlth.2009); Appellant's Reply Brief at 21.

Having reviewed all of Appellant's issues and concluding that none has any merit, we affirm the order of the PCRA court denying Appellant's petition.[53]

Justice EAKIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, Justices BAER, TODD, and ORIE MELVIN join the opinion.

Chief Justice CASTILLE files a concurring opinion, joined by Justice McCAFFERY and Part II of which Justice ORIE MELVIN joins.

Justice SAYLOR files a concurring opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion in its entirety. I write separately to note and address broader issues implicated by the role and performance of federal counsel in purely state court collateral proceedings in capital cases, such as this one.

Although the sources of the Federal Defender's funding are not entirely clear or easily ascertainable, the federal courts apparently play a central role in financing these activities in state court through the Administrative Office of Federal Courts.[1] To my knowledge, this policy has been determined and implemented without the consultation and involvement of this Court, or of any other Commonwealth authority. The federal courts—as well as other federal authorities and the

---

**53.** The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

**1.** *See Commonwealth v. Hill,* 609 Pa. 410, 16 A.3d 484, 488–89, 489–90 (Pa.2011).

Pennsylvania citizenry generally (who may not even be aware of this unusual federal activity in state courts)—may not be aware of just how global, strategic, and abusive these forays have become. The federal judicial policy has raised issues that should be known to the federal authorities financing and authorizing the incursions; to Pennsylvania's Senators and House members; and to the taxpayers who ultimately foot that bill. This is an appropriate case to highlight those issues.

I write to these global issues in this case because the cumulative effect of the Defender's strategy has taken a substantial and unwarranted toll on state courts; and also because the Defender has begun to complain, both in this Court and in federal court, about delays in state court decision-making, claiming that the delays violate various federal rights and even, in one intemperate federal pleading, asserting that this Court is indifferent to, and incapable of managing, its capital docket.[2] The pleadings do not disclose or focus upon the primary cause of the delays, which very often is the prolix and abusive pleadings filed by the Defender in their many cases, as well as the Defender's ethically dubious strategies and activities in other Pennsylvania capital cases—cases involving both initial and serial PCRA petitions—all of which bog down Pennsylvania courts. If the Defender is to be taken at its word respecting actionable delay and the Court's supposed incapacity, then it is time for this Court to take affirmative measures to address the most obvious causes of delay, which are well known to this Court, and which to a great extent involve the Defender. To that end, this Court should immediately eliminate its existing page-limitation briefing indulgence in capital PCRA matters, and should begin regulating the rampant briefing abuses found in briefs such as the improper one the Defender has filed in this case. I also believe it is time to take more seriously requests by the Commonwealth to order removal of the Defender in cases where, as is becoming distressingly frequent, their lawyers act

2. *See Dougherty v. Beard,* No. 09–CV–902 (Petitioner's Motion to Reactivate *Habeas* Proceedings), lodged on this Court's docket in *Commonwealth v. Dougherty,* 585 CAP.

inappropriately. There are other measures I would refer to our Rules Committees for suggested remedial measures in the face of the Defender's abuses, which I will discuss in Section II below.

–I–

I appreciate the Majority's yeoman effort in the face of the Defender's abusive appellate briefing, which brings me to my main point. This is not a federal case; a later, civil and collateral iteration of it may be federal if appellant ultimately pursues federal *habeas corpus* relief, at which point the federal district court will be free to appoint whichever counsel it pleases. But, there is no proper role of the federal courts at this point; and, it is not clear that the courts of this Commonwealth are obliged to suffer continued abuses by federal "volunteer" counsel paid by the federal courts. The capital PCRA petitioner, if indigent, is entitled under our Rules to the appointment of PCRA counsel, at state expense. But, the Defender has decided that federal tax dollars should be deployed to conduct appellant's state collateral attacks; and, the federal authorities who finance their state litigation strategy apparently approve the tactic. The resources the Defender was able to bring to bear in litigating this state collateral attack border on the perverse, and this fact, combined with the tactics employed, and the obvious global efforts of the Defender to obstruct capital punishment in Pennsylvania at all costs, strongly suggests that there is more at work here than non-political, professionally responsible, "zealous advocacy."

There are members of the private bar who continue to litigate capital PCRA appeals in our Court responsibly and effectively, proving (as if proof were needed) that abusive briefing is not a necessary component of competent and zealous advocacy. Capital PCRA appeals are inherently important—because the ultimate penalty is involved. They are time-consuming—because we permit longer briefs, the review encompasses lengthy capital trials, lengthy collateral pleadings, exhibits, and (oftentimes) hearings, and both the procedural and substantive law at issue may encompass an intersec-

tion of federal and state law. They are difficult—because, in virtually all of these cases, there are a few troublesome issues, of substance and procedure, which often divide the seven-member Court.

However, the inherent difficulties, and the inherent time commitment required, has been made needlessly more burdensome by the Defender's litigation strategy, which is conducted on multiple fronts. Few litigants, much less taxpayer-financed litigants, could afford to mount such strategic campaigns. This case presents a typical example of the myriad abuses of the Defender; but, there are examples of worse conduct I outline later. Indeed, I write in this case in part because of its typicality, as it raises the question of the propriety of the current, partisan federal role in Pennsylvania capital collateral proceedings.

The Defender "volunteered" itself here before direct review was completed: Robert Brett Dunham, Esquire, filed appellant's unsuccessful direct appeal *certiorari* petition in the U.S. Supreme Court. *See Spotz v. Pennsylvania*, 534 U.S. 1104, 122 S.Ct. 902, 151 L.Ed.2d 871 (2002). The Defender then initiated state collateral proceedings on December 4, 2002, by filing a 275–page document in the Court of Common Pleas of Cumberland County, which the court properly construed as a PCRA petition. This petition, filed by Attorneys Dunham and Anne Saunders, also of the Federal Defender, encompassed 622 paragraphs, setting forth 18 primary claims, most of which included various sub-claims.[3] After the Defender's initial filings, the proceedings evidently were put on hold by agreement of the parties pending disposition of the PCRA appeal of appellant's manslaughter conviction in Clearfield County for killing his brother, a conviction that was ultimately reinstated.

---

**3.** The Defender has also volunteered itself in appellant's two other capital PCRA cases, arising from the separate murders that appellant committed in Schuylkill and York counties in 1995, which are pending on collateral review. Appellant's petition in this case listed 19 claims the Defender raised in appellant's Schuylkill County PCRA petition, and 33 claims the Defender raised in appellant's York County PCRA petition. In both cases, as here, the claims entail various sub-claims as well as allegations of counsel ineffectiveness at all levels. Appellant's PCRA Petition, 12/4/02, at 28–39.

On January 11, 2007, the Defender filed a supplemental PCRA petition, prepared by four attorneys: Dunham, Mary Hanssens, Michael Gonzales, and David L. Zuckerman. Five days later, Dunham filed yet another supplemental petition seeking to amend prior filings to add another new claim.

On January 17–18, 2007, the first two days of PCRA hearings were conducted. Dunham, Hanssens, and Zuckerman represented appellant. Among other witnesses, the Defender called a proffered expert in forensic psychiatry, a Defender investigator, two Defender "mitigation specialists," a proffered expert in clinical psychology, and a Clearfield County Children and Youth Services caseworker. On February 12, 2007, Dunham, Hanssens, Gonzales, and Zuckerman filed another supplemental petition asserting yet additional claims or arguments. On February 22–23, 2007, two more days of hearings were conducted, with Dunham, Zuckerman, and Gonzales representing appellant. Among other witnesses, the Defender presented another proffered expert in psychiatry. Another full-day hearing was held on May 10, 2007, where four lawyers—Dunham, Hanssens, Zuckerman, and Gonzales—appeared for appellant. The sixth and final full day of PCRA hearings was held on May 11, 2007, featuring Dunham, Zuckerman, and Gonzales.

On June 26, 2008, the PCRA court issued its order and opinion denying all of appellant's claims. Appellant's motion for reconsideration, filed by Dunham and Gonzales, was denied and appellant's notice of appeal followed in July 2008.

Of course, there is a federal constitutional right to counsel at trial, and I suppose the federal government could decide to help finance the states in providing such assistance to vindicate the right, to ensure fairer trials. But, the scope and resources deployed here, not to ensure a fair trial, but to try to prove that a presumptively competent trial lawyer was incompetent is simply perverse. This is a state collateral proceeding. The Defender devoted, at a minimum, five lawyers, an investigator, multiple mitigation specialists, and multiple experts to the project. It inundated the PCRA court with prolix pleadings, including trivial and frivolous claims inter-

mixed with more serious issues; it deployed multiple lawyers at hearings, who then attempted to conduct multiple and redundant examinations.

The overwhelming majority of appellant's claims sound in ineffective assistance of counsel, implicating the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* claims involve not mere errors or mistakes at trial, but lapses of constitutional magnitude, a circumstance where it is as if the defendant did not have a lawyer at all. Proper examination of such claims requires deference to counsel, avoiding hindsight, recognizing the art in lawyering, and accepting that mere errors by counsel are not enough to prove prejudice. To warrant relief, a *Strickland* claim has to involve some kind of readily apparent, undeniable lapse by counsel of obvious and serious prejudicial effect. It is not a law school test of "spot the foregone objection." And, it takes a team of five federal lawyers and a supporting group of untold size comprising investigators and experts to prove the *Strickland* violation in this case?

Laying aside the overtly obstructionist aspect of the Defender's performance here, the commitment of federal manpower alone is beyond remarkable, something one would expect in major litigation involving large law firms. It is perverse to think that the federal judiciary knowingly makes this sort of financial commitment in Pennsylvania capital cases at the collateral review level. The individual counties in Pennsylvania, which typically pursue capital murder prosecutions, lack the resources to provide this sort of representation at the main event—for the prosecution or the defense. And, equally perverse, the federal commitment of resources, on collateral review, is apparently partisan, assisting only capital defendants in attempting to undo their final state judgments.

The Defender's briefing in this Court is similarly abusive. The product of officers of the Court, it was not a good faith effort to abide by our already-lax briefing restrictions, and it borders on a contemptuous flouting of those Rules. The manner of briefing is designed to exhaust as much of this Court's time and resources as possible. The incentive for

such conduct in capital cases is obvious: each day of delay the abuse generates is another delay of the day of eventual reckoning. But, this is not a legitimate justification for burdening the Court with abusive pleadings.

The "Initial Brief" bears the names of four Defenders: Dunham, Zuckerman, Gonzales, and Eric Montroy. The Brief runs exactly 100 pages. By Rule, principal briefs in this Court are limited to 70 pages; by custom, however, we have routinely indulged 100–page principal briefs in capital cases. The Rules of Appellate Procedure dictate that the brief "shall" include a Statement of the Case, Pa.R.A.P. 2111(a)(5); and that the Statement "shall" contain, *inter alia*, "A closely condensed chronological statement, in narrative form, of all of the facts which are necessary to be known in order to determine the points in controversy, with an appropriate reference in each instance to the place in the record where the evidence substantiating the fact relied upon may be found." Pa.R.A.P. 2117. The purpose and importance of the requirement is obvious to any lawyer who has drafted an appellate brief.

The Defender deliberately omitted a Statement of the Case, so that it could raise more claims and thereby evade the 100–page briefing limit. In an endnote to a truncated one-page procedural summary that it inaccurately calls the "Statement of Facts," the Defender says: "Because of the number, and fact-intensive nature, of the claims presented in this appeal, and so as to both preserve all issues and keep this brief to a reasonable size"—seriously, the Defender says this—"the facts material to the individual claims are set forth in connection with the discussion of each claim." Initial Brief of Appellant at 4 n. 1. Our briefing rules are not bizarre Pennsylvania procedural requirements. Notably, the Federal Rules of Appellate Procedure limit principal briefs to (a) a mere 30 pages, or (b) 14,000 words, or (c) no more than 1,300 lines of text if the brief employs a "monospaced face." Headings, footnotes, and quotations count toward the word and line limitations. FED. R.APP. P. 32(a)(7). The Federal Rules also mandate that the Appellant's Brief "must contain" both a statement of the case (addressing procedural matters) and a

"statement of facts relevant to the issues submitted for review with appropriate references to the record." FED. R.APP. P. 28(a)(6), (7).

In a case where the appellant files a maximum brief, as here, this particular deliberate violation both hampers the Court's review and burdens the Court with however many additional claims the Defender squeezes into the pages it has improperly gained by the violation. And, squeeze the Defender did. The Brief pretends to raise "only" 20 issues, which would be burdensome enough. But, within those twenty claims are multitudes of additional claims or sub-claims. My conservative count of the total number of distinct "claims" presented in the Defender's Brief, including both derivative and subsidiary allegations, exceeds 70. How does the Defender manage to "litigate" 70 claims in a 100–page brief? It employs a number of additional tricks.

For example, in 100 pages of Brief, the Defender includes no less than 136 single-spaced footnotes, many of extreme length, and then routinely advances distinct substantive arguments in those footnotes. *See, e.g.,* Initial Brief of Appellant, nn. 15, 18, 20–29, 32–33, 37–39, 43–51, 53, 59, 61–70, 72–77, 79–85, 94–95, 103, 107–18, 123–25, 127–34. The Defender also seizes more briefing space by single-spacing, and not indenting, its Statement of Questions Presented, making them virtually unreadable in the process. *See, e.g., id.* at 2 (containing 40 single-spaced lines of text running margin to margin). Another common Defender abuse, immediately recognizable to those of us charged with attempting to read their Briefs, is to list distinct claims or sub-claims by single-spaced bullet point in text, essentially doubling the number of points to be made. To make the abuse worse, these bullet points often simply declare the sub-claims without development or legal support; other times, the Defender will append footnotes, which may contain factual support or substantive argument, or may provide no meaningful development or explanation of the relevance of bald citations. *See, e.g., id.* at 29–30 & nn. 27–29; 47–48 & nn. 53–57; 53; 64–65 & nn. 82–83; 66–67 & nn. 86–92; 71–72 & nn. 96–101; 75–76; 83; 95–98 & nn. 125–34. The

time-consuming burden is then placed on the Court to attempt to decipher the arguments. Query: does the Defender do this in federal district court? In the U.S. Supreme Court? Or is the federal abuse reserved for state courts?

For a particularly egregious example—and, it is but a single example—of this abusive briefing, take Issue # 19, third sub-argument. The "argument" consists of a declaration that the PCRA court erred in "Precluding Appellant from Presenting Material Evidence" during the six days of collateral review hearings the court held. What follows are ten, single-spaced bullet point claims spanning over two pages of the Brief, all accompanied by footnotes, and none accompanied by legal citation or developed argument. The Majority gives a sense of just how frivolous these single-spaced claims are, discussing some examples. *See* Majority Op. at 149–54 & nn. 46–50, 18 A.3d at 322–325 & nn. 46–50.

This is not a good faith effort by officers of the Court to abide by perfectly reasonable briefing restrictions. What is next: framing the entire argument section of the brief as a giant single-spaced footnote? What legitimate purpose explains such briefing tactics? And, is it appropriate, given principles of federalism, for the federal courts to finance abusive litigation in state courts that places such a burden on this Court?

A capital defendant, like any litigant, has the right to raise and pursue viable claims. And, of course, capital cases are different. This Court's commitment to affording more than sufficient opportunity to raise colorable, non-frivolous claims is reflected in the fact that this Court, to date, has permitted capital appellants to file briefs that are 43% longer than other litigants' briefs—both on direct appeal and on PCRA appeal. The Brief here is a thorough and deliberate abuse of that indulgence. Moreover, as the Majority correctly points out, many of appellant's claims here are frivolous as stated, oftentimes unsupported by recourse to case law or the record. *See also* Majority Op. at 154 n. 50, 18 A.3d at 325 n. 50 ("Appellant is attempting to compensate for a lack of overall merit with an overwhelming number of assertions of error."). Other claims are obviously makeweight: for example, as if every other word

out of a trial prosecutor's mouth both violates due process, and represents a test of the constitutional competence of trial counsel.

There is no legitimate, ethical, good faith basis for this obstreperous briefing. The Defender's lawyers, who are officers of this Court, have no right to jam as many undeveloped and frivolous claims into their briefs as possible, employing footnotes and single-spaced blocking to sabotage briefing restrictions, in pursuit of an agenda that maximizes the burden on this Court's resources and time, so as to create delay. If this Court had the time, I would recommend striking the Brief and ordering a professional, appropriate brief; but that would only delay the matter, and I will suggest we address the problem by specifically altering our briefing rules.

It did not have to come to this. The provision of federally-financed lawyers for state capital PCRA petitioners appears benign on its face and welcome; it spares Pennsylvania taxpayers the direct expense of state-appointed counsel. But, that veneer ignores the reality of the time lost and the expenses generated in the face of the resources and litigation agenda of the Defender. Capital cases, like criminal cases generally, are highly individualized. Each case is invariably about one defendant and one primary capital crime; and the defense lawyer has a duty of zealous advocacy in advancing his client's cause, within the ethical limits that govern all Pennsylvania lawyers, whether they are paid by the federal government or not. But, the Defender has the resources and the luxury to pursue a more global agenda, and its conduct to date strongly suggests that, if it once engaged in mere legitimate zealous defense of particular clients, it has progressed to the zealous pursuit of what is difficult to view as anything but a political cause: to impede and sabotage the death penalty in Pennsylvania. It is not difficult to understand the motivation: indeed, there are persons of good faith and integrity who sincerely oppose capital punishment and are willing to contribute their time and talents to its defeat, whether by one stroke politically, or incrementally, case by case.

But, this is not the political realm, lawyers must act ethically, and obstructionist tactics and agendas in litigation are

inappropriate. Assuming the courts of Pennsylvania must abide the participation of the Defender at all in purely state collateral proceedings, it is only because they are officers of **this** Court. Whether lawyer death penalty abolitionists like it or not, the people of Pennsylvania, like the people of 33 other states and the nation as a whole, have spoken on capital punishment, and the death penalty is lawful; this Court is not obliged to indulge political tactics that seek to dismantle or impede governing law. The difference of death does not mean that any and all tactics in pursuit of the defeat of a capital judgment are legitimate.

I am sure our federal judicial brethren are unaware of the extent of the abuses, nor can they fully appreciate the effect of these abuses, so I will attempt to illustrate. The Defender strategy, as revealed in this case, attempts to overwhelm the state courts with volumes of claims and pleadings, many simply frivolous, a strategy which burdens prosecutors and can shut down a trial court for weeks. It is also a strategy which requires this Court to devote an increasing portion of its docket and time to consideration and decision of the Defender's cases. Our Court, like the U.S. Supreme Court and unlike the Third Circuit, is the highest court in its jurisdiction. Like the U.S. Supreme Court, we have finite manpower, and one of our most important functions is determining which cases on our discretionary dockets warrant review. Like the U.S. Supreme Court, we do not have the resources to grant review in every case: we look for cases posing new questions, close questions, questions affecting a wide range of cases, questions which have divided courts, cases posing supervisory questions, cases with apparent egregious errors, etc. Also like the U.S. Supreme Court, the cases we accept typically pose a very limited number of discrete issues. But, unlike the High Court, we also have a capital appeal docket, which governs multiple rounds of intensive direct review. We have no statutory discretion over the capital docket, and, **so far,** it has been the capital appellant who determines the number and types of claims we will review.

Our Opinions in first petition capital PCRA cases where the Defender participated are far and away the most time-consuming of the cases on our appeal docket. Certainly, they generate many of our longest opinions. Take this case, where the Slip Opinion exceeds 125 pages, as the Court painstakingly slogs through the pleadings below, the record, and the morass that is the Defender's brief. *See also, e.g., Commonwealth v. Lesko,* 609 Pa. 128, 15 A.3d 345 (2011). As a very conservative estimate, it is fair to say that the practical consequence of the expenditure of resources necessary to decide a typical Defender appeal in these cases is to render this Court unable to accept and review about five discretionary appeals. As a result, for example, this Court rarely accepts review of cases (via direct appeal or PCRA) where convicted murderers are sentenced to life in prison, without possibility of parole. Though those sentences are not as "different" as death, they are certainly different from criminal cases where the defendant has the prospect of release; and they are of importance to the defendants serving them.

Of course, the objection will be that all claims must be raised in a capital case. But, that simply is not so, and particularly on collateral review. Abusive briefing does not increase the chance of prevailing; what it increases is the delay in briefing (both sides, in capital cases, require multiple extensions of time to file briefs) and in decision-making. Moreover, the notion that all of the claims in these abusive briefs are colorable is a canard. Many are deliberately undeveloped. Consider, also, the theoretical last stage of collateral review of state capital convictions, which is the defendant's federal *habeas* appeal to the federal Circuit Court. How many federal issues in those cases ultimately qualify under the certificate of appealability requirements attending federal *habeas* review? *See* 28 U.S.C. § 2253 (state prisoners cannot appeal final orders unless a certificate of appealability issues; "A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."). The bulk of the issues raised in the PCRA petitions in this case, and renewed in this appeal, are

pure makeweight, designed only to bog the state courts down and induce delay.

Does it comport with principles of federalism for lawyers financed by the federal courts to so affect a state Supreme Court's docket? Does it comport with principles of federalism for the federal courts to finance a group to enter state capital cases at will and pursue an agenda that inundates the PCRA courts and this Court with abusive pleadings and frivolous claims, with the apparent ultimate aim of attempting to **bypass** the state courts?

These questions are not theoretical. In a number of recent instances involving pending cases with typically prolix briefing by the Defender, capital PCRA defendants have complained in this Court or in federal court about the delay in the decisions of their PCRA appeals, complaining that this Court has not dropped all other business to decide their cases in a time-frame acceptable to them. *See, e.g., Commonwealth v. Dougherty*, 585 CAP (Motion to Reactivate *Habeas* Proceedings filed in federal district court, premised upon this Court's failure to decide appeal within eleven months); *Commonwealth v. Hutchinson*, 517 CAP (Motion to Expedite filed in this Court, consisting of boilerplate assertion that delay in decision violates various federal rights, none of which address circumstance at issue); *Commonwealth v. Douglas*, 495 CAP (alleging, without supporting documentation, recent diagnosis of potentially fatal cancer, and arguing that diagnosis warrants preferential expedition of decision). Notably, none of the motions mention the length of the Defender's briefs in the appeals, or the number of prolix claims, or the complexity of the proceedings and maneuverings below, or the overall and collective burden the Defender has imposed on this Court.

The federal motion in *Dougherty* is revealing. In *Dougherty*, the capital appellant is represented by four lawyers: two from the Defender (Robert Dunham and Renee Edelman) and two *"pro bono"* partners from the law firm Ballard Spahr (David Fryman and Shannon Farmer). The subject of the Motion is the alleged lassitude of this Court in disposing of the pending PCRA appeal, but the Defender and Ballard did not

favor this Court with a copy of the Motion.[4] The federal motion, dated November 9, 2010, states that this Court "refused" to expedite appellant's appeal, inaccurately represents the time that had then passed, and declares that "no action" had been taken on the case. In fact, counsel have no idea what actions have been undertaken by this Court in its deliberations. The Defender and Ballard then go on to attack this Court's entire handling of its capital docket. The Defender and Ballard contemptuously declare that, "Based on the Pennsylvania Supreme Court's track record of deciding capital appeals, [appellant's] opportunity for any substantive state court review of his case is still years away." The Defender and Ballard then declare that they face "continued inordinate delay before a state court that has proven itself incapable of managing its capital docket," later accusing the Court of "leaving [the appeal] to languish" and falsely alleging that it has been held "in suspense." The Defender and Ballard declare that "judicial delays in the determination of initial PCRA appeals have become routine." The Defender and Ballard then complain of the undecided "active" cases on our docket, making no attempt to account for: the record and briefing status of cases; whether there have been remands; whether they are serial PCRA petition appeals (appeals, frequently time-barred and frivolous, most often filed by the Defender, which generate automatic delay in the disposition of pending federal *habeas* petitions); and the role of individual circumstances—such as delays requested by or chargeable to the Defender itself. The aim of the federal motion, of course, is to convince the federal *habeas* court to forgive the Defender's clients the necessity of exhausting their claims in state court, so that they may proceed *de novo* in the court system that finances them.

These are grievous accusations made by members of the bar of this Court. If these accusations were true, and if candor were part of the Defender armamentarium, the federal plead-

**4.** The Motion was forwarded by the Commonwealth via a Post–Submission Communication, seeking to lodge the Motion, with the Commonwealth noting that this Court should be made aware of the accusations. We granted the Commonwealth's Motion.

ing would have stated that "the Defender has succeeded in causing such delay in the decision of capital cases that [fill in the outrage]. We have succeeded in exhausting the state courts; so now, please forgive us the federal *habeas* exhaustion requirement." But, the accusations are not true; indeed, they are beyond disingenuous.[5] And the Defender knows it.

**5.** Two examples of Defender delay in cases the Defender calls "active" and "pending" and "languishing" due to this Court's supposed incapability are illustrative of the abusiveness of the federal motion filed in *Dougherty. Commonwealth v. Clayton*, 573 CAP, involves a serial PCRA petition filed in 2004. That matter was not briefed and submitted to the Court until March 29, 2011. Before filing the underlying serial petition, the Defender had successfully moved to have Clayton's federal *habeas* petition held in abeyance so he could ping-pong back to state court to pursue serial claims. State relief was denied in June of 2008 because the serial petition was untimely; yet, the Defender appealed. Thereafter, the matter was delayed because the Defender failed to discharge its duty as appellant to ensure the forwarding of the record. It was only after the Commonwealth filed a Motion to Dismiss in March of 2010 that the logjam broke, and the Defender, in response to the Motion, requested that a briefing schedule issue. The Defender obviously knew these facts when it filed its federal motion in *Dougherty*. The defendant, and then the Defender, also caused the bulk of the delay in *Commonwealth v. Ali*, 437 CAP, as detailed in our recent opinion deciding that case. *See* 10 A.3d 282, 290 (Pa.2010). The PCRA petitioner in *Ali* sought to represent himself, and we remanded for a hearing on the issue. The Defender opposed its client's wishes every step of the way, which included claiming that Ali must be incompetent if he did not want its services, filing an interlocutory appeal, attempting to add new collateral claims in violation of the limited remand order, and then filing an unauthorized appeal after the PCRA court granted Ali's request to represent himself. It is debatable whether all of these procedural maneuvers were legitimate; what is not debatable is that it was the defendant's request, and the Defender's ensuing maneuvers, not judicial indifference, that delayed the case.

In the text below, I discuss three other cases on the Defender/Ballard list of "languishing cases" resulting from this Court's "incapability" of managing its capital docket: *Commonwealth v. Hill*, 521 CAP (decided); *Commonwealth v. Porter* (pending); and *Commonwealth v. Banks* (pending). In all three cases, the strategic conduct of the Defender was the primary cause of delay.

Furthermore, this case, which involves abusive Defender briefing requiring a dispositional opinion in excess of 125 pages, is on the Defender/Ballard list.

In addition, eight other capital appeals on the Defender/Ballard list were decided by published opinions of this Court between December 30, 2010 and April 28, 2011: *Commonwealth v. Ali* (PCRA appeal impeded by Defender as discussed above; 57–page slip opinion); *Commonwealth v. Dennis*, 491 CAP (PCRA appeal following remand, a fact

Whatever the response of the federal courts to such unethical conduct, it will not be fashioned with a first-hand awareness of the burden that their decision to finance defense-side collateral capital litigation has imposed on Pennsylvania's courts. Does it comport with principles of federalism to finance lawyers who pursue an agenda in state court designed to bottle up the state courts? Does it comport with federalism when those lawyers undertake an agenda designed to maximize the power of federal courts to ignore state court decisions, or to authorize bypassing state courts?

Notably, with respect to the specific issue of delay in the decision of capital PCRA appeals, the local federal Circuit Court must have some sense of the difficulty. In its Motion to Lodge the Defender's federal pleading in *Dougherty*, the Commonwealth notes the substantial delay in the resolution of numerous appeals involving various state capital defendants. *See, e.g., Abu–Jamal v. Horn*, 520 F.3d 272 (3d Cir.2008) (initial *habeas* appeal filed in Third Circuit in December 2001; final order issued by Third Circuit in March 2008; on petition by Commonwealth, U.S. Supreme Court granted *certiorari*

not accounted for in federal motion and calculation of "delays"); *Commonwealth v. Briggs* (direct appeal necessitating 76–page slip opinion); *Commonwealth v. Lesko*, 518–520 CAP (PCRA cross-appeals; 93–page **Defender** brief on Lesko's appeal raising 22 principal claims and innumerable sub-claims, including in 68 footnotes allowing brief to violate page limitation; 91–page Defender brief as appellee; necessitating 104–page slip opinion); *Commonwealth v. Hill* (PCRA appeal; **Defender** representation and conduct the primary issue); *Commonwealth v. Paddy*, 478 CAP (PCRA appeal; 99–page **Defender** principal brief raising 17 primary claims; necessitating 57–page slip opinion); and *Commonwealth v. Smith*, 591 CAP (PCRA appeal following remand, 71–page **Defender** brief raising 11 principal claims, despite fact that case was limited to guilt phase issues; necessitating 62–page slip opinion). Decisions in another two capital cases on the Defender/Ballard list are being issued contemporaneously with the decision in this case: *Commonwealth v. Dougherty* itself; and *Commonwealth v. Houser*, 541 CAP.
In addition, two other cases involving time-barred, serial PCRA petitions were decided by this Court via *per curiam* affirmance: *Commonwealth v. Fisher*, 607 CAP (third PCRA petition; Defender brief); and *Commonwealth v. Bridges*, 609 CAP.
These capital cases—largely courtesy of the Defender—represent a small part of the workload of this Court. Such is the supposed lassitude of our approach to our capital docket.

and remanded to Third Circuit in January 2010; on April 26, 2011, Third Circuit issued opinion reinstating its previous order affirming district court's grant of *habeas* penalty phase relief on a claim involving *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)).[6] And those appeals, of course, are limited to but a few substantive issues. Furthermore, I suspect the Federal Defender is more circumspect, and less contemptuous, when it appears before the Third Circuit.

I say none of this lightly. The Defender, as I have outlined, pursues a complex and legally questionable global strategy in Pennsylvania capital cases. But, just as the Defender stares at this Court, we have no choice but to stare back at it. And, this case is merely a typical case of Defender abuses. We have had circumstances where the conduct of the Defender is not even this benign.

On multiple occasions, the Defender has taken unauthorized appeals in capital PCRA matters against its former clients' wishes. *See Commonwealth v. Ali,* 10 A.3d 282, 290 (Pa.2010); *Commonwealth v. Saranchak,* 570 Pa. 521, 810 A.2d 1197, 1198 (2002). *Accord Commonwealth v. Sam,* 597 Pa. 523, 952 A.2d 565 (2008) (noting that Robert Dunham initiated PCRA proceeding by filing PCRA without authorization from petitioner, claiming he was doing so on petitioner's "behalf"). Each such unauthorized appeal, of course, exhausts the time and resources of the Commonwealth and the state judiciary. The Defender has employed the same strategy involving unauthorized litigation in at least one reported federal *habeas* case involving a Pennsylvania capital defendant. *See Michael v. Horn,* 459 F.3d 411 (3d Cir.2006). As Judge Greenberg explained, in concurrence:

It is highly significant, indeed remarkable, with respect to the tenuous nature of these proceedings, that Michael [the capital defendant] did not decide to take an appeal in this case in the first place and, in fact, this case never should

6. The Commonwealth may still seek rehearing *en banc* or petition the U.S. Supreme Court for *certiorari* review of the Third Circuit's recent decision.

have reached this court. Thus, the actual question before us is whether a defendant may cause an appeal filed in his name without his authority by someone else to be dismissed. In this case, the Capital *Habeas Corpus* Unit of the Defender Association of Philadelphia, without Michael's authorization, filed the appeal from the district court's order of March 10, 2004, granting Michael's motion to dismiss the *habeas* corpus petition. Thus, this case truly is extraordinary because the Capital *Habeas Corpus* Unit filed this unauthorized appeal in the name of an appellant whom the district court had found to be competent, from an order that the appellant had sought and obtained and from which, quite naturally, he did not want to appeal.

Moreover, there is yet another extraordinary fact about this appeal. The Capital *Habeas Corpus* Unit filed the appeal even though the district court in its March 10, 2004 order dismissing the petition for *habeas corpus* also dismissed the Capital *Habeas Corpus* Unit and all its attorneys as counsel for Michael, *Michael v. Horn*, 2004 WL 438678, at *24 (M.D.Pa. Mar. 10, 2004), and neither we nor the district court ever has stayed that order. Accordingly, the Capital *Habeas Corpus* Unit acted without authority when it filed this appeal in an attempt to frustrate Michael's wishes. The reality of the situation could not be clearer. The Capital *Habeas Corpus* Unit, rather than representing Michael, its supposed client, was representing itself and advancing its own agenda when it filed this appeal.

459 F.3d at 421–22 (Greenberg, J., concurring) (italics added; footnote omitted).[7]

In other instances, the Defender's conduct has been so inexplicable (inexplicable when measured by professional ethi-

---

7. *Commonwealth v. Lambert*, 584 Pa. 461, 884 A.2d 848 (2005), involving a non-Defender client, details a distinct form of unauthorized Defender (mis)conduct. *See id.* at 853 (noting finding of supervising judge of criminal division of Philadelphia Court of Common Pleas, who concluded that Defender illegally abused subpoena power to circumvent PCRA discovery rules and obtain archived police files in approximately 25 capital cases, including Lambert's, leading to disciplinary referral).

cal standards), that the Commonwealth has moved for the Defender's removal, colorably suggesting that the Defender's strategy is aimed not at fairly raising and exhausting federal claims in state court, but at positioning the case in such a way that Pennsylvania courts would deem them defaulted, while laying the groundwork to attempt to proceed *de novo* in federal court. For example, in *Commonwealth v. Bracey*, 604 Pa. 459, 986 A.2d 128 (2009), the Defender, per Billy Nolas, Esquire, filed a serial PCRA petition, asserting a claim under the then-new decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In litigating the claim below, the Defender argued that the petitioner had a constitutional right for the *Atkins* claim to be decided by a jury. The PCRA court, per the Honorable C. Darnell Jones, II, scheduled an *Atkins* bench hearing, but shortly before that could take place, the Defender wrote to the court asserting that if the court declined to put the serial collateral claim before a jury, the Defender and Bracey would refuse to participate in a bench hearing, but instead would rely on the evidence of record—evidence that was not produced with an eye toward the requirements of *Atkins.*

The PCRA court ultimately held that the Defender's refusal to present any relevant evidence in support of Bracey's *Atkins* claim rendered it meritless and that fact, in turn, rendered the request for a jury trial moot. On appeal to this Court, the Defender, predictably enough, argued that if we rejected the request for a collateral attack *Atkins* jury, the case should be remanded for the bench hearing the PCRA judge offered him, but which the Defender had refused. The Commonwealth responded with a critique of the Defender's gamesmanship. Our summary of the Commonwealth's description of the tactic was as follows:

> As to the question of mandate ... the Commonwealth requests a remand for a bench determination of *Atkins* mental retardation.... The Commonwealth asserts that any other result might ultimately reward appellant's federal counsel for their gamesmanship, which the Commonwealth submits was a strategy to bypass the state courts on the

substantive *Atkins* question. Thus, the Commonwealth avers that refusing to remand the matter would reward appellant's "contumacy by enabling him to raise the claim anew in a federal *habeas* petition, without the burden of fact-finding by the state courts." Brief of the Commonwealth at 17. The Commonwealth argues that appellant's stated rationale for refusing to introduce relevant evidence before the PCRA judge of his supposed mental retardation—a professed fear of thereby waiving his claim of an existing "right" to a jury determination—is "nonsense," since appellant made an objection before the PCRA court, which the court specifically noted that the objection preserved the jury question for this Court's review. The Commonwealth hypothesizes that such a facially risky position suggests that appellant and his counsel have their strategic sights set on *de novo habeas corpus* review in the local federal courts, which appellant's federal lawyers view as a more sympathetic forum in capital matters. Luring this Court into finding the *Atkins* claim waived, the Commonwealth argues, "would offer them their best long-term prospect for relief," since "if no *Atkins* hearing is held in state court, defense counsel will argue on *habeas* review that defendant is entitled to such a hearing in federal court. And, since it has been decades since the federal courts have upheld a sentence of death with respect to any Philadelphia prisoner who did not consent to be executed, they will find themselves in a remarkably favorable forum for that argument." *See* Brief of the Commonwealth at 19–20. The Commonwealth argues that this Court should reject this illegitimate strategy, and order a bench hearing on the mental retardation claim.

*Bracey,* 986 A.2d at 137–38 (italics added; footnote omitted).

This Court ultimately sustained the PCRA court's unassailable finding that there was no constitutional right to a collateral attack *Atkins* jury. Like the Commonwealth, we recognized the Defender's gambit for what it was, describing the refusal to participate in the *Atkins* hearing it had requested as lacking any legitimate justification. We noted that the Defender's disagreement with the PCRA court's ruling that the

*Atkins* claim was properly for the court, and not a jury, to decide, "was not a legitimate ground to refuse to abide by the ruling and decline thereafter to present evidence, as if a matter of this import invites some game of capital 'chicken.'" *Id.* at 138. We added that:

The presumptive outcome of appellant's refusal to present his *Atkins* case would be that the *Atkins* claim would fail on the merits—the very result that occurred here. Most parties do not risk defeat of the merits of their claims with these sorts of manipulations. But this Court recognizes that the calculations by experienced federal capital counsel are more sophisticated. *See Commonwealth v. Steele,* 599 Pa. 341, 961 A.2d 786, 836–38 (2008) (Castille, C.J., joined by McCaffery, J., concurring). The ... Defender's position below was obviously risky and tenuous: both the notion that appellant would somehow waive the claim of a right to a jury, or would somehow be prejudiced by presentation of his case to a judicial factfinder, as well as the substantive claim of an *Atkins* jury trial "right" of constitutional import which, as we explain below, finds no support in any existing, governing authority. Indeed, this is so much the case that it lends some credence to the Commonwealth's position that the strategy below was designed to ensure that no state court judge would pass upon the merits of the *Atkins* claim (or if it did, it would only be after the substantial delay occasioned by an incomplete record and appeal to this Court, seeking remand).

Notably, however, the Commonwealth has not pressed a waiver argument here, or even set forth an argument that appellant's *Atkins* claim fails on the merits.... Instead, it suggests that this Court overlook this logical conclusion and remand this matter so that a bench *Atkins* hearing can be held, thus ensuring that the state court serves its primary role as the initial forum for constitutional claims, and avoiding the initial federal determination of *Atkins* that appellant seems to prefer.

If the defense strategy and obduracy were all we had here, we might be inclined to deny remand. After all,

salutary Pennsylvania procedural doctrine should not be defeated by attorney manipulations or even by concerns with subsequent federal *habeas corpus* review. . . . Unfortunately, the PCRA court did not take this bull by the horns, and did not put appellant to the appropriate, explicit choice. . . . In these circumstances, we will not hold that appellant has waived any entitlement to an *Atkins* remand for the bench evidentiary hearing he refused below. Our holding in this regard should not be read as approval of the defense tactics below; rather, it should serve as a caution to PCRA courts in capital cases to be aware of the potential manipulations that may be forwarded in these high stakes cases, and to take clear control of the proceedings before them.

*Id.* at 139–40.

A more recent case where the assigned Defender's conduct, rather than the merits of the client's cause, became the focus of the appeal is *Commonwealth v. Hill*, 609 Pa. 410, 16 A.3d 484 (2011). The capital PCRA appellant in that case was also represented by Nolas, and was awarded a new penalty hearing in the trial court, but was denied guilt phase relief. She appealed, but the Defender inexplicably failed to file a Rule 1925(b) statement as ordered by the PCRA court. The Defender then filed a brief in this Court raising no less than fifteen principal guilt-phase claims.

The Commonwealth preliminarily argued that, by his conduct, and under settled law concerning Rule 1925, Nolas had defaulted Hill's claims and was *per se* ineffective. Recognizing that Nolas's default may have been strategic, however, the Commonwealth did not argue for affirmance, but instead urged the Court to remove the Defender and remand to appoint new counsel to comply with the Rule 1925 directive. The Commonwealth also argued that the Defender's conduct raised serious questions concerning the proper use of federal tax dollars because, while the Federal Defender is funded by the Administrative Office of Federal Courts, they routinely appear in state court appeals at a time when state and municipal services are being curtailed because of budget

shortfalls in the current economic recession. In that light, the Commonwealth suggested that this Court exercise its supervisory authority over the practice of law in Pennsylvania and require the Defender to address these concerns before being permitted to proceed in Pennsylvania appeals. *Id.* at 418–20, 16 A.3d at 488–89.

The Defender replied that it had substantially complied with Rule 1925 because Nolas had assured the PCRA court in a series of *ex parte* communications of the issues he intended to raise. The Defender did not acknowledge or discuss the governing cases under Rule 1925, instead focusing on Hill's alleged "right" to have Nolas continue to represent her. The Defender also argued that, to the extent Nolas's conduct had impeded this Court's review, a remand (and attendant delay) was appropriate.

On the particular point of the Commonwealth's argument concerning removal of the Defender, we recounted the Defender's argument as follows:

> Appellant also asserts that the Federal Defender is the counsel of her choice and its removal would be contrary to what she claims is a "right" to taxpayer-financed counsel of her choice. Appellant contends that the Federal Defender has protected her interests and advocated ably on her behalf, and that given its experience and competence in Pennsylvania state death penalty proceedings, it should be permitted to continue to represent her in Pennsylvania courts. Finally, with respect to the Commonwealth's concerns regarding the federal funding sources for the Federal Defender's forays into state court, appellant asserts that the Federal Defender is in full compliance with applicable federal administrative rules and regulations and has a separate source of funding to support its elective excursions into state court. Appellant does not attach or cite those rules and regulations.

*Id.* at 421–22, 16 A.3d at 490.

Ultimately, this Court held that, under our settled jurisprudence, we could not grant the Commonwealth's request to remove counsel and remand the matter; instead, the Defend-

er's default had waived Hill's issues. *Id.* at 427–29, 16 A.3d at 494–95. We also noted that:

> [I]n considering the Commonwealth's request to recalibrate our Rule 1925(b) jurisprudence, we are mindful of the significant potential for resulting mischief in capital cases. Delay can be an end in itself for some capital defendants. *See, e.g., Commonwealth v. Sam,* 597 Pa. 523, 952 A.2d 565, 577 (2008), *cert. denied,* —— U.S. ——, 130 S.Ct. 50, 175 L.Ed.2d 42 (2009). Manufacturing the requested exception would serve as an invitation to delay-minded counsel to deliberately flout the Rule, knowing that it would trigger the time-consuming process of remand, appointment of new counsel, filing a Rule 1925(b) statement, and preparation of a lower court opinion.

*Id.* Since all claims were waived and there was no basis to remand, there was no need for the Court to pass upon the Commonwealth's request to order the removal of the Defender, or its broader concern with federal judicial funding for these questionable endeavors.

A competent appellate lawyer without a global agenda, intent on having his client's issues actually heard on appeal, would **never** deliberately ignore a Rule 1925 order. But, the Defender is financed and positioned to strategize differently and globally. In Pennsylvania capital cases, the Defender routinely argues in federal *habeas* court that various Pennsylvania procedural default rules are arbitrarily applied, and therefore should be ignored. The reward, if the federal court accepts the argument, is *de novo* federal review, unimpeded by state court findings, and unimpeded by the federal *habeas* standard of review requiring deference to state court decisions. The result of this perverse system of incentives for professional capital counsel who ping-pong back and forth between state and federal courts, and who have seemingly inexhaustible federal resources and ample cases to choose from, is an opportunity and incentive to feign that they do not know how to comply with state procedural rules, *see Steele,* 961 A.2d at 834–38 (Castille, C.J., joined by McCaffery, J., concurring); and in the process attempt to generate "uneven"

procedural default rulings by the state courts. Then, counsel will proceed to argue in federal court that the particular default rule should be ignored in **all** cases. The state response, faced with continuing federal criticism that our procedural rules have too much discretionary flexibility to be considered legitimate expressions of state sovereignty, is to adopt less flexible rules. *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1150 (2008) (Castille, C.J., joined by McCaffery, J., concurring) ("The threat of dismissive federal responses to flexible state procedural rules can lead to state legislatures and courts adopting ever-more inflexible rules.").

But, for those with the luxury to pursue a global agenda, this refinement does not end the incentive to create disruption in state court; it just requires a shift in strategy. Faced with a clear, simple, and known rule such as Appellate Rule 1925, counsel can ratchet up the stakes by deliberately engaging in the most overt of defaults, daring the state court to apply its "inflexible" Rule. If the state devises an exception, the Defender will then proceed to federal court, in all cases involving Rule 1925 waivers and say; "Aha, they do not always follow the default; you may ignore it and consider my claims *de novo*."

Recently, and thankfully, the U.S. Supreme Court has issued unanimous decisions in cases which operate to reduce the incentive for counsel such as the Defender to pursue this ploy. As I explained in my recent concurrence in *Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431, 439 n. 1 (2011):

Significantly, since *Steele* was decided, the U.S. Supreme Court has issued unanimous decisions in two federal *habeas corpus* cases involving state prisoners, including *Beard v. Kindler*, 558 U.S. ——, 130 S.Ct. 612, 175 L.Ed.2d 417 (2009), a Pennsylvania capital case, which should significantly diminish the incentive for counsel to try to sow inconsistencies and confusion in state court procedural rulings, in an effort to lay the groundwork for a later federal *habeas* claim that state court procedural defaults should not be honored. "In a recent decision, *Beard v. Kindler*, 558 U.S. ——, 130 S.Ct. 612, 175 L.Ed.2d 417 (2009), this Court clarified that a

state procedural bar may count as an adequate and independent ground for denying a federal *habeas* petition even if the state court had discretion to reach the merits despite the default." *Walker v. Martin,* — U.S. ——, ——, 131 S.Ct. 1120, 1125, 179 L.Ed.2d 62 (2011). The *Walker* decision built upon and significantly expanded *Kindler,* making it clear that a state procedural default rule need not be invoked in every case in order for the rule to be deemed adequate.

These corrective decisions came too late to spare this Court the time and energy that was expended in cases like *Steele, Hill,* and *Paddy.*

The Defender has also burdened this Court with improper appeals in serial capital PCRA appeals, thereby building in delay in cases which should be proceeding to resolution in federal court. For example, in *Commonwealth v. Abdul–Salaam,* 606 Pa. 214, 996 A.2d 482 (2010), a case, like *Bracey,* involving the murderer of a police officer, the defendant had already litigated his direct appeal and two PCRA appeals and was currently litigating a federal *habeas* petition. The Defender then filed a facially untimely, third PCRA petition, but deceptively labeled it, leading to the lower court taking no action. The Defender attempted a procedural maneuver, filing a *"Praecipe* for Entry of Adverse Order Pursuant to Pennsylvania Rule of Appellate Procedure 301 D & E" and a contemporaneous Notice of Appeal (from the *praecipe* ) to this Court. These pleadings feigned outrage with the PCRA court's "inexplicable delay" and "inaction" with regard to Abdul–Salaam's disguised claims. The maneuver was improper and disingenuous: no adverse order had ever been issued (as the Defender well knew) that could be formally "entered;" the contemporaneous notice of appeal denied the PCRA court of jurisdiction to issue and enter any such order; and the Defender never made a request for a ruling before filing its improper snap judgment.

This Court quashed the bogus Defender appeal, deeming it improper because the PCRA court had no opportunity to address the merits and issue a final and appealable order; we

recognized that "the Appellant's *praecipe* and appeal are not remotely supported by the terms of the rule he invoked, or the facts of this case. There was no basis or justification for this transparent procedural maneuver." *Id.* at 485–88. More to the point, we added:

This Court is not naïve. We do not discount the possibility that appellant's misleading characterization of his serial PCRA petition was designed to create confusion, and to set the stage for the very maneuvering and inherent delay that followed. It is also not lost upon this Court that appellant's maneuvering purported to deprive the court below of jurisdiction at the very moment he first forwarded his supposed complaint about the matter not being decided promptly. Although appellant cited [Appellate] Rule 301(d), he obviously had no intention of permitting the court or the Commonwealth to address his supposed concern, since he took his "appeal" immediately. Appellant's maneuvering has succeeded in building-in a year's delay in the disposition of his serial PCRA petition. We do not condone the tactic.

*Id.* at 488. The decision in *Abdul–Salaam* required more time and effort, expended by this Commonwealth's highest Court, occasioned by deceptive, unprofessional, and frivolous conduct by the Defender.

Another dubious appeal in a case involving a serial PCRA petition is currently pending before the Court in *Commonwealth v. Porter*, 557 CAP. Following submission of that case on the briefs, we directed the parties to file supplemental briefs because there was an obvious jurisdictional issue. Our order reads as follows:

AND NOW, this 13th day of October, 2010, it appearing that a colorable issue of jurisdiction is implicated in this appeal, which has not been addressed by the parties, the parties are directed to file supplemental briefs addressing the following:

Whether the lower court's order dismissing appellant's present serial PCRA claim under *Brady v. Maryland*, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963), without also disposing of appellant's long-pending serial PCRA claim

under *Atkins v. Virginia*, 536 U.S. 304 [122 S.Ct. 2242, 153 L.Ed.2d 335] (2002), was an appealable final order? In briefing the jurisdictional question, the parties should address these necessarily included points:

(a) whether a PCRA petitioner may "amend" a pending serial petition to add an entirely new serial claim;

(b) whether, instead, a new serial claim comprises a new and separate petition under the terms of the PCRA;

(c) whether a PCRA court has authority to pass upon a new serial claim where a prior PCRA petition has been held in stasis; and

(d) whether a serial PCRA petition may properly be held in stasis to allow for federal review of different claims already litigated in state court.

The Defender, per Billy Nolas, has responded that the lower court's order was not an appealable final order. And yet, the Defender took the appeal. But, what is more remarkable is the record in *Porter*, which reveals the federal/state logjam the Defender's litigation strategy has created in that case. At the September 25, 2007 hearing on appellant's 2006 *Brady* "amendment" petition, Nolas stated that the PCRA court was holding appellant's 2002 *Atkins* serial petition "in abeyance," awaiting the outcome of the federal *habeas* cross-appeals by Porter and the Commonwealth, which were pending in the Third Circuit. *Commonwealth v. Porter*, N.T., 9/25/07, at 12. The following exchange occurred among the court, Nolas, and the assistant district attorney ("ADA"), after the court announced its intention to dismiss the new *Brady* petition:

Court: I am denying the PCRA petition on the grounds that it is not timely and it does not meet the requirements for *Brady* material.... Are there any other reasons?

Nolas: This is a separate issue before the Court pertaining to *Atkins*[ ] in our submission that [appellant] has mental retardation.

Court: I didn't deal with that.

\* \* \*

Nolas: That's before the Court. If you don't deny that today, what's wrong with taking [Mr. Gentile's] deposition [in furtherance of the *Brady* claim]?

Court: The two don't mix together. . . .

\* \* \*

Court: Is that issue [*Atkins* ] before the Third Circuit?

Nolas: It is not before the Third Circuit.

Court: So that's squarely with me?

Nolas: Yes, Your Honor. I know Your Honor held it in abeyance because the Third Circuit reversed the death sentence and the Commonwealth is appealing that and [appellant is] appealing the denial of relief of the guilt phase from the Third Circuit. So I think the reasoning before was holding in [ ] abeyance to see what the Third [C]ircuit would do because if there's no death sentence then there's no point in us doing an *Atkins.*

Court: So there is no death sentence. All it is is an appeal?

ADA: Yeah, exactly. So I was going to suggest that you send 907[ [8]] notice [dismissing without a hearing] just on the after discovered evidence slash *Brady* claim. And we'll specify that that's the claim that you are denying today and then we'll leave in abeyance to the *Atkins* to hear from the Third Circuit.

Court: Let me see if I understand this. The Third Circuit has already taken the death penalty off the table.

Nolas: No, Your Honor. The District Court granted relief to [appellant] on an instructional error in the penalty phase. The Commonwealth appealed that to the Third Circuit. That appeal is pending [sic] the Third Circuit along with an appeal from us arguing [other issues].

Court: So the death penalty is still on the table?

Nolas: It's still on the [t]able potentially, yes.

\* \* \*

ADA: I misspoke.

8. Pa.R.Crim.P. 907.

Nolas: And that's why we asked Your Honor to look at the *Atkins* issue.

Court: It appears that from what I read he won on the death penalty issue.

Nolas: He just won a new penalty phase from the District Court which is subject to the Commonwealth's appeal and may be subject to resentencing down the road. They didn't take the death penalty off the table.

Court: When will that issue be resolved?

**ADA: They are waiting for us.**

**Nolas: They were waiting for Your Honor to decide on the [new *Brady*] issue**....

Court: Okay. That's all. They [the Third Circuit] are not counting on me to deal with the *Atkins* issue? [Both counsel respond in the negative.]

**Court: So I just need to do a 907 with respect to the *Brady* claim and timeliness issue surrounding the [filing].**

**Nolas: And I think I have to object to that because that's strange. You have a proceeding before the Court with two claims that are being raised. And I guess with a 907 notice we'd restate our objections and file a notice of appeal and then you have no jurisdiction, so it's a non-process.**

Court: What are you suggesting I do?

Nolas: I suggest you let us do [Mr. Gentile's] deposition [*i.e.*, drag out the disposition of the time-barred *Brady* claim].

**Court: We are beyond that. What are you suggesting that I do, rule on *Atkins* ?**

**Nolas: I don't think you can rule on *Atkins*. I don't know I haven't seen that process before, so I think I have to object.**

N.T., 9/25/07, at 12–15 (emphasis supplied).

Nolas's argument respecting the PCRA court's power to

decide was straight out of "Catch–22." [9] He argued that the PCRA court: (a) could not dismiss the serial *Brady* claim (a new PCRA claim that led Nolas to secure a federal stay of the *habeas* appeals pending in the Third Circuit) without also ruling on the pending *Atkins* petition; and (b) could not rule on the *Atkins* claim, because the court somehow lacked authority to do so, and Nolas would have to object. So, according to Nolas, the PCRA court could act on neither "claim," and counsel had already succeeded in having the federal *habeas* appeals held **until** the PCRA court acted on the *Brady* claim. Then, Nolas appealed the non-final order. This Defender strategy assured a *de facto,* perpetual stay of execution.

It bears mentioning that the argument advanced by Nolas that the PCRA court in *Porter* lacked power to rule on *Atkins* was frivolous. There is no basis in the PCRA or any other governing rules or law to hold serial PCRA petitions in abeyance; and there most certainly is no basis in law to hold a PCRA petition in stasis merely to permit the petitioner to seek federal *habeas* relief. Likewise, Nolas's earlier argument that there was "no point" in deciding the serial *Atkins* issue until the Third Circuit decided other, already-exhausted, non-*Atkins* claims is baseless. The appeals before the Third Circuit in *Porter* will not eliminate the *Atkins* claim. If the district court's grant of relief on a perceived penalty phase instructional error is reversed, Porter's death sentence will stand. If the determination is affirmed, the Commonwealth is free to seek the death penalty in a new proceeding. Either way, it is a capital case and the *Atkins* issue must be decided.

Not once, by the way, did Nolas forward the Defender's new-found concern with delay while ensuring delay in both judicial systems in *Porter,* instead telling each court it could not act. The very same group—the Defender—engaged in these shenanigans in *Porter* and then forwarded the "court can't manage its docket" complaint in *Dougherty.* These are the sorts of abuses that keep us from addressing all of the Defender's over-maximum briefs simultaneously in their other cases, and rendering decisions according to their schedule.

9. *See* JOSEPH HELLER, CATCH-22 (1961).

But, there is more. Another case cited by the Defender in the *Dougherty* federal pleading as an example of this Court's incapacity is *Commonwealth v. Banks,* Nos. 461, 505, and 578 CAP, which also prominently features Billy Nolas. *Banks* concerns narrow issues of competency to be executed, and is a case in this Court's plenary jurisdiction. This Court is well familiar with the record in *Banks.* Nolas's strategic maneuverings in *Banks,* including but not limited to forwarding unauthorized motions before our masters to impede the Commonwealth's expert's examinations of Banks, caused numerous, lengthy periods of delay; and in addition, required this Court to step in on multiple occasions and assure that the fair hearing we had ordered would be held, consistent with our directive. *Commonwealth v. Banks,* 596 Pa. 297, 943 A.2d 230, 239 (2007) (*per curiam* ) ("[W]ith the exception of scheduling and logistical matters, the trial court is not to be diverted by tangential motions and assertions by counsel: **this** Court retains jurisdiction over such matters. The trial court is to act expeditiously in conducting the rehearing."); *Commonwealth v. Banks,* 603 Pa. 435, 984 A.2d 937 (2009) (*per curiam* ) ("AND NOW, this 10th day of December 2009, the Motion for Notice of Evaluations by Commonwealth Experts [filed by Nolas] is DENIED. The Commonwealth's mental health evaluations and the competency hearing ordered by this Court are to be conducted as expeditiously as possible. No extraneous delays shall be permitted."). To put an end to the abuse, we finally directed that: "This matter, involving a necessary hearing to pass upon a single important issue, and remanded for an expeditious determination, once again has inexplicably been delayed. The significant delay has continued to hamper this Court's ultimate disposition regarding petitioner's competency to be executed, a question over which we continue to retain plenary jurisdiction.... Any motion or argument from either party, that seeks or would occasion further delay, is to be made directly to this Court; and the pendency of any such motion is not to be forwarded, referenced, or accepted as a ground for delaying the proceedings below." *Commonwealth v. Banks,* 605 Pa. 322, 989 A.2d 881, 882–83 (2010) (*per curiam* ).

The foregoing is but a sampling. Much of this Court's time has been taken up with the Defender's strategic diversions. The Defender obviously has no fixed position on delay. When delay advances their global litigation strategy, they do their best to grind state courts to a halt, as with their prolix pleadings and abusive briefing in this case, and their more extreme conduct and/or misconduct in cases like *Banks*, *Abdul–Salaam*, and *Bracey*. When faux outrage about the delays their overall strategy necessarily induces serves their purpose, they forward that claim, accusing Pennsylvania courts of incompetence or laziness, their argument unencumbered by concerns for accuracy, honesty, and candor.

This is what federal judicial financing of the Defender's state court litigation strategy has wrought in Pennsylvania. When the families of murder victims, and other concerned citizens, ask why there is no effective death penalty in Pennsylvania, the dirty secret answer is: ask the federal court. And if the federal court fails to reply, you may want to ask your U.S. Senators and Representatives.

–II–

Given the Defender's recent rolling out of the back-end of its global litigation strategy—claiming that the decisional delays that their abusive tactics necessarily induce give rise to some right to preferential decisional time-frames and/or a right to immediate *de novo* review in federal court—it is time for this Court to take formal measures to ensure quicker decisions in capital PCRA appeals. To curb the rampant abuses in this case and other cases, I would:

(1) Direct the Supreme Court Prothonotary to immediately reinstate a briefing limit of 70 pages in capital PCRA appeals, with no exceptions absent: (a) a showing of extraordinary circumstances; and (b) the explicit concurrence of the Commonwealth.

(2) Direct the Supreme Court Prothonotary to amend briefing notices to advise parties that: (a) substantive arguments and sub-arguments are not to be set forth in footnotes or

other compressed texts, such as block quotes or single-spaced bullet points, since such practices facilitate violation of the restrictions on the length of briefs; and (b) arguments set forth in such fashion will not be considered. I would also refer the matter to the Appellate Procedural Rules Committee to recommend changes to our Rules to curb these abuses, including: (a) limitations on the number of words in a brief, such as are found in the Federal Rules, and (b) required certification from counsel that the brief is compliant.

(3) Make referrals to the Criminal Procedural Rules Committee and the Appellate Procedural Rules Committee to consider measures that will lead to the more efficient disposition of capital PCRA appeals including, but not limited to: (a) whether procedural rules can and should be adopted to provide for the operation of unitary review as envisioned by the General Assembly in the Capital Unitary Review Act ("CURA"), 42 Pa.C.S. §§ 9570–9579, consistent with the concerns outlined in *In re Suspension of Capital Unitary Review Act*, 554 Pa. 625, 722 A.2d 676 (1999) (explaining suspension of CURA); (b) whether it is possible and advisable to adopt a limited issue certification process in capital PCRA appeals, similar to the provision in the federal *habeas corpus* statute, *see* 28 U.S.C. § 2253, which should curtail the pursuit of frivolous and implausible claims, without impeding the federal *habeas* exhaustion requirement. *See In Re: Exhaustion of State Remedies in Criminal and Post–Conviction Relief Cases*, No. 218 Judicial Administration Docket No. 1 *(per curiam )* (May 9, 2000); and (c) whether the current role of volunteer federal counsel is appropriate, and whether such counsel may properly be precluded from participation in state collateral proceedings.

Justice McCAFFERY joins this opinion and Justice ORIE MELVIN joins Part II of this opinion.

Justice SAYLOR, concurring.

I join Sections 6, 7, 8, 10, 12, 14, 17, 18, and 20 of the majority opinion, concur in the result with regard to the

balance of the opinion, and offer the following comments arranged in conformity with the designated sections of the majority opinion.

## Guilt Phase

### 2. Waiver of Right to Counsel

As to the waiver of right to counsel, a main thrust of Appellant's claim is that his counsel failed to conduct an adequate guilt-phase investigation and, therefore, left him with a Hobson's choice of proceeding with unprepared counsel or representing himself. *See* Brief for Appellant at 13–15.

At the outset, on review of this record, it appears to me that the attorney put a great deal of time, effort, and thought into the representation of his client, particularly with regard to the penalty phase. *See* Majority Opinion, at 122–29, 18 A.3d at 306–11. It seems equally clear, however, that he conducted a very limited guilt-phase investigation. For example, the following interchanges with the attorney occurred in the post-conviction proceedings:

Q. [B]ased upon the Commonwealth's discovery, you did not conduct an independent investigation?

A. I think there's some truth to that, yes.

\* \* \*

Q. You said that you considered the evidence of the Commonwealth to advise the defendant to plead guilty. Is that all you considered in giving your advice to Mr. Spotz?

A. No.

Q. What else did you consider in giving that?

A. I though he was an unpersuasive witness.

\* \* \*

Q. [D]o you recall why or why not you may have [decided against representing Appellant at trial through separate attorneys at the guilt and penalty phases of trial]?

A. Because I think the major effort, frankly, was at the penalty phase.

\* \* \*

Q. When it came time for—when you were in the pretrial stage, did there come a time in which you indicated to Mr. Spotz what defense you wanted to present at the guilt phase?

A. No. My counsel to Mr. Spotz was to plead guilty, not to put forward a defense at the guilt phase. It was not a position that he appreciated.

Q. Was it after that that he indicated that he wanted to represent himself?

A. Yes.

N.T., May 10, 2007, at 230; N.T., May 11, 2007, at 31; *id.* at 28–29; N.T., May 10, 2007, at 175.

Moreover, counsel confirmed that there was no investigation relative to an intoxication/diminished capacity defense and, had there been evidence of drug intoxication, such an investigation should have been pursued. *See* N.T., May 10, 2007, at 229. The attorney's decision not to pursue the line of inquiry was in tension with his testimony that he understood that Appellant's extensive drug use on the day of his Cumberland County offenses was well established. *See* N.T., May 11, 2007, at 20.

Counsel's explanation for foregoing a guilt-phase investigation into the possibility of diminished culpability was:

I guess I was persuaded by the Commonwealth's evidence of Mr. Spotz's behavior starting in Harrisburg with the apparent abduction and withdrawal of money from a bank, the driving of a car from there to Carlisle, the shopping at a sporting goods store. In all of that, I was not receiving any information of impairment.

\* \* \*

You asked me yesterday whether I pursued an intoxication defense, . . . and I did not. So either as a defense or in mitigation the fact that he was flying high on drugs on the day of the event, I did not put that forward.

I'm not certain that that would have a mitigating effect to the jury, and I'm not certain insofar as the question you asked me yesterday that being high on cocaine has the same

intoxication effect as to be an intoxication defense. I suspect that's why that was not investigated at the guilt phase. N.T., May 10, 2007, at 230; N.T., May 11, 2007, at 20.

I appreciate that—in light of the multiple murders committed during Appellant's crime spree, as well as the brutal calculation apparent in the kidnapping and killing of Ms. Amstutz—the attorney's task relative to both guilt and penalty was daunting. Nevertheless, given the limited options and the strong evidence of contemporaneous drug use, it does seem to me that the possibility of an intoxication defense should have been investigated. While I agree with counsel's reservations about the likelihood that a jury would consider voluntary intoxication as reducing Appellant's culpability in the circumstances, counsel very plainly was faced with a limited range of options in any event.

I join the majority's holding on this point, primarily because I agree that Appellant has not established that a further investigation concerning the degree of his intoxication would have impacted his own decision-making as to his waiver. *See* Majority Opinion, at 53–54, 18 A.3d at 264–66.

I also believe counsel should have investigated the allegations regarding Charles Carothers' potential involvement in the killing of Ms. Amstutz. *See* Majority Opinion, at 59–61, 18 A.3d at 268–70 (setting out the background and allegations relative to Carothers' involvement with Appellant in the relevant time frame). I am persuaded, however, that counsel's assessment that the hearsay evidence produced from fellow prisoners implicating Carothers in the killing was not sufficiently trustworthy to warrant admissibility. *See* N.T., May 10, 2007, at 230–39. Furthermore, it would appear to me that, much like the evidence of voluntary intoxication, the evidence of Carothers' involvement was a two-edged sword in any event. For example, one of the prisoners testified on post-conviction that, before she was killed, Ms. Amstutz had been placed in the trunk of her car while Appellant and Carothers were "riding around" and "getting high." *See id.* at 98. These were appalling details which the jurors did not hear but

could very well have encountered had the prisoners testimony been admitted into evidence at trial. Moreover, the other prisoner's accounts were internally inconsistent in material respects. For instance, while in some accounts the prisoner implied that Carothers said Appellant was incapacitated when Ms. Amstutz was killed, in another he had said he "heard Carothers saying how he and Spotz pulled [Ms. Amstutz] out of the car and dumped her along the side of the road[.]" *Id.* at 32 (quoting the prisoner's statement dated April 3, 1996).

In light of Appellant's involvement in two previous calculated killings of female victims whose vehicles he had also seized within the past two days, it seems to me to be very unlikely that jurors would have believed that it would have been his intention to ever release Ms. Amstutz.

Finally, I respectfully disagree with the majority to the degree it suggests that a defendant's reasons for exercising a right to self-representation are irrelevant in a waiver colloquy. *See* Majority Opinion, at 53 n. 12, 18 A.3d at 265 n. 12. The *Starr* decision, cited by the majority, strongly confirms that a trial court may not substitute its own judgment for that of the defendant. *See Commonwealth v. Starr,* 541 Pa. 564, 583–85, 664 A.2d 1326, 1336–37 (1995). I do not read *Starr,* however, as preventing the court from probing the defendant's reasons to evaluate the rationality of the decision and to determine, for example, whether some dereliction on the part of counsel has contributed to it. *Cf. James v. Brigano,* 470 F.3d 636, 644 (6th Cir.2006) (explaining that "the choice between unprepared counsel and self-representation is no choice at all"); *United States v. Silkwood,* 893 F.2d 245, 248 (10th Cir.1989) (establishing a rule prevailing in the Tenth Circuit that, "[f]or the waiver to be voluntary, the trial court must inquire into the reasons for the defendant's dissatisfaction with his counsel to ensure that the defendant is not exercising a choice between incompetent or unprepared counsel and appearing *pro se* "). While I am aware of no federal constitutional requirement that a court inquire into a defendant's reasons, *accord United States v. Robinson,* 913 F.2d 712, 716 (9th Cir.1990), I see no reason to dissuade such inquiry.

### 4. Prosecutor Misconduct During Guilt Phase Closing Argument

I differ with the majority's decision that Appellant's claims in this category are "trivial" and "frivolous." Majority Opinion, at 76, 77–78, 18 A.3d at 278, 279. In particular, understanding the prosecutor's justifiable frustration with Appellant's performance in his self-representation, I do not believe it was proper for him to relate such performance to Appellant's crimes or to personalize the matter with the jury by asserting an attempt on the part of a *pro se* litigant to "fool you." N.T., May 15, 1996, at 94. I also differ with the majority's speculation that "[t]here is no question that, if appellate counsel had invoked the relaxed waiver doctrine in an attempt to obtain review of the above comments, we would have declined to grant such review." Majority Opinion, at 77, 18 A.3d at 279. In this regard, I do not believe, in the relevant time period, the Court was widely exercising its discretion to deny relaxed-waiver review on direct review in capital cases.

In the end, however, in light of the trial court's instructions concerning the remarks of counsel, and although I would disapprove some of the prosecutor's comments, I find that Appellant has not established that they "had the unavoidable effect of undermining the neutrality of the jury so as to preclude the rendering of a true verdict." *Commonwealth v. Kennedy*, 598 Pa. 621, 634, 959 A.2d 916, 923–24 (2008) (setting forth the prevailing standard of review relative to claims of prosecutorial misconduct).

### 6. Prior Criminal Acts Evidence and Jury Instructions

As noted, I join the majority's reasoning and disposition on this claim. I would only add that I strongly agree with the wide majority of other jurisdictions which have concluded that a contemporaneous instruction on the limited use of prior-bad-acts evidence is the preferred practice. *See, e.g., Lesko v. Owens*, 881 F.2d 44, 56 (3d Cir.1989); *United States v. Cuch*, 842 F.2d 1173, 1177 (10th Cir.1988); *People v. Heard*, 187 Ill.2d 36, 240 Ill.Dec. 577, 718 N.E.2d 58, 72 (1999); *People v. Abernathy*, 402 Ill.App.3d 736, 341 Ill.Dec. 737, 931 N.E.2d

345, 361 (2010); *State v. Angoy,* 329 N.J.Super. 79, 746 A.2d 1046, 1052–53 (App.Div.2000) ("[A] prompt delivery of limiting instructions, either before, simultaneously with, or immediately after, the admission of other crimes evidence is preferable, and-unless there is some compelling reason to do otherwise-should be standard procedure followed by trial courts in all cases."); *cf. Lott v. State,* 98 P.3d 318, 335 (Okla.Crim.App. 2004) (indicating that a trial court "must issue contemporaneous and final limiting instructions").

## Penalty Phase

### 9. Burglary Convictions as an Aggravating Factor

I support the majority's holding on this question, as I have in and since *Commonwealth v. King,* 554 Pa. 331, 369–70, 721 A.2d 763, 782–83 (1998), based on precedent. I note only that Appellant's references to the substantially more lenient approach reflected in the two-strikes sentencing law, *see* Majority Opinion, at 86–87, 18 A.3d at 285 n. 25, demonstrate that this Court does not always apply a narrowing construction to aggravating circumstances in death-penalty cases. *Cf. Commonwealth v. Mitchell,* 588 Pa. 19, 84, 902 A.2d 430, 469 (2006) (Saylor, J., concurring) ("I believe that an unnecessarily broad construction of provisions of the death penalty statute renders the statute vulnerable to constitutional attack.").

### 11. Prosecutorial Comments During the Penalty Phase

Although I support the PCRA court's conclusion that "[n]othing stated by the prosecutor was so prejudicial that the jury was incapable of rendering a true verdict," *Commonwealth v. Spotz,* CP–21–CR–0794–1995, *slip op.* at 54 (C.P. Cumberland, June 26, 2008), I have reservations about the majority's categorical dismissal of Appellant's concerns here. While it is true that this Court has indicated that it is permissible for a prosecutor to "disparage" mitigation evidence proffered by a defendant, *see* Majority Opinion, at 97–98, 18 A.3d at 291–92, certainly a prosecutor may not deny there is some mitigating effect of the circumstances the Legislature expressly has denominated as mitigating, nor may he

inject unfair prejudice into the proceedings. Thus, as with many other issues, assessment of these types of claims involves matters of degree and not mere categorization. Notably, moreover, some other jurisdictions have taken a more restrictive approach to overt denigration of a mitigation case. *See, e.g., Williamson v. State,* 994 So.2d 1000, 1014 (Fla.2008) (highlighting that the Florida high court has "long recognized that a prosecutor cannot improperly denigrate mitigation during a closing argument"). To the degree we continue to see prosecutorial arguments implying that no weight should be afforded by jurors to statutorily-prescribed mitigators and/or approaching the boundaries of fairness, it seems to me advisable to consider a similar approach.

### 13. *Simmons* "Life Means Life" Instruction

I support the majority's holding on this claim solely in light of this Court's holding that *Kelly v. South Carolina,* 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002), is to be applied only prospectively. *See Spotz,* 587 Pa. at 92–93, 896 A.2d at 1245–46. I specifically disassociate myself from the *dictum* concerning *Kelly's* application to this pre-*Kelly* case, *see* Majority Opinion, at 115–17, 18 A.3d at 302–03, with which I have material differences.

Finally, in light of the assertions in Mr. Chief Justice Castille's concurrence, some of which I have previously supported, I believe that a referral to our lawyer disciplinary apparatus is warranted. This would permit the named attorneys to respond, and it would provide a foundation for the imposition of any appropriate sanctions.